

# ENTERED

**TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET**



**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed November 17, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **VALLECITO GAS, LLC,** | § | **CASE NO. 07-35674-BJH-11** |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| **HARVEY L. MORTON, as Chapter 11** | § | |
| **Trustee of Vallecito Gas, LLC,** | § | |
| | § | |
| Plaintiff, | § | **ADV. PRO. 10-3039-BJH** |
| - against - | § | |
| | § | |
| **TOM D. KIEVIT, et al.,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a motion for partial summary judgment (the "Motion") filed by Harvey

L. Morton, Chapter 11 Trustee (the "Trustee") of the estate of Vallecito Gas, LLC ("Vallecito" or

"the Debtor"). In the Motion, the Trustee seeks summary judgment on only Count 1 of his complaint, and solely against one defendant, Joel Pugh ("Pugh"). The Court has core jurisdiction over this adversary proceeding and the Motion in accordance with 28 U.S.C. §§ 157 and 1334. This Memorandum Opinion contains the Court's findings of fact and conclusions of law regarding the Motion in accordance with Federal Rule of Bankruptcy Procedure 7052.

This dispute has a complicated factual and procedural history, some of which is more fully set forth in (i) the Court's Memorandum Opinion and Order dated August 29, 2008 in Adversary Proceeding No. 08-3132-BJH (the "Tiffany Adversary Proceeding"), (ii) the court-approved disclosure statement in Vallecito's bankruptcy case (Docket No. 203 in Case No. 07-35674-BJH-11), and (iii) the Court's Amended Order Relating to Order to Show Cause (Docket No. 351 in Case No. 07-35674-BJH-11. However, an abbreviated recitation of some of the factual and procedural background of the present dispute is necessary, to which we now turn.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Prior to its bankruptcy filing, Vallecito purchased a mineral lease, located on the land of the Navajo Nation in San Juan County, New Mexico, from Tiffany Gas Co., LLC ("Tiffany") known as the "Hogback Lease." Suffice it to say that on the date of Vallecito's bankruptcy filing, there were several competing claims to the Hogback Lease, asserted in litigation pending in other fora, and the status of Vallecito's title to the Hogback Lease was less than clear. Most importantly to the resolution of the Motion, after it received the Hogback Lease from Tiffany but before its bankruptcy filing, Vallecito executed an assignment of the Hogback Lease to Briggs-Cockerham, LLC ("B-C"),

which entity held 100% of the membership interests in Vallecito.[1] The validity and/or effect of that assignment, which shall be referred to herein as the "B-C Assignment," is the primary issue before the Court in the Motion. As detailed below, the validity of the B-C Assignment has never been judicially determined because the Trustee, the Court, and all parties-in-interest in the Vallecito bankruptcy case believed, until recently, that B-C, while once claiming an interest in the Hogback Lease, had disclaimed any such interest in open court during the course of a Vallecito hearing; and thus, B-C no longer asserted any interest in the Hogback Lease.[2]

Also prior to its bankruptcy filing, Vallecito entered into several participation agreements with Arcturus Corporation ("Arcturus") that involved certain of Vallecito's oil and gas properties (but not the Hogback Lease) and disputes had arisen between these parties. Specifically, Arcturus sued Vallecito and others in July of 2006 in the 298th Judicial District of Dallas County (the "Arcturus Litigation"). In April of 2007, the judge in the Arcturus Litigation entered a temporary injunction (the "Arcturus Injunction") against Vallecito and Briggs, an indirect principal of Vallecito. The Arcturus Injunction provided that

> Vallecito and Briggs, their affiliates, agents, servants, employees, and representatives are hereby commanded forthwith to desist and refrain from accessing, spending, diverting, selling, or transferring, or otherwise disposing of any of their assets (of any kind) and any funds within their actual or constructive possession or control . . . and

---

[1] On the Petition Date, the membership interests in B-C were held 50% by Michael Briggs ("Briggs") and 50% by John Cockerham ("Cockerham").

[2] B-C is not the party currently arguing that the B-C Assignment is valid; Pugh is. However, the undersigned judge has been assigned to preside over the bankruptcy case recently filed by B-C, and a review of its schedules discloses that B-C claims as personal property on Schedule B "[t]he entire gross working interest (100%), together with all rights and appurtenances, granted to Debtor under Navajo Lease No. 1-89-IND-5." The B-C schedules also assert ownership of "claims and causes of action against Henry [sic] Morton, Chapter 11 Trustee of the estate in *In re Vallecito LLC* (Case No. 07-35674-BJH), relating to the adjudication of the Debtor's interest in Navajo Lease No. 1-89-IND-58," and claims against Briggs and Cockerham "for damages arising out of or relating to the purported "disclaimer" of the Debtor's interest in Navajo Lease No. I-89-IND-48 . . . ." *See* Amended Schedule B, Docket No. 28 in E.D. Tex. Case No. 10-41219-11.

**Memorandum Opinion and Order** 3

from altering, erasing, or otherwise destroying any and all records that relate to the $1,920,000 they received from Arcturus and its investors, such that all of Vallecito's and Briggs' funds and assets are hereby frozen, and Vallecito and Briggs are hereby restrained from disposing of any of their funds and assets until the final trial on the merits in this case.

The Arcturus Injunction was still in place when Vallecito filed its bankruptcy case on November 14, 2007 (the "Petition Date"). And, as discussed more fully below, the Arcturus Injunction was still in place on the date that B-C purportedly assigned a 5% overriding royalty interest in the Hogback Lease to Pugh.

Shortly after the Petition Date, Arcturus moved for the appointment of a Chapter 11 Trustee for Vallecito. After a hearing on that motion, the Trustee was appointed and began to take steps to marshal the assets of the Vallecito bankruptcy estate. In March of 2008, the Trustee filed a "Motion for Contempt, Sanctions and Appointment of Receiver Against Michael Briggs, Individually" (the "Motion for Contempt"), which was ultimately heard on April 17, 2008. In addition, in order to resolve the competing claims to the Hogback Lease, the Trustee filed an agreed motion for mediation, which was agreed to by many of the competing claimants to the Hogback Lease.[3] *See* Docket No. 117 in Case No. 07-35674-BJH-11. At the April 16, 2008 mediation, a settlement was reached with many, but not all, of the parties claiming an interest in the Hogback Lease.

The Trustee also separately settled the dispute between Arcturus and Vallecito, conditioned upon confirmation of a Chapter 11 plan embodying the terms of his settlement and consummation of such a plan.

As noted earlier, the mediation did not resolve all disputes with all of the competing claimants

---

[3] The parties asserting interests in the Hogback Lease who agreed to mediation were the Trustee, B-C, Briggs, Barrons Resources, LLC, Harold O'Connor, Sandia Development & Consulting Services, Inc., Phillip John Burle, and Mary Clare Moser.

**Memorandum Opinion and Order**                                                                                     **4**

to the Hogback Lease – specifically, it did not resolve disputes with B-C and Briggs, who also claimed ownership of the Hogback Lease. Instead, the Motion for Contempt, which alleged various violations of both the Arcturus Injunction and the Bankruptcy Code, proceeded to hearing the day after the mediation (April 17, 2008). In the midst of that hearing, the parties requested a brief recess and, at the conclusion of the recess, announced that they had reached a settlement. The Trustee placed the terms of the settlement on the record. As is relevant here, one of the terms of the settlement was that "Mr. Briggs, Mr. Cockerham, Briggs-Cockerham, LLLC [sic] are releasing any and all claims they have to anything in the Vallecito estate, including any claims to the Hogback lease and any sale can go forward without they [sic] objection. And they're waiving all of their claims and any assets in Vallecito, including ones if we discover any." Transcript 4/17/08, p. 74:12-18. This "disclaimer" was the source of the Trustee's (among others') belief, until recently, that B-C no longer claimed an interest in the Hogback Lease.

The results of the mediation, the settlement with Arcturus, and the settlement with and "disclaimer" by Briggs, Cockerham, and B-C were thought to remove a further, but not the last, impediment to a liquidation of the Hogback Lease for the benefit of Vallecito's creditors. The last apparent impediment, a dispute with Tiffany over an alleged forfeiture of the Hogback Lease by Vallecito, matured in May of 2008 when Tiffany filed an adversary proceeding against the Trustee seeking a determination that Vallecito had forfeited its rights to the Hogback Lease. In short, Tiffany asserted that the purchase and sale agreement between the parties required Vallecito to obtain approval of the transfer from Tiffany to Vallecito by the Bureau of Indian Affairs ("BIA") by a date certain, that Vallecito (now a Chapter 11 debtor) had failed to timely obtain such approval, and therefore Tiffany was entitled to a return of the Hogback Lease upon its repayment of the purchase

price previously paid to it by Vallecito. On August 29, 2008, the Court entered its Memorandum

Opinion and Order on the Trustee's motion for summary judgment, in which the Court concluded,

as a matter of contract interpretation, that Tiffany was not entitled to a forfeiture of the Hogback

Lease. Tiffany appealed the Court's Memorandum Opinion and Order (the "Tiffany Appeal").[4]

Thus, with the exception of the Tiffany Appeal, all of the apparent impediments to

confirmation of a plan that would liquidate the Hogback Lease for the benefit of Vallecito's creditors

were thought to have been removed. Accordingly, the Trustee proposed the First Amended Plan of

Liquidation for the Debtor (the "Plan"). Essentially, the Plan provided that the Hogback Lease would

be sold to Vision Energy, LLC ("Vision") in exchange for approximately $6.6 million in cash, subject

to certain terms and conditions, with the proceeds to be distributed in accordance with the various

settlements with the relevant parties, who agreed to disclaim their alleged interests in the Hogback

Lease in order to permit the sale to Vision to occur. One of the conditions to the Plan becoming

effective, and the closing of the sale to Vision, was that the Tiffany Appeal be resolved in the

Trustee's favor. Another was that the conveyance of the Hogback Lease would be finalized pursuant

to an asset purchase agreement that would provide, among other things, for the sale of 100% of the

working interest and net revenue interest in the Hogback Lease, subject only to the royalty interest

of the Navajo Nation, and that except for the Navajo Nation, all other interests in the Hogback Lease,

including but not limited to those of B-C, Briggs, Cockerham, Vallecito, and other named settling

---

[4] On June 29, 2009, United States District Judge Godbey affirmed this Court's order. *See* Docket No. 10 in Case No. 3:08-CV-1936-N. Tiffany appealed Judge Godbey's decision to the Fifth Circuit. However, in March, 2010, the Trustee and Tiffany settled the appeal on terms which required the estate to pay Tiffany $95,000 in full and final satisfaction of any claims Tiffany has arising out of or related to the Vallecito case, and Tiffany agreed to dismiss the Tiffany Appeal upon receipt of that payment. *See* Order Granting Mot. To Approve Compromise and Settlement Pursuant to Fed. R. Bankr. P. 9010 [sic] with Tiffany Gas Co., LLC (Docket No. 384 in Case No. 07-35674-BJH-11).

**Memorandum Opinion and Order**                                                                 **6**

parties, would be extinguished upon the transfer of the Hogback Lease to Vision. The Plan was confirmed by Order entered on March 17, 2009 (the "Confirmation Order"). Due to the continued pendency of the Tiffany Appeal, the Plan was not consummated.

In December of 2009, another obstacle to consummation of the Plan and the sale to Vision became apparent. Specifically, the Trustee filed a pleading alleging that despite the April 17, 2008 "disclaimer" of any interest in the Hogback Lease by Briggs, Cockerham, and B-C, Briggs

> acting on behalf of Briggs-Cockerham LLC, has purported to sell overriding royalty interests in the Hogback Lease (collectively the "ORRI Interests") to third-parties. Briggs not only purported to sell previously undisclosed ORRI Interests in the Hogback Lease prior to the Vallecito Bankruptcy, but continued to do so post-petition. Even more disturbing, Briggs sold ORRI Interests and executed ORRI Interests months *after* he disclaimed any interest in the Hogback Lease in open court . . . Based on information provided to the Trustee, it appears throughout 2008, after Briggs' disclaimed all interest in the Hogback Lease, Briggs continued to communicate with, upon information and belief, approximately 30 people that may have purportedly purchased ORRI Interests in the Hogback Lease from Briggs-Cockerham LLC. In these communications, Briggs advised these individuals the Hogback Lease, among other things, was: (1) owned by Briggs-Cockerham LLC; (2) Briggs-Cockerham LLC was obtaining drilling permits for wells on the Hogback Lease; (3) Briggs-Cockerham LLC was days away from starting to drill on the Hogback Lease, even sending pictures of drilling rigs purportedly en route to New Mexico for drilling; (4) Briggs was making trips to Europe and China purportedly to obtain funding for the Hogback Lease development; and (5) Briggs allegedly had entered into contracts for production of Helium on the Hogback Lease.

Trustee's Expedited Mot. For Order to Show Cause as to Why Michael Briggs, Briggs-Cockerham LLC and Joel Pugh Should Not be Held Contempt [sic] and Sanctioned (Docket No. 329 in Case No. 07-35674-BJH-11)(the "Motion for Order to Show Cause"), pp. 2-3. The Court granted the Motion for Order to Show Cause, and issued its Order to Show Cause on December 23, 2009. *See* Docket No. 338 in Case No. 07-35674-BJH-11.

**Memorandum Opinion and Order**                                                                 **7**

At a hearing held on February 1, 2010 on the Order to Show Cause, Briggs did not appear.[5] The Trustee proceeded with his evidence, and after hearing the evidence, the Court found, among other things, that (i) the Arcturus Injunction "remains in force today and has at all times since April 27, 2007," (ii) during the April 17, 2008 hearing, Briggs, Cockerham, and B-C "disclaimed any and all interest in Vallecito, including, but not limited to, any interest in the Hogback Lease," (iii) Briggs received relevant notices of the Arcturus Injunction and the Plan, (iv) Briggs "made a myriad of transfers of interests in the Hogback Lease after the entry of the [Arcturus Injunction] purporting to transfer overriding royalty interests in the Hogback Lease," and (v) the transfers were made in knowing and direct violation of the Arcturus Injunction.  Amended Order Relating to Order to Show Cause (Docket No. 351 in Case No. 07-35674-BJH-11), ¶¶ 9, 16, 21, 22 and 23.

On March 9, 2010, the Trustee filed the above-captioned adversary proceeding against the persons to whom Briggs transferred overriding royalty interests ("ORRIs") in the Hogback Lease in violation of the Arcturus Injunction.  As is relevant here, the Trustee alleges, and it is undisputed, that on November 1, 2008, B-C purported to assign an undivided five percent ORRI in the Hogback Lease to Pugh.  Not only was this transfer made by B-C in violation of the Arcturus Injunction, it was made *after* B-C had "disclaimed" any interest in the Hogback Lease in open court during the Vallecito bankruptcy case.  It is this transfer to Pugh that is the subject of the Motion.

In his complaint, the Trustee alleges that (i) any assignment of the Hogback Lease requires

---

[5] The Court notes that the Order to Show Cause originally scheduled the hearing for January 22, 2010. Briggs requested time to obtain counsel and indicated that he would not appear on January 22, 2010. Accordingly, the Court continued the hearing to February 1, 2010 and directed certain service upon Briggs of the re-set hearing. The Trustee duly served Briggs with notice of the February 1, 2010 hearing.  On the morning of the February 1, 2010 hearing, Briggs responded to an email by the Trustee asking for his counsel's contact information.  In that email, Briggs (1) stated that he still did not have counsel, (2) asked that the hearing be re-scheduled again, (3) stated that he would not appear, and (4) stated that if he were required to appear, he would decline to answer questions on Fifth Amendment grounds.  *See* Tr. 2/1/10, 6:15-19.

the approval of both the Navajo Nation and the United States Secretary of the Interior (through the Bureau of Indian Affairs (the "BIA")), and that an assignment is not valid without such approvals; (ii) as of June 18, 2008, the Trustee had obtained all necessary approvals for the assignment from Tiffany to Vallecito and, as a result, Vallecito owns the Hogback Lease; (iii) the pre-petition B-C Assignment was never submitted to, or approved by, either the Navajo Nation or the BIA and, therefore, the B-C Assignment is "void ab initio as a matter of law;" and (iv) Briggs's transfers on behalf of B-C of ORRIs to the defendants, which were done in violation of the Arcturus Injunction, "are void and transferred no right, title or interest in the Hogback Lease as Briggs-Cockerham LLC had no right, title or interest to transfer." Compl., ¶ 110.

As is relevant here, the Trustee's first cause of action seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that Pugh's ORRI is void or voidable.[6] Specifically, the Trustee alleges that (i) the Hogback Lease is property of the Vallecito bankruptcy estate, (ii) because the B-C Assignment was never approved by the Navajo Nation and the BIA it is void as a matter of law, (iii) because the B-C Assignment is void, B-C had no interest in the Hogback Lease to transfer to Pugh, and (iv) because Pugh had knowledge of Vallecito's bankruptcy case as early as January 2008, had actual knowledge of the Confirmation Order in March 2009, and failed to appeal the Confirmation Order, Pugh's post-petition recording of his ORRI on June 16, 2009 is subject to avoidance pursuant to 11 U.S.C. §§ 362, 544 and 549. Accordingly, the Trustee seeks: (i) a determination that Pugh's

---

[6] 28 U.S.C. § 2201(a) provides that "in a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." As such, declaratory judgment actions are permissive, not mandatory, and a court need not provide declaratory judgment relief on request. Rather, the matter is left to the court's discretion. *In re Mirant Corp.*, 327 B.R. 262 (Bankr. N.D. Tex. 2005).

**Memorandum Opinion and Order**                                                                                        **9**

purported interest in the Hogback Lease is void and/or voidable; (ii) a determination that Pugh has

no right, title or interest in the Hogback Lease, and (iii) an order enjoining Pugh from asserting any

interest in the Hogback Lease arising out of any interest received from B-C and directing Pugh to

execute any and all documents to address any purported title issues as a result of Pugh's claims.  The

Trustee has moved for summary judgment on his first cause of action, which Pugh has opposed.

## II.   LEGAL ANALYSIS

While certain of the issues raised by the parties are novel issues addressing the intersection

of statutes and regulations relating to assignments of interests in Indian land and the Bankruptcy

Code, other issues are more straight-forward and can be disposed of easily.  The Court will address

the easier issues first.

### A.   Is Pugh Bound by the Confirmation Order?

The Trustee argues that Pugh has no interest in the Hogback Lease because Pugh had actual

notice of the Confirmation Order and is therefore bound by its terms pursuant to 11 U.S.C. § 1141.

According to the Trustee, since the Confirmation Order authorized the sale of the Hogback Lease

free and clear of all liens, claims and encumbrances, and Pugh never appealed the Confirmation Order,

Pugh is bound by its terms.[7]  In response, Pugh argues that: (i) 11 U.S.C. § 1141 does not apply,

since he was not a creditor of Vallecito, and (ii) the Trustee may not use 11 U.S.C. § 1141 to

effectively invalidate his ORRI, since that relief is only available through an adversary proceeding,

---

[7] The Confirmation Order further directs that "[a]ll persons that are presently, or on the Effective Date may be, in possession of some or all of the Hogback Assets are hereby directed to surrender possession of the Hogback Assets to the Purchaser on the Effective Date."  The Court notes that the Effective Date, as defined in the Plan, has not yet occurred.  Paragraph 15 of the Confirmation Order also says that "[u]pon consummation of the . . . sale [to Vision], all persons holding any lien, claim, interest or encumbrance against or in the Debtor, the Hogback Lease or the Hogback Assets of any kind or nature whatsoever are prohibited from asserting, prosecuting or otherwise pursuing such lien, claim, interest or encumbrance against the Purchaser, the Hogback Lease or any of the Hogback Assets."  The Court also notes that the sale to Vision has not been consummated yet.

citing *In re Mansaray-Ruffin*, 530 F.3d 230 (3rd Cir. 2008), which held that confirmation of a plan did not invalidate a lien where the lienholder failed to object to confirmation, because the debtor had not filed an adversary proceeding to invalidate the lien.

At the outset of its analysis, the Court notes that there is a factual dispute as to when Pugh had knowledge sufficient to require him to act to protect his rights in the Vallecito case, if ever. The Trustee asserts that Pugh (i) was listed as a creditor and received all notices in the Vallecito bankruptcy case, (ii) admitted at his deposition that he received the Confirmation Order in March 2009, and (iii) knew that the Plan authorized the Trustee to sell the Hogback Lease free and clear of liens, claims or encumbrances. In contrast, Pugh asserts that (i) the first time he learned that the Trustee was asserting that Vallecito holds title to the Hogback Lease free and clear of his ORRI was in December, 2009, when the Trustee filed his motion for contempt; (ii) he had no reason to believe that he held a claim against Vallecito, since he took his assignment from B-C, not Vallecito; and (iii) he was not listed as a creditor of Vallecito on Vallecito's schedules and/or matrix; rather, an entity he had an interest in was so listed.

Although there may be a factual dispute, it is simply immaterial to the legal issue presented by the Motion. The Court agrees with Pugh that § 1141 of the Bankruptcy Code does not apply here since Pugh, individually, was not a creditor of Vallecito. The Trustee initially argued that Pugh was "listed as a creditor in the Vallecito Bankruptcy." *See* Motion, p. 19. However, as Pugh pointed out, a review of the schedules and claims register shows that Pugh, individually, was not listed in Vallecito's schedules, and that Pugh, individually, did not file a proof of claim in Vallecito's bankruptcy case. The Trustee now argues that because Vallecito's schedules show that an entity called "EPMC" was a Vallecito creditor, and its address is listed as "c/o Joel Pugh," Pugh can be

bound by the Confirmation Order in his individual capacity.  The Trustee cites no authority for such

an interpretation of the breadth of § 1141(a).

The Court disagrees with the Trustee's legal contention.  While EPMC is certainly bound by

the Confirmation Order pursuant to § 1141(a), because Pugh was not a creditor of Vallecito §

1141(a) cannot serve as the basis for a conclusion that Pugh's interest in the Hogback Lease was

adversely affected by confirmation of the Plan.  *See* 11 U.S.C. § 1141(a) ("the provisions of a

confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring

property under the plan, and any creditor, equity security holder, or general partner in the debtor");

*see also In re Cross Media Marketing Corp.*, 367 B.R. 435 (Bankr. S.D.N.Y. 2007 (defendants who

were not creditors nor parties in interest in a chapter 11 case were not bound by chapter 11 plan).[8]

### B.    Is the B-C Assignment Void?

#### 1.    Recording is Irrelevant to Title Creation Issues.

In addition to arguing that because the B-C Assignment has never been approved by either

the BIA or the Navajo Nation it is therefore void (which will be addressed below), the Trustee

attempts to preemptively respond to what he perceives Pugh's arguments to be.  The Trustee asserts

that "Defendant Pugh, like all other putative holders of ORRIs received from [B-C], want to rely on

the fact that they recorded their respective assignments in the San Juan County Register of Deeds."

---

[8] The Court acknowledges that in certain narrow instances, entities which are not creditors may nevertheless be bound by confirmation of a chapter 11 plan, but finds none of those situations present here. For example, the Bankruptcy Code itself contemplates that *future* creditors may be enjoined from taking legal action with respect to their claims under certain circumstances. *See, e.g.*, 11 U.S.C. § 524.  By way of further example, confirmation of a plan operates as a final judgment, and all questions that could have been raised that pertain to the confirmed plan are barred by the doctrine of *res judicata* as to parties and those in privity with them.  8 Collier on Bankruptcy, ¶ 1141.02[4] (16th ed. 2010).  However, on this summary judgment record, the Trustee has not made any showing of privity between Pugh and EPMC or established the elements of the doctrine of *res judicata* as to Pugh.

Motion, p. 15. The Trustee then argues that recording is irrelevant, because (i) under New Mexico's Constitution, Indian tribes are not subject to the laws of the State in which they are located, and (ii) New Mexico's recording statute is preempted by federal statutes and regulations regarding transfers of Indian land. Although not explicitly so stating, the Trustee implies that because the federal regulations regarding transfers of interests in Indian land are so pervasive, they preempt state recording systems.

In response, Pugh asserts that federal law does *not* preempt New Mexico's recording statutes because the case law makes clear that the federal regulations applicable to Indian land are "internal to the federal government," such that the obligations to record "falls on the shoulders of the BIA, not the party acquiring an interest in Indian land." Pugh's Opp. To Pltf's Mot. for Partial Summ. J., p. 18 ("Pugh's Opposition"). In other words, Pugh asserts that the federal regulations regarding the recording of transfers of interests in Indian land are *internal* governmental regulations and are therefore not pervasive or intended to preempt state recording statutes. Pugh also submitted the affidavit of Richard C. Tully ("Tully"), a licensed attorney in New Mexico who practices oil and gas law and has experience with title searches in New Mexico, including those on Navajo land and involving the transfer of oil and gas leases. In his affidavit, Tully states that there are two parallel chains of title that should be searched to determine title for oil and gas leases on Indian land – the county records and the records of the U.S. Bureau of Land Management ("BLM"). Tully further states that: (i) it is industry practice to record title documents in both places, (ii) due to delays in BIA approval (which can take years), the county records are generally more current and accurate, and (iii) it is very unusual for the filings in the county records to exactly match the filings with the BIA at a specific point in time. Tully concludes that the county records are therefore "considered paramount

and it is an industry practice to rely on the county records rather than the BIA or Indian tribe records." Tully Aff., p. 2.

Again, there may be a fact issue with respect to the recording of assignments of oil and gas leases, and even disputed issues of law with respect to whether New Mexico's recording statutes have or have not been preempted or where interests in Indian land should be recorded. However, the Court does not find those factual and legal disputes to be material to resolving the Motion. From the Court's perspective, these issues are simply irrelevant. Recording statutes are intended to protect those having subsequent dealings with real property, and have the effect of imputing notice by record to those who are bound to search for it. *Romero v. Sanchez*, 492 P.2d 140 (1971). The effect of recording an instrument affecting title to real property is to put the world on notice of the existence and contents of those documents, and to determine the priority of interest of competing lienholders. *In re Beltramo*, 367 B.R. 825 (Bankr. D.N.M. 2007). Recording does not have the effect of creating or conveying title.

The Court therefore agrees with the Trustee that Pugh's recording of his ORRI is irrelevant here, but not for the reasons alleged by the Trustee. In fact, the Court is at a loss to understand the Trustee's argument that Pugh's recording of his ORRI has any effect – one way or the other – on the validity of the B-C Assignment (which occurred several years prior to that recording).

Similarly, the Court is at a loss to understand Pugh's argument, in response to the Trustee's argument that the Hogback Lease is property of the estate (but not in response to the Trustee's argument that the B-C Assignment is void), that the Hogback Lease was *not* property of the estate on the Petition Date because, in part, Vallecito assigned the Hogback to B-C pre-petition, and the B-C Assignment was properly recorded in San Juan County pre-petition. If the B-C Assignment is

invalid for some reason, neither the recording of it, nor Pugh's recording of his ORRI, saves the B-C Assignment. As noted previously, the recording of an assignment does not affect title one way or the other; recording merely gives notice to third parties.

> **2.      The Title Status Report is Irrelevant Here and § 544 Does Not Apply to the Transfer to Pugh.**

The Trustee next argues that Pugh lacks an interest in the Hogback Lease because "Pugh is bound by the Title Status Report, showing that the Hogback Lease is owned by Vallecito Gas, LLC . . . [and] the Trustee is entitled to avoid the Pugh Transfer pursuant to 11 U.S.C. § 544(a)(3) . . . ." Trustee's Mot. For Partial Summ. J. Against Def. Joel Pugh, pp. 23-25. Without citation to a single case, the Trustee argues that: (i) federal regulations make clear that all title documents must be submitted to the appropriate Land Titles and Records Office for recording, (ii) the relevant Land Titles and Records Office for the Hogback Lease has provided a Title Status Report which "unequivocally states that the title to the Hogback Lease is in Vallecito Gas, LLC, subject only to the Navajo Nation's Royalty Interest", and (iii) the Title Status Report "conclusively demonstrates that the Pugh Assignment has never been recorded in the Land Titles and Records Office." Trustee's Motion for Partial Summ. J. Against Def. Joel Pugh, p. 23-4. The Trustee then argues that: (i) since § 544(a)(3) gives the Trustee the status of a hypothetical bona fide purchaser ("BFP"), (ii) a BFP could rely on the Title Status Report and buy the Hogback Lease free and clear of Pugh's interest (because Pugh's interest does not appear on the Title Status Report and has not been recorded with the Land Titles and Records Office), (iii) he can therefore avoid the transfer to Pugh pursuant to § 544(a)(3), and (iv) he is entitled to a summary judgment declaring that Pugh has no interest in the Hogback Lease.

Pugh responds by arguing, among other things, that his interest was obtained *post-petition*,

**Memorandum Opinion and Order**                                                                          **15**

and thus the Trustee cannot use the "strong-arm" powers under § 544 to avoid it, as § 544 may only be used to avoid pre-petition transfers. For the reasons explained more fully below, the Court agrees.

The Trustee can only succeed here if § 544(a)(3) applies to both pre-petition and post-petition transfers. And, while there is conflicting case law with respect to this issue, the Court concludes that the majority, and better, view is that § 544 may only be used to avoid pre-petition transfers. *In re Troutman Enters., Inc.*, 356 B.R. 786 (6th Cir. BAP 2007) (Table, text in Westlaw, unpublished disposition); *In re Branam*, 247 B.R. 440 (Bankr. E.D. Tenn. 2000); *In re Schneiderman*, 251 B.R. 757 (Bankr. D.C. 2000); *In re Blastein*, 244 B.R. 290 (Bankr. E.D. Pa. 2000); 5 Collier on Bankruptcy ¶ 544.01 (16th ed. rev.) ("these section 544(a) powers and section 544(b) powers are limited by their terms and may not be used by the trustee to avoid postpetition transfers. Avoidance of postpetition transfers is governed by section 549"). First, the language of the two sections differs in a very significant, if facially slight, manner. Section 544(a) provides that "the trustee . . . may avoid any transfer of *property of the debtor*"; § 549(a) provides that "the trustee may avoid a transfer of *property of the estate* . . .". It is the commencement of the bankruptcy case that creates the estate to which § 549 refers and vests property of the debtor in the estate. *See* 11 U.S.C. § 541(a). Secondly, the few cases which permit § 544 to target post-petition transfers have done so without due regard for the significant difference in statutory language between §§ 544 and 549. Instead, they have relied upon general equitable principles without much analysis. *See, e.g., In re Guillot*, 250 B.R. 570, 601 (Bankr. M.D. La. 2000) ("courts routinely opine that § 544(a) has no applicability to post-petition transfers . . . [w]e differ from the courts who relegate § 544(a) to pre-petition transfers, because, we think, § 549 simply does not work to give the trustee any relief in this proceeding, but § 544(a) does. We see the two sections working together . . .").

Because § 544(a) does not apply to the transfer at issue here, it cannot serve as the basis for a conclusion that Pugh lacks an interest in the Hogback Lease.

### 3. Is the Hogback Lease Property of the Vallecito Estate; Is the B-C Assignment Void due to a Lack of BIA and Navajo Nation Approval?

The Trustee next argues that the Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date and that the B-C Assignment is void because neither the Navajo Nation nor the BIA has approved it. And, according to the Trustee, because B-C had no interest in the Hogback Lease (because the B-C Assignment is void), B-C could transfer nothing to Pugh. Pugh responds that the B-C Assignment is fully enforceable between the parties to it – *i.e.*, Vallecito and B-C – and, when that assignment is accorded its proper effect, the Hogback Lease was not property of the Vallecito bankruptcy estate on the Petition Date. Because these issues are intertwined, the Court will consider them together.

The starting point in the Trustee's analysis is Vallecito's interest in the Hogback Lease on the Petition Date. The parties agree that Vallecito purchased the Hogback Lease from Tiffany prior to the Petition Date. And, according to the Trustee, while Vallecito had not yet received BIA approval on the Petition Date, Vallecito had an interest in the Hogback Lease on the Petition Date subject to the satisfaction of one contingency – *i.e.*, BIA approval (which was received post-petition).[9] Looking to the broad definition of the phrase "property of the estate" in § 541 of the Bankruptcy Code, and the case law indicating that the phrase is to be given the "broadest possible definition," the Trustee argues that, at a minimum, the Debtor had an equitable interest in the Hogback Lease on the Petition Date. The Trustee also argues that the B-C Assignment (executed pre-petition from Vallecito to B-

---

[9] Navajo Nation approval of the Tiffany sale to Vallecito was received pre-petition.

C) does not change this result because it is void for lack of either BIA or Navajo Nation approval.[10]

Pugh responds that Navajo Nation and/or BIA approval is not required in order to make the assignment valid as between the parties to the assignment. For the reasons set forth below, the Court agrees with Pugh.

The Secretary of the Interior and Commissioner of Indian Affairs are statutorily charged with the management of all Indian affairs. 25 U.S.C. §§ 1, 2. Section 2102 of title 15, United States Code, provides that any Indian tribe, subject to the approval of the Secretary of the Interior may enter into leases for the development of mineral resources on Indian land, and § 2107 provides that the Secretary of the Interior shall promulgate rules and regulations to facilitate the implementation of that right. One such regulation provides that

> an assignment of a minerals agreement, or any interest therein, shall not be valid without the approval of the Secretary and, if required in the minerals agreement, the Indian mineral owner. The assignee must be qualified to hold the minerals agreement and shall furnish a satisfactory bond conditioned on the faithful performance of the covenants and conditions thereof as stipulated in the minerals agreement. A fully executed copy of the assignment shall be filed with the Secretary within five (5)

---

[10] It has not gone unnoticed that the Trustee's current position is diametrically opposed to the position he took in the Tiffany Adversary. In the Tiffany Adversary, the Trustee vehemently argued that assignments that are not approved by the BIA or the Navajo Nation are still effective as between the parties. The Trustee asserted there that "[t]here is a subtle undercurrent that runs throughout Tiffany's claims that needs to be debunked at the outset. Specifically, Tiffany's argument is premised on the notion that because the BIA has not approved the Agreement it is void. This is wholly incorrect. In fact, the law is clear: as between Vallecito and Tiffany there is a valid, enforceable contract." *See* Tr. Mot. For Summ. J., Adv. Pro. No. 08-3132-BJH, p. 8. Tiffany, however, argued vehemently that the lack of BIA/Navajo Nation approval rendered the assignment void. In the present context, the Trustee literally cites to the Court the same two cases in support of his present position that Tiffany cited in opposing the Trustee in the Tiffany Adversary.

Pugh filed, on June 14, 2010, a motion under Rule 12(b)(6) premised in part on the ground that the Trustee should be judicially estopped from asserting that the B-C Assignment is invalid. The Court denied that motion, but only because the Court had not relied upon the Trustee's prior position – the Court entered judgment in the Tiffany Adversary as a matter of contractual interpretation, and thus did not reach the parties' arguments respecting the validity of an unapproved assignment. However, the Court finds the Trustee's fortuitous change of legal position troubling and ultimately concludes that the Trustee got it right the first time. *See infra* at pp. 19-26.

**Memorandum Opinion and Order**                                                                 **18**

working days after execution by all parties.  The Secretary may permit the release of any bonds executed by the assignor upon submission of satisfactory bonds to the Bureau of Indian Affairs by the assignee, and a determination that the assignor has satisfied all accrued obligations.

25 C.F.R. § 225.33.  The effect of this regulation is in dispute here.

In support of his argument that the B-C Assignment is void (or as the regulation puts it – not valid), the Trustee relies upon several cases, to which we now turn.  In *HCB Industries, Inc. v. Muskogee Area Director*, 1990 WL 321035 (IBIA  Mar. 28,1990), HCB Industries, Inc. ("HCB"), appealed a decision of the BIA declining to approve an assignment of a lease to HCB by Arrow Production Company ("Arrow"). The BIA declined to approve the assignment on the ground that the leases were being cancelled.  At some point *after* the assignment, the BIA had advised Arrow, but not HCB, that the leases had expired by their own terms over a year prior to the assignment.  On appeal, HCB argued that it had been denied due process, because it was not given notice of, or the opportunity to respond to, the BIA's determination that the leases had expired, since that notice had been given to Arrow but not to HCB.  HCB argued that because the BIA was on notice of the assignment from Arrow to HCB, it should have given notice to HCB.  The Board of Indian Appeals (the "Board") noted that the federal regulation governing assignments of leases of the type there at issue[11] provided that leases may be assigned only with the approval of the Secretary of the Interior, and that such approval had not been obtained.  The Board stated:

---

[11] The federal regulation at issue in the *HCB* case was 25 C.F.R. § 213.38(a), which governs the leasing of restricted lands of members of the Five Civilized Tribes for mining purposes.  In the present case, the Trustee relies on 25 C.F.R. § 225.33.  Although worded slightly differently, both regulations require the approval of the Secretary of the Interior for assignments of leases on Indian lands.  The Court notes that in the present case, the applicable federal regulation contains even stronger language than the regulation at issue in *HCB*.  The regulation at issue here, 25 C.F.R. § 225.33, provides that an assignment of a minerals agreement *shall not be valid* without the approval of the Secretary, while the federal regulation at issue in *HCB* merely required Secretary approval of assignments, without specifying any consequence from the failure to obtain such approval.

**Memorandum Opinion and Order**                                                                                      **19**

[HCB's] due process argument assumes that even though its lease assignments were not approved as required . . . it nevertheless acquired a property interest in the leases. [HCB] contends that because the Secretary has authority to approve a conveyance of trust or restricted lands retroactively, with approval relating back to the date of the execution of the attempted conveyance, its "title" is not void, but merely imperfect until approved. [HCB] cites *Lykins v. McGrath*, 184 U.S. 169 (1902), and *Pickering v. Lomax*, 145 U.S. 310 (1892), in support of this argument.  In *Wishkeno v. Deputy Assistant Secretary--Indian Affairs (Operations)*, 11 IBIA 21 (1982), the Board addressed retroactive approval of conveyances of trust or restricted lands. Retroactive approval is predicated on the requirement that "the transaction [be] fair in all respects," although the conveyance document was not properly presented to BIA for approval. *George Big Knife*, 13 L.D. 511, 515 (1891). As the Supreme Court has held, however, "[t]he doctrine of relation [back in retroactive approval of conveyances of trust or restricted lands] is a legal fiction, resorted to for the purpose of accomplishing justice." *Kendall v. Ewert*, 259 U.S. 139, 148 (1922). The doctrine of retroactive approval of conveyances of trust or restricted lands has no effect in the present situation. The doctrine provides that, under appropriate conditions and for equitable reasons, a conveyance that initially had no force or effect for failure to be approved may be revived through the application of a legal fiction. This does not equate with a finding that the initial unapproved conveyance actually passed some form of legal title or property interest to the grantee. Such a holding would be antithetical to the very essence of the statutory and regulatory proscriptions against the conveyance of trust or restricted lands without Secretarial approval. The Board has previously held that an unapproved conveyance of trust or restricted lands is void ab initio, has no force or effect, and grants no rights to either the attempted grantor or grantee. *Smith v. Acting Billings Area Director*, 17 IBIA 231, 235 (1989). Although *Smith* dealt with an initial lease of trust or restricted lands, the Board finds that the same rule applies to assignments. Because an assignment of a lease of trust or restricted lands is not effective until it has been approved, appellant acquired no interest in the leases and was not a party to them. Accordingly, appellant was not a person to whom BIA was required to give notice of actions affecting lease management and lacks standing to object to any such actions.

*HCB*, 1990 WL 321035 at *3.  The Board therefore dismissed HCB's appeal.

Similarly, in *Chisum v. Acting Muskogee Area Director*, 1996 WL 287746 (IBIA May 16, 1996), the BIA issued a notice to BKANS Oil, Inc. stating that a lease had expired for failure to produce oil in paying quantities.  The notice stated: "it is our understanding that this lease was sold and commercially assigned to Mr. Gerald Chisum . . . however, as this transfer of title was not

approved by the Secretary of the Interior, BKANS Oil, Inc. remains lessee of record." *Chisum*, 1996
WL 287746 at *1**.** The assignee, Chisum, sought review of the BIA's decision. The Board cited its
earlier *HCB* case to Chisum and gave Chisum a deadline to "show that he had standing to bring this
appeal." *Id*. Chisum did not respond, and the Board dismissed his appeal.

The Board of Indian Appeals has continued to cite to its own decision in *HCB*. *See e.g.,*
*Uinta Oil & Gas, Inc. v. Acting Phoenix Area Director*, 1994 WL 682956 (IBIA Nov. 4, 1994)
(dismissing appeal for lack of standing where appellant did not show BIA approval of an assignment
to it and thus failed to show "it had a valid interest in the lease"); *Pacific Enterprises Oil Co. v.*
*Muskogee Area Director*, 1994 WL 593093 (IBIA Oct. 20, 1994). In *Pacific Enterprises*, Pacific
Enterprises Oil Co. ("Pacific") appealed a BIA decision that an oil and gas lease had expired for
failure to produce oil in paying quantities. Pacific, the lessee of record, had been notified by the BIA
of its determination in May of 1994, and had also been notified that an appeal must be mailed within
thirty days. In September, Pacific filed its notice of appeal, and contended that the appeal should be
considered as timely filed in part because Pacific had sold and/or assigned its interest in the lease in
1985 and had instructed the assignee to obtain approval of that assignment from the BIA. The Board
dismissed the appeal as untimely, noting:

> [t]he lessee's duties do not end until the assignment is approved. [Pacific's] belief
> concerning what another person might have been informed and/or might have done
> does not support a finding that [Pacific] has no responsibility toward this lease based
> on an assignment . . . [Pacific] has not submitted any evidence or argument sufficient
> to warrant a finding that it is not the lessee of record for this lease; that it was not
> responsible for providing BIA with its current address; or that it should not be
> charged with receipt of a BIA letter sent to it at its address of record, and signed for
> at that location.

*Pacific Enterprises*, 1994 WL 593093 at *2.

In response to the Trustee's argument that the B-C Assignment is invalid and void ab initio, Pugh distinguishes these cases on the ground that each involved a dispute between one of the parties to the unapproved assignment and the government, and not a dispute between two private parties over the validity of an unapproved assignment as between them.  Pugh argues, citing *Wood v. Cunningham*, 147 P.3d 1132 (Ct. App. N.M. 2006), that this distinction is significant.  For the reasons explained more fully below, the Court agrees with Pugh.[12]

In *Wood*, a seller tried to rescind a purchase and sale agreement ("PSA") under which the seller sold its interest in oil and gas leases on Navajo land to the buyer.  The *Wood* court first noted that it was undisputed that the assignments of the oil and gas leases had to be approved by the BIA and the Navajo Nation.  The seller argued that such approval was a condition precedent to the effectiveness of the PSA.  In rejecting this argument, the *Wood* court first noted that the contract itself did not evidence such an intent.  There was no performance made contingent upon BIA approval; there was no deadline in the agreement for obtaining such approval.  And, because the lack of BIA approval resulted in no injury to the seller, the *Wood* court held that the seller could not rescind its sale.  The court further noted that the case before it was *not* a case in which *the buyer* was seeking rescission for a failure to receive good title.  In this context, the *Wood* court concluded that the purpose of BIA approval is to effectuate the fiduciary duty the United States owes to Indian tribes, and the PSA's validity or lack thereof for failure to obtain BIA approval was solely a matter between the buyer and the government.  However, as between *the parties to the agreement*, the lack of BIA approval did not render the PSA invalid or ineffective.

---

[12] Of course, it was the Trustee who was citing the *Wood* case to the Court in connection with the Tiffany Adversary, for the proposition that "the required approval by the BIA is to protect the Indian tribe not the parties to the Agreement."  *Trustee's Mot. For Summ. J.*, Adv. Pro. No. 08-3132-BJH, p. 9. *See supra*, n. 10.

Like the seller in *Wood*, here it is the assignor (Vallecito) who is seeking to hold its assignment invalid. And, as the *Wood* court noted, "the grounds generally available to the purchaser for rescission are not likewise available to the seller for that purpose." *Wood*, 147 P.3d at 1136.[13] In this context this Court would find it odd that Vallecito (or, more accurately, the Trustee – although he stands in Vallecito's shoes) could argue that its own assignment is invalid for lack of BIA approval, when BIA approval is required in order to protect *the Indian tribe*, not Vallecito. It makes perfect sense, therefore, that the government (*i.e.*, the BIA) can assert rights that the parties to the agreement cannot. *See also Chuska Energy Co. v. Mobil Exploration & Producing North America, Inc.*, 854 F.2d 727, 732 (5th Cir. 1988) ("That the Navajos or the Secretary of the Interior could have standing in federal court to challenge the assignment does not confer a similar right on non-tribal or

---

[13] The *Wood* court cited to two administrative appeals decisions of the Interior Board of Land Appeals as further support for its holding. While the Court finds the *Wood* decision persuasive, these other two cases are not terribly helpful here because neither directly addresses the validity of an unapproved assignment of Indian leases as between the parties to the assignment. Specifically, the *Wood* court cited to *Petrol Resources* Corp., 1982 WL 34736 (Bd. of Land Appeals, June 24, 1982) and *Frederick J. Schlicher*, 1981 WL 28612 (Bd. of Land Appeals, Apr. 10, 1981). In *Petrol Resources*, the Board of Land Appeals (which hears appeals relating to leases on federal, not Indian, land) held that it was error for the Bureau of Land Management to approve an assignment of a lease where the lease had previously been assigned to someone else, and in the course of doing so, noted that on the date of execution of an assignment, the assignment is effective as between the parties and all that remains is for the assignee to obtain government approval of the assignment. However, its statements are not very persuasive in the present context, because the *Petrol* court was *not* dealing with an Indian lease, where the Secretary of the Interior is given the right to approve leases in order to effectuate the fiduciary duty which the United States owes to the beneficiary Indian tribes. Instead, under the regulations at issue in the *Petrol* case, the Bureau of Land Management was statutorily permitted to refuse approval only for a lack of qualification of the assignee or for lack of a sufficient bond. Similarly, in *Schlicher*, the Board of Land Appeals framed the issue as whether an assignee is required to file an assignment with the Bureau of Land Management in order to be protected by a statute which said that "the right to cancel or forfeit for violation of any of the provisions of [the Mineral Leasing Act] shall not apply so as to affect adversely the title or interest of a bona fide purchaser of any lease . . . which . . . was acquired and is held by a qualified person . . . in conformity with those provisions, even though the holdings of the person . . . from which the lease . . . was acquired . . . may have been canceled or forfeited or may be or may have been subject to cancellation or forfeiture for any such violation." The *Schlicher* panel noted that the statute was designed to protect the equities of innocent purchases of federal oil and gas leases who acquire in good faith from the consequences of Mineral Leasing Act violations by predecessors in title, and thereby to foster the development of oil and gas on public lands. The panel held that the assignee could be protected under that statute even though the assignment had not yet been approved by the government, as approval by the government of the assignment had no bearing on the status of the assignee as a bona fide purchaser.

non-governmental litigants whom it was not designed to protect").

Similarly, in *Ganas v. Tselos*, 11 P.2d 751 (Ok. 1932), the court rejected an argument that an assignment of an interest in an oil and gas lease on Indian land was void for lack of approval of the Secretary of the Interior. The plaintiff in *Ganas* alleged that at the defendant's request, plaintiff drilled wells and operated oil and gas leases for the defendant, who had invested funds. The parties had an oral agreement whereby the plaintiff would operate the lease and pay its expenses and the defendant would receive the oil and gas proceeds, but when plaintiff's expenses reached a certain amount, the defendant agreed to assign a one-half interest in the lease to the plaintiff. The defendant thereafter argued that its agreement to assign the lease interest was void. After noting that the action before it was *not* an action to enforce specific performance of the agreement to assign, but rather an action seeking an accounting, the court held that a lessee of an oil and gas lease on Indian land may contract for the sale or disposal of the lease on the same terms as he might contract respecting an ordinary commercial lease. "If the proposed assignment be approved by the Secretary of the Interior, the conditions and terms of the contract for the sale thereof will be given the same effect as if the assignment had passed the title to the assignee at the time of execution and delivery." The *Ganas* court cited with approval the rule announced by the Eighth Circuit in *Hertzel v. Weber*, 283 F. 921 (8th Cir. 1922), which was that a lease of Indian land that had not been approved by the Secretary of the Interior was not void, and the Eighth Circuit's statement in *Hertzel* that "while such a contract was subject to approval by the Secretary of the Interior . . . it was not in violation of the act. The plaintiff had a right to the assignment as per the agreement, and it would then be a matter between the plaintiff and the Secretary of the Interior as to its approval." *Ganas*, 11 P.2d at 753. As announced by the *Hertzel* court, a general rule of statutory (and contractual) construction is that:

an act declared to be void by statute which is malum in se or against public policy is utterly void and incapable of ratification, but an act or contract so declared void, which is neither wrong in itself nor against public policy, but which has been declared void for the protection or benefit of a certain party, or class of parties, is voidable only and is capable of ratification by the acts or silence of the beneficiary or beneficiaries . . . Such an act or contract is valid until avoided, not void until validated, and it is subject to ratification and estoppel.

*Hertzel*, 283 F. at 928.[14]

The Court finds the *Wood, Ganas* and *Hertzel* cases persuasive.  Moreover, there is simply no policy reason to permit private parties who have negotiated their contract to escape the consequences of an otherwise valid assignment by asserting a statutory right enacted and designed to protect a class of persons to which they do not belong.  There is no assertion here that the B-C Assignment is invalid on any other ground.  Under New Mexico law, in order to effect a valid assignment, there must be evidence of an intent to assign the whole or part of some specific thing, debt, or chose in action, and the subject matter of the assignment must be described sufficiently to make it capable of being readily identified.  *Russell v. Texas Consol. Oils*, 120 F. Supp. 508 (D.N.M. 1954).  The B-C Assignment meets that standard and thus appears to be a valid assignment.  Had Vallecito and B-C wanted to negotiate an assignment that was conditioned upon BIA approval, they could have done so.  Having failed to include such a provision in their otherwise valid and binding

---

[14] The *Hertzel* case involved a lease by two Cherokee to third-party lessees.  The lease was made pursuant to a federal statute that originally allotted lands to the Cherokee, and it was approved by the Secretary of the Interior, as required by that statute.  The lease also contained a provision stating that no sublease or assignment could be made without the approval of the Secretary of the Interior and any such sublease or assignment would be void.  After the lease, the lessees reached a verbal agreement with Weber for drilling for oil and gas.  Weber allegedly made a further agreement with Hertzel respecting a division of the drilling expenses and oil and gas proceeds.  A dispute arose between Hertzel and Weber, and Hertzel subsequently purchased the leased lands from the Cherokee, and sued Weber in federal court seeking to evict him on the ground that the verbal agreement between the original lessees and Weber was void.  The Eighth Circuit rejected that argument, despite the requirement of the approval of the Secretary of Interior and the contractual language stating that unapproved assignments would be void.

assignment, neither party should be able to avoid being bound by their agreement by taking advantage of the regulations requiring BIA approval of that assignment. The purpose of the requirement that the BIA approve assignments of oil and gas leases on Indian land is "to effectuate the fiduciary duty the United States Government as trustee owes the beneficiary Indian tribes," *Wood*, 147 P.3d at 1136, not to protect private contracting parties from their own bargain.

For the reasons stated, this Court cannot conclude that the B-C Assignment is void ab initio, although it may be avoided if the Navaho Nation and/or the BIA fails to approve it. And, to the extent that the Motion seeks a declaration that Pugh's ORRI is void because the B-C Assignment is void (and therefore B-C had no title to transfer to Pugh), the Motion must be denied.

Having concluded that the B-C Assignment is valid as between Vallecito and B-C (and therefore Pugh (at least for now)), the ordinary result would be that the Hogback Lease was not property of the estate on the Petition Date, as it had been transferred away. *In re Onasni Property Group, LLC*, 425 B.R. 237 (Bankr. W.D. Pa. 2010) (rents which had been assigned pre-petition were not property of the estate); *In re Jones Const. & Renovation, Inc.*, 337 B.R. 579 (Bankr. E.D. Va. 2006) (debtor's pre-petition assignment of construction contract proceeds to surety prevented proceeds from becoming property of the estate); *In re Brooks*, 248 B.R. 99 (Bankr. W.D. Mich. 2000) (debtor's pre-petition assignment of right to receive payments under settlement agreement prevented payments from inclusion in property of the debtor's estate); *cf*, *Kapila v. Deutsch Bank AG (In re Louis J. Pearlman Enters., Inc.)*, 398 B.R. 59 (Bankr. M.D. Fla. 2008) (an individual's pre-petition transfer of all interests in a limited liability corporation to a bank without the consent of the majority of members in the LLC, which was required by the LLC's operating agreement in order to effectuate such a transfer, was void, such that no interest was in fact transferred to the bank and

thus the membership interests were property of the individual's bankruptcy estate on the petition date).

However, the B-C Assignment is no ordinary assignment.  As noted earlier, that assignment is required by federal law to be approved by the BIA.[15]  The Trustee and Pugh agree that such approval has neither been sought nor obtained.  In the words of the *Hertzel* court, the B-C Assignment is "valid until avoided."  *Hertzel*, 283 F. At 928.  It is this possibility of avoidance (if the BIA refuses to approve the B-C Assignment), that changes the outcome of the analysis as to whether the Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date.  Let me explain.

Under § 541(a) of the Bankruptcy Code, the Vallecito estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held."  11 U.S.C. § 541(a).  As legions of cases have stated, Congress's intent was to define "property of the estate" in the broadest possible sense.  *See, e.g.*, *In re* Graves, 609 F.3d 1153, 1156 (10th Cir. 2010); *In re Builders Transport, Inc.*, 471 F.3d 1178, 1185 (11th Cir. 2006); *In re Burgess*, 438 F.3d 493, 509 (5th Cir. 2006).  And, as legions of cases have stated, even contingent interests are property of the estate.  *See, e.g., In re Dittmar*, 618 F.3d 1199, 1207 (10th Cir. 2010) (an interest may be property of the estate even if it is novel or contingent); *In re McClain*, 516 F.3d 301 (5th Cir. 2008) (§ 541 brings into the estate all interests held by the debtor, even future, non-possessory, contingent, speculative and derivative interests); *In re Wick*, 276 F.3d 412 (8th Cir.

---

[15] The Trustee argues that approval by the Navajo Nation is also required, and Pugh does not appear to dispute that.  The regulation upon which the Trustee relies, 25 C.F.R. 225.33, requires approval of the Indian mineral owner only "if required in the minerals agreement."  The Court does not believe that either side has provided it with a copy of the original minerals agreement.

2002) (unvested options contingent on continued employment are property of the estate); *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993) ("every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within reach of section 541"). If the B-C Assignment is not approved by the BIA, title to the Hogback Lease would revert to Vallecito, the last party to hold title that had received such approvals.[16] Even a contingent, reversionary interest is included within the bankruptcy estate. *In re Graves*, 609 F.3d 1153 (10th Cir. 2010); *Askanase v. LivingWell, Inc.*, 45 F.3d 103 (5th Cir. 1995); *In re Spring Ford Indus., Inc.*, 338 B.R. 255 (E.D. Pa. 2006); *DCRI L.P. No. 2, Inc.*, 299 B.R. 146 (Bankr. N.D. Tex. 2003). For these reasons, and notwithstanding the B-C Assignment, the Court concludes that Vallecito retained a sufficient interest in the Hogback Lease to make it property of the estate on the Petition Date.

In coming to its conclusion that the Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date, the Court has considered and rejected several arguments made by Pugh. First, the Court rejected Pugh's argument that B-C's recording of the B-C Assignment in the San Juan County Clerk's office seven months prior to the Petition Date "is paramount in determining title in New Mexico of interest in Indian and other lands [and] [a]ccordingly, Briggs-Cockerham, not Vallecito, held legal and equitable title in the Hogback Lease on the Petition Date . . . ." *Pugh's Opposition*, ¶ 13. As noted earlier, while recording is relevant in determining priority between competing lien claimants, it does nothing to create title. Recording merely serves as evidence of title and provides notice of title to third parties. *See supra* at p. 14. Second, the Court rejected Pugh's argument that because Vallecito did not obtain BIA approval of the assignment from Tiffany until

---

[16] Neither side has provided any evidence, or briefed the issue, as to what happens if the BIA does not approve the B-C Assignment. Logic dictates, however, that if the BIA refuses to approve the B-C Assignment, it will at that point be invalid and therefore Vallecito will be the full and rightful holder of the Hogback Lease.

after the Petition Date, Vallecito did not hold title on the Petition Date.  *See Wood v. Cunningham*,

147 P.3d 1132, 1136 (Ct. App. N.M. 2006) ("if the proposed assignment be approved by the

Secretary of the Interior, the conditions and terms of the contract for the sale thereof will be given

the same effect as if the assignment had passed the title to the assignee at the time of its execution and

delivery") (*quoting Ganas v. Tselos* 11 P.2d 751, 753 (Ok. 1932). Third, the Court rejected Pugh's

argument that Vallecito's failure to schedule the Hogback Lease as an asset of its estate on the

Petition Date precludes it from being property of the estate under § 541.  The fact that Vallecito may

have taken the position on the Petition Date that the Hogback Lease was not its property is not

conclusive as to its actual interest in that lease.  Vallecito may well have had reasons for failing to

schedule its interest in the Hogback Lease unrelated to its honest belief as to the property's character.

Debtors fail to schedule assets all the time, whether through inadvertence, mistake, or nefarious intent

to hide property from their creditors.  Fourth, for the same reason, the Court rejected Pugh's

argument that the fact that the Trustee later sought to have B-C "disclaim" any interest in the

Hogback Lease affects its character as property of the estate on the Petition Date.  The Trustee has

always taken the position that the Hogback Lease was property of the Vallecito estate.  The Trustee's

desire to obtain a "disclaimer" from Briggs, Cockerham, and B-C was no doubt the result of a belt-

and-suspenders approach and a recognition that B-C claimed, at the time, an interest in the Hogback

Lease by virtue of the B-C Assignment.  Finally, the same may be said with respect to the Trustee's

inclusion of provisions in the Plan and the Confirmation Order purporting to require a transfer "back"

to Vallecito from B-C.

　　　　For all of these reasons, the Court concludes that the B-C Assignment is not void ab initio and

that the Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date.

**Memorandum Opinion and Order**                                                                                    **29**

### C.    Is Pugh's ORRI Invalid due to the Lack of Navajo Nation Approval?

Next, the Trustee asserts that Pugh lacks an interest in the Hogback Lease, citing § 605(A)(6)

of the Navajo Nation Code.  That section provides:

> No overriding royalty may be created by any transfer authorized hereby without the consent of the Minerals Department of the Navajo Nation nor shall such overriding royalty be approved if it is determined by the Minerals Department that it will have such an adverse economic impact that it may prevent full recovery of the mineral resources.

18 N.N.C. § 605(A)(6).  As evidence that the Navajo Nation has never consented to the Pugh ORRI,

the Trustee points to a Title Status Report for the Hogback Lease, issued by the Division of Land

Titles and Records in Albuquerque, New Mexico, *See* Tr. Ex. J.

The Trustee's argument fails on summary judgment for several reasons.  First, the Trustee has

not established through evidence or citation to any legal authority that the conveyance of an

overriding royalty interest, if made, would appear on a Title Status Report issued by the Division of

Land Titles and Records.  Without any such authority, the Court is unable to find as a factual matter

that the Navajo Nation has not consented to the Pugh ORRI.[17]  In making his argument, the Trustee

appears to rely heavily on 5 U.S.C. § 5 and the federal regulations implementing that statute.  Section

5 of title 5, entitled "Record of deeds by Indians *requiring approval,"* (emphasis added) provides that

the Commissioner of Indian Affairs

is hereby empowered and directed to continue to make and keep a record of every

---

[17] Pugh did not respond in any fashion to the Trustee's argument that ORRIs require the consent of the Navajo Nation.  Pugh does, however, assert that the BIA does not approve or disapprove ORRIs, citing 25 C.F.R. 211.53, which implies that the government would not maintain records of conveyances of ORRIs.  However, the case Pugh cites for the proposition that the BIA's recording of leases with the Bureau of Land Management is not applicable to ORRIs, *i.e. Emerald Outdoor Adver., LLC*, 444 F.3d 1077, 1083 (9th Cir. 2006) does not discuss ORRIs at all.

> deed executed by any Indian, his heirs, representatives, or assigns, *which may require the approval of the President of the United States or of the Secretary of the Interior*, whenever such approval shall have been given, and the deed so approved returned to said office.

5 U.S.C. § 5.  The Trustee argues, however, that Pugh's ORRI requires consent of the *Navajo Nation*, not of the President of the United States or of the Secretary of the Interior.  The regulations implementing § 5 provide for the issuance of a Title Status Report by the Land Titles and Records Office.  It does not appear, therefore, that the Title Status Report would necessarily show any documents transferring an ORRI which had been consented to by the Navajo Nation, and therefore Exhibit J does not constitute evidence that the Navajo Nation has not consented to the transfer of an ORRI to Pugh.

Second, and more importantly, the document that purports to convey the ORRI from B-C to Pugh does not contain any deadline for the consent of the Minerals Department of the Navajo Nation.  *See* Tr. Ex. L.  The Trustee asserted, in connection with his claim that the assignment from B-C to Pugh (which also contains no deadline for obtaining BIA approval) has not been approved, that BIA approval can *never* be obtained because B-C is barred by the Confirmation Order from seeking such approval.  However, even if this assertion is correct (which the Court does not now decide), the same cannot be said for Pugh.  Because Pugh was not a creditor of Vallecito, he is not bound by the Plan or the Confirmation Order.  *See supra* at p. 10.  Thus, there is no evidence in the record that Navajo Nation approval of the Pugh ORRI cannot still be obtained.  Therefore, the Motion, to the extent that it seeks a declaration that Pugh lacks any interest in the Hogback Lease for his failure to obtain Navajo Nation approval, is denied.

### D.     Is Pugh's ORRI Invalid due to Violations of the Automatic Stay?

The Trustee next asserts that Pugh lacks any interest in the Hogback Lease because B-C's transfer to Pugh occurred post-petition in violation of the Vallecito automatic stay and is therefore void. As the Court has previously concluded that the Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date, *see supra* at pp. 26-28, the automatic stay applies to protect Vallecito's interest in the Hogback Lease. And, as is relevant here, 11 U.S.C. § 362(a) provides that the filing of a bankruptcy petition "operates as a stay, applicable to *all entities*, of . . . (3) *any act* to . . . exercise control over property of the estate." The stay is effective upon the filing of a bankruptcy case, without regard to notice to anyone of its filing. *In re Cueva*, 371 F.3d 232 (5th Cir. 2004).

Clearly, B-C's assignment, post-petition, of the ORRI in the Hogback Lease to Pugh was an act to exercise control over property of the estate. It is well-established in the Fifth Circuit that actions taken in violation of the stay are "voidable," not "void." *Jones v. Garcia*, 63 F.3d 411, 412 (5th Cir. 1995). It is also clear, however, that a transfer[18] made in violation of the automatic stay is invalid when it occurs, although the transfer may be retroactively validated if someone seeks and receives an annulment of the stay under § 362(d). *Cueva*, 371 F.3d at 236. No one has sought, or received, such relief here; and thus, the post-petition transfer by B-C to Pugh of the ORRI was, and remains, invalid unless the stay is annulled under § 362(d) or some exception to the automatic stay applies. For the same reasons, Pugh's recording of the ORRI in June of 2009 also violated the

---

[18] A transfer is defined as, among other things, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54). Clearly, the assignment of an interest in property of the estate is a transfer.

**Memorandum Opinion and Order**                                                                                  32

automatic stay and is invalid unless the stay is annulled or an exception to the automatic stay applies.[19]

Section 362(b) contains a laundry list of exceptions to the automatic stay. As is relevant here, it provides that the filing of a bankruptcy petition "does not operate as a stay . . . (24) under subsection (a), of any transfer that is not avoidable . . . under section 549." Pugh argues that the transfer of the ORRI to him by B-C is not avoidable under section 549 and therefore this transfer was excepted from the automatic stay. The Trustee disagrees, arguing instead that § 549 is not an exception to the stay set forth in § 362(a).

However, as Pugh correctly notes, all of the cases that the Trustee cites for the proposition that a transfer to a good faith purchaser under § 549(c) is not excepted from the automatic stay were decided before the enactment by Congress in 2005 of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). Prior to BAPCPA, courts had struggled with the myriad of legal issues raised by the interplay of §§ 362 and 549. The case of *U.S. v. Miller*, 5:02-CV-0168-C , 2003 WL 23109906 (N.D. Tex. Dec. 22, 2003) contains a comprehensive discussion of the varying analyses employed by the courts. Some courts held that § 549 was an uncodified exception to the automatic stay – others did not – and the Fifth Circuit fell into the later camp. *In re Cueva*, 371 F.3d 232 (5th Cir. 2004). With the enactment of BAPCPA, however, § 362(b)(24) was added to the Bankruptcy Code; accordingly, the Court must consider the effect of its addition.

There are only two reported decisions and one unreported decision which consider the interplay between §§ 362(b)(24) and 549 as relevant here. The first was *In re Striblin*, 349 B.R. 301

---

[19] Of course, Pugh's recording of his ORRI does not have any effect on whether or not Pugh's ORRI is valid or whether Pugh has title to an interest in the Hogback Lease. Rather, as noted previously, recording would simply put the world on notice of Pugh's asserted interest in the Hogback Lease.

(Bankr. N.D. Fla. 2006). In that case, a purchaser at a post-petition foreclosure of the debtor's homestead asserted that the sale was not held in violation of the automatic stay because it was a good faith purchaser under § 549(c). The Court noted the then-recent addition of § 362(b)(24) to the Bankruptcy Code, and concluded that the sale was not a transfer to which § 549 applied, and was therefore not excepted from the automatic stay. It did so on two grounds: (1) § 549 applies only to "debtor-initiated" transfers, and (2) § 549(c) insulates a *transfer* to a bona fide purchaser, not the foreclosure sale itself, from the automatic stay. The Court held that "because the sale is not a transfer to which § 549 applies in the first instance, it is not 'not avoidable under section 549' and is therefore not an exception to the automatic stay as set forth in § 362(b)(24)." *Striblin*, 349 B.R. at 304. Therefore, the court concluded that the purchaser's purchase of the property at the foreclosure sale was "void and without effect" due to the stay violation. *Id*.

In *In re Ducker*, No. 06-70250, 2007 WL 1119640 (Bankr. E.D. Ky. Apr. 3, 2007), the purchaser at a post-petition foreclosure sale of the debtor's property conducted in violation of the automatic stay argued that the sale was excepted from the stay under § 362(b)(24) because he was a good faith purchaser without notice of the bankruptcy filing. The *Ducker* court adopted the analysis of the *Striblin* court *in toto*, and concluded that § 549 did not apply for the same two reasons identified by the *Striblin* court, with the same result.

The court in *In re Howard*, 391 B.R. 511 (Bankr. N.D. Ga. 2008) disagreed with the analysis of *Striblin* and *Ducker*, but reached the same ultimate result. The question before the court was whether a purchaser at a tax sale conducted in violation of the automatic stay, who lacked knowledge of the bankruptcy case, could avail itself of § 549(c), such that the sale would not be avoidable under § 549 and thus excepted from the automatic stay pursuant to § 362(b)(24). The court concluded that

**Memorandum Opinion and Order** 34

the term "purchaser" in § 549(c) "contemplates that the transfer is 'voluntary' leading this court to conclude that a forced sale, such as a tax sale, does not satisfy the elements of § 549(c)'s exception." *Howard*, 391 B.R. 516. The court rejected the notion that § 549 only applies to debtor-initiated transfers because that limitation is not found in the language of § 549 itself.

None of these cases are, of course, binding here. Rather, this Court is bound by the pronouncements of the United States Supreme Court and courts higher than this one within the Fifth Circuit. Those tribunals are universal in their pronouncement of the appropriate starting point for ascertaining Congressional intent – *i.e.*, the existing statutory text. Moreover, they are universal in ruling that "when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 533 (2004) (*quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000)). Further, a court may turn to "the more controversial realm of legislative history," *Lamie*, 540 U.S. 536, as an aid in interpretation only if the statute is ambiguous.[20] *In re SeaQuest Diving, L.P.*, 579 F.3d 411 (5th Cir. 2009).

Here, there is no such ambiguity. There is nothing in the text of § 362 that suggests that the exception applies to anything less than the full panoply of transfers rendered unavoidable by § 549. In turn, there is nothing in the text of § 549 that limits its application to transfers by the debtor, or

---

[20] The legislative history to § 362(b)(24) is sparse. It states only that the section was added to "respond[] to a 1997 Ninth Circuit case in which two purchase money lenders (without knowledge that the debtor had recently filed an undisclosed chapter 11 case that was later converted to chapter 7), funded the debtor's acquisition of an apartment complex and recorded their purchase-money deed of trust immediately following recordation of the deed to the debtors." That statement suggests, however, that § 549 could apply to transfers by entities other than the debtor, because Congress was hoping, in enacting § 362(b)(24), to protect the purchase-money lender who took and recorded its deed of trust post-petition.

to voluntary transfers.[21]  Cases within this Circuit have applied § 549 to transfers initiated by entities other than the debtor. *See In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643 (Bankr. S.D. Tex. 2009). *Id.* (permitting avoidance of transfers of property of the estate by insiders of the debtor).

Therefore, the Court concludes that a transfer that is not avoidable under § 549 is excepted from the automatic stay under § 362(b)(24).[22]  Thus, the Court must consider whether the transfer to Pugh was avoidable under § 549 in order to determine whether that transfer was excepted from the automatic stay.

> Section 549(a) provides:
>
> (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate–
>
> > (1) that occurs after the commencement of the case; and
> >
> > (2) (A) that is authorized only under section 303(f) or 542(c) of this title; or
> >
> > > (B) that is not authorized under this title or by the court.

There is no dispute that the transfer from B-C to Pugh occurred on November 1, 2008 – after the commencement of the Vallecito bankruptcy case.  There is also no dispute that the transfer was not authorized by the Court or by the Bankruptcy Code,[23] or that the assignment was a "transfer" within

---

[21] In order to establish a claim under § 549, the Trustee need only establish that  (1) a transfer occurred, (2) the transfer occurred after the commencement of the case, (3) the transfer was made without court authority, and (4) the property transferred was property of the estate. *See In re Advanced Modular Power Sys., Inc.*, 413 B.R. 643 (Bankr. S.D. Tex. 2009).  The Trustee need not establish that the transfer was by the debtor, or that the transfer was voluntary.

[22] The Court acknowledges that § 362(b)(24) is "one of the oddest and perhaps the most poorly drafted of the BAPCPA provisions dealing with the automatic stay," David B. Young, "*BAPCPA'S Changes to the Automatic Stay: the 2005 Amendments and Court Decisions*, 906 PLI/Comm. 11 (2008), and that the "provision itself was a surprise to most who followed the enactment of the legislation."  2 Norton Bankruptcy Law & Prac. §43.38 (William Norton, ed. 2010).  Nevertheless, the problems with § 362(b)(24) are for Congress to fix, not this Court.

[23] Section 303(f) governs certain activities by the debtor in an *involuntary* case, and thus is inapplicable here.  Section 542(c) provides that an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, in good faith, to an entity

**Memorandum Opinion and Order**                                                                        36

the meaning of § 549. Therefore, the Trustee may avoid the transfer under § 549(a) "except as provided in subsection (b) or (c)" of § 549. Subsection (b) applies only in an involuntary bankruptcy case, and is not at issue here. The issue here is whether the exception to § 549 avoidance contained in subsection (c) applies. That subsection provides:

> (c) The trustee may not avoid under subsection (a) of this section a transfer of an interest in real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy or notice of the petition was filed, where a transfer of an interest in such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such real property, against whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to such interest of such good faith purchaser. A good faith purchaser without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any present value given, unless a copy or notice of the petition was so filed before such transfer was so perfected.

It is undisputed that the Trustee did not file a copy or notice of Vallecito's bankruptcy petition with either the BIA or with the county in which the Hogback Lease is located prior to Pugh's recording of his ORRI. *Pugh's Opposition*, Ex. B (responses to requests for admission). Pugh has submitted an affidavit that the assignment of the ORRI from B-C was payment for several debts which B-C owed to Pugh, aggregating approximately $2,190,700, and at that time "no facts were known to [Pugh] that would have made me believe that Vallecito Gas, LLC, a third-party, claimed a non-operating ownership interest in the Hogback Lease . . . ."[24] The Trustee has not responded to any of this evidence. When this evidence is viewed in the light most favorable to Pugh, the Court

---

other than the trustee, with the same effect as to the entity making such transfer as if the bankruptcy case concerning the debtor had not been commenced. It is undisputed that B-C had notice of the commencement of Vallecito's bankruptcy case prior to its assignment to Pugh.

[24] The Trustee argues that Pugh knew of Vallecito's bankruptcy filing, but Pugh's position is that his assignment came from *B-C*, not Vallecito, and he did not learn that Vallecito claimed any interest in the Hogback Lease until December 2009, after the date of the assignment.

**Memorandum Opinion and Order** 37

concludes that Pugh has raised a genuine issue of material fact as to the § 549(c) defense, such that the Court is unable to conclude that the transfer is avoidable under § 549 and therefore not excepted from the automatic stay.

Accordingly, the Motion, to the extent that it relies on the Trustee's argument that the B-C Assignment is void as made in violation of the automatic stay, must be denied.

## III.    CONCLUSION

Pugh is not a creditor of Vallecito and is not bound by the Confirmation Order – at least not on the basis of this summary judgment record. Section 1141 therefore cannot serve as the basis for a conclusion that Pugh lacks an interest in the Hogback Lease.

The Court cannot conclude that the B-C Assignment is void ab initio for several reasons. First, the existence and content of the BIA's Title Status Report has no effect, one way or the other, on the validity of Pugh's interest in the Hogback Lease, and cannot serve as the basis for a conclusion that Pugh lacks an interest in the Hogback Lease. Second, § 544 of the Bankruptcy Code, which applies to pre-petition transfers, does not affect the validity of the transfer from B-C to Pugh, which occurred after the Petition Date. Finally, the approval of the BIA and the Navajo Nation is not required in order to make an assignment of an interest in an oil and gas lease located on Indian land effective as between the parties to the assignment. Rather, the statute and regulations requiring the approval of those entities were enacted and exist for the protection of the Indian tribe, and private litigants may not invoke their provisions in order to invalidate an assignment between them. Therefore, the assignment to Pugh, which depends for its validity upon the validity of the B-C Assignment, may not be avoided by Vallecito as being made without BIA and Navajo Nation approval – at least not at this time.

The Hogback Lease was property of Vallecito's bankruptcy estate on the Petition Date, notwithstanding the pre-petition execution of the B-C Assignment, because Vallecito retained a contingent interest in the Hogback Lease. There is no evidence in the record that Navajo Nation approval of the assignment of the ORRI to Pugh has not been, or cannot still be, obtained; therefore, the failure to obtain Navajo Nation approval cannot serve as the basis for a conclusion that Pugh lacks an interest in the Hogback Lease.

The transfer of the ORRI to Pugh and Pugh's recording of that ORRI, both of which occurred post-petition, violated the automatic stay unless an exception to the automatic stay applies. Under § 362(b)(24), transfers which are not avoidable under § 549 are excepted from the automatic stay. The Trustee has failed to show an absence of genuine issues of material fact with respect to Pugh's § 549(c) defense, and material factual disputes exist precluding summary judgment in the Trustee's favor.

For these reasons, the Motion must be denied in its entirety.[25]

**SO ORDERED.**

**### End of Memorandum Opinion and Order ###**

---

[25] As the Court has concluded that the Motion must be denied, the Court need not address Pugh's argument that he needs to complete discovery in order to respond to the Motion or his request for a continuance to allow full discovery to occur.