

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed July 19, 2011**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| VALLECITO GAS, LLC, | § | CASE NO. 07-35674-BJH-11 |
| | § | |
| Debtor. | § | |
| | § | |
| HARVEY L. MORTON, as Chapter 11 | § | |
| Trustee of Vallecito Gas, LLC, | § | |
| | § | |
| Plaintiff, | § | ADV. PRO. 10-3039-BJH |
| - against - | § | |
| | § | |
| TOM D. KIEVIT, et al., | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION

The Court tried this adversary proceeding on May 9, 2011.[1]  The Court has jurisdiction over

---

[1] The parties agreed that Exhibits 1-109 would be admitted into evidence.  They further agreed to the stipulated facts contained in paragraphs 3-43 of the parties' Joint Pretrial Order.  At trial, the Court heard the testimony of John Joel Pugh ("Pugh").  No other witnesses testified at trial.

**Memorandum Opinion**

the parties and the subject matter pursuant to 28 U.S.C. §§ 1334 and 157(b).  This Memorandum

Opinion contains the Court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052.

This dispute has a complicated factual and procedural history, some of which is more fully set

forth in (i) the Court's Memorandum Opinion and Order dated August 29, 2008 in Adversary

Proceeding No. 08-3132-BJH (the "Tiffany Adversary Proceeding"), (ii) the court-approved

disclosure statement in the bankruptcy case filed by Vallecito Gas, L.L.C. ("Vallecito") (Docket No.

203 in Case No. 07-35674-BJH-11), (iii) the Court's Amended Order Relating to Order to Show

Cause (Docket No. 351 in Case No. 07-35674-BJH-11, (iv) the Court's Memorandum Opinion and

Order denying the Trustee's motion for partial summary judgment on his claim against John Joel Pugh

("Pugh") (Docket No. 116), and (v) the transcript of the Court's oral ruling on December 21, 2010

on the Trustee's motion for summary judgment against Briggs-Cockerham, LLC ("B-C") (Docket No.

142).  In addition and significantly, the parties stipulated to substantially all of the relevant facts in

their Joint Pretrial Order, § II, ¶¶ 3-43, which facts the Court adopts herein as if they were restated

in their entirety.  However, an abbreviated recitation of some of the factual and procedural

background of the present dispute is necessary, to which we now turn.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Prior to its bankruptcy filing, Vallecito purchased a mineral lease, located on the land of the

Navajo Nation in San Juan County, New Mexico, from Tiffany Gas Co., LLC ("Tiffany") known as

the "Hogback Lease."  Suffice it to say that on the date of Vallecito's bankruptcy filing, there were

several competing claims to the Hogback Lease, asserted in litigation pending in other fora, and the

status of Vallecito's title to the Hogback Lease was less than clear.  Most importantly to the

resolution of this dispute, after it received the Hogback Lease from Tiffany but before its bankruptcy

filing, Vallecito executed an assignment of the Hogback Lease to B-C, which entity held 100% of the membership interests in Vallecito.[2] The validity and/or effect of that assignment, which shall be referred to herein as the "B-C Assignment," remains a primary issue before the Court. As detailed below, until the late fall/early winter of 2009 the Trustee, the Court, and all parties-in-interest in the Vallecito bankruptcy case believed that B-C, while once claiming an interest in the Hogback Lease, had disclaimed any such interest in open court during the course of a Vallecito hearing, and thus, B-C no longer asserted any interest in the Hogback Lease.[3]

Also prior to its bankruptcy filing, Vallecito entered into several participation agreements with Arcturus Corporation ("Arcturus") that involved certain of Vallecito's oil and gas properties (but not the Hogback Lease) and disputes had arisen between these parties. Specifically, Arcturus sued Vallecito and others in July of 2006 in the 298th Judicial District of Dallas County (the "Arcturus Litigation"). In April of 2007, the judge in the Arcturus Litigation entered a temporary injunction (the "Arcturus Injunction") against Vallecito and Briggs, an indirect principal of Vallecito. The Arcturus Injunction provided that

---

[2] On the Petition Date, the membership interests in B-C were held 50% by Michael Briggs ("Briggs") and 50% by John Cockerham ("Cockerham").

[3] B-C is not the party currently arguing that the B-C Assignment is valid; the Trustee's claims against B-C in Count V of the Complaint (defined hereinafter) and certain counter- and cross-claims involving B-C have been severed for trial by agreement of the parties. *See* Order Granting Briggs-Cockerham LLC's Unopposed Request for Separate Trial, Docket No. 144. B-C filed its own petition for relief under chapter 11 in the United States Bankruptcy Court for the Eastern District of Texas, which case was subsequently transferred to the undersigned. *See* Case No. 10-34222-BJH-11. A review of B-C's schedules discloses that B-C claimed as personal property "[t]he entire gross working interest (100%), together with all rights and appurtenances, granted to Debtor under Navajo Lease No. 1-89-IND-58." The B-C schedules also asserted ownership of "claims and causes of action against Henry [sic] Morton, Chapter 11 Trustee of the estate in *In re Vallecito, LLC* (Case No. 07-35674-BJH), relating to the adjudication of the Debtor's interest in Navajo Lease No. 1-89-IND-58," and claims against Briggs and Cockerham "for damages arising out of or relating to the purported 'disclaimer' of the Debtor's interest in Navajo Lease No. 1-89-IND-58 . . ." *See* Amended Schedule B, Docket No. 28 in E.D. Tex. Case No. 10-41219-11. On June 17, 2010, the Trustee moved, as an interested party, to dismiss B-C's bankruptcy case. On November 23, 2010, the Court entered a Memorandum Opinion and Order granting that motion. *See* Docket No. 32 in Case No. 10-34222-BJH-11.

> Vallecito and Briggs, their affiliates, agents, servants, employees, and representatives are hereby commanded forthwith to desist and refrain from accessing, spending, diverting, selling, or transferring, or otherwise disposing of any of their assets (of any kind) and any funds within their actual or constructive possession or control . . . and from altering, erasing, or otherwise destroying any and all records that relate to the $1,920,000 they received from Arcturus and its investors, such that all of Vallecito's and Briggs' funds and assets are hereby frozen, and Vallecito and Briggs are hereby restrained from disposing of any of their funds and assets until the final trial on the merits in this case.

The Arcturus Injunction was still in place when Vallecito filed its bankruptcy case on November 14, 2007 (the "Petition Date"). As discussed more fully below, the Arcturus Injunction was still in place on each date that B-C purportedly assigned an overriding royalty interest in the Hogback Lease to each of the defendants in this adversary proceeding.[4]

Shortly after the Petition Date, Arcturus moved for the appointment of a Chapter 11 Trustee for Vallecito. After a hearing on that motion, the Trustee was appointed and took steps to marshal the assets of the Vallecito estate. In March of 2008, the Trustee filed a "Motion for Contempt, Sanctions and Appointment of Receiver Against Michael Briggs, Individually" (the "Motion for Contempt"), that was ultimately heard on April 17, 2008. In addition, in order to resolve the competing claims to the Hogback Lease, the Trustee filed an agreed motion for mediation, that was agreed to by many of the competing claimants to the Hogback Lease.[5] *See* Docket No. 117 in Case No. 07-35674-BJH-11. At the April 16, 2008 mediation, a settlement was reached with many, but

---

[4] Each defendant grantee of an overriding royalty interest is identified by name, grant date, recording date, percentage acquired and price paid on Exhibit A to the Joint Pretrial Order. Moreover, the parties define (and identify) the defendants in the Joint Pretrial Order as the "Kievit Defendants," the "Wolz Defendants" and Joel Pugh ("Pugh"). *See* Joint Pretrial Order at p. 2. Pugh is *pro se*, but the Kievit Defendants and the Wolz Defendants are represented by counsel, as is the Trustee. The Court will use these same terms to refer to the defendants and, when referring to them collectively, will use the term "Defendants."

[5] The parties asserting interests in the Hogback Lease who agreed to mediation were the Trustee, B-C, Briggs, Barrons Resources, LLC, Harold O'Connor, Sandia Development & Consulting Services, Inc., Phillip John Burle, and Mary Clare Moser.

not all, of the parties claiming an interest in the Hogback Lease.

The Trustee also separately settled the dispute between Arcturus and Vallecito, conditioned upon confirmation of a Chapter 11 plan embodying the terms of his settlement and consummation of such a plan.

As noted earlier, the mediation did not resolve all disputes with all of the competing claimants to the Hogback Lease – specifically, it did not resolve disputes with B-C and Briggs, who also claimed ownership of the Hogback Lease. Instead, the Motion for Contempt, which alleged various violations of both the Arcturus Injunction and the Bankruptcy Code, proceeded to hearing the day after the mediation (April 17, 2008). In the midst of that hearing, the parties requested a brief recess and, at the conclusion of the recess, announced that they had reached a settlement. The Trustee placed the terms of the settlement on the record. As is relevant here, one of the terms of the settlement was that "Mr. Briggs, Mr. Cockerham, Briggs-Cockerham, LLLC [sic] are releasing any and all claims they have to anything in the Vallecito estate, including any claims to the Hogback lease and any sale can go forward without they [sic] objection. And they're waiving all of their claims and any assets in Vallecito, including ones if we discover any." Transcript 4/17/08, p. 74:12-18. This "disclaimer" was the source of the Trustee's belief that B-C no longer claimed an interest in the Hogback Lease.

The results of the mediation, the settlement with Arcturus, and the settlement with and "disclaimer" by Briggs, Cockerham, and B-C were thought to remove a further, but not the last, impediment to a liquidation of the Hogback Lease for the benefit of Vallecito's creditors. The last apparent impediment, a dispute with Tiffany over an alleged forfeiture of the Hogback Lease by Vallecito, matured in May of 2008 when Tiffany filed an adversary proceeding against the Trustee

seeking a determination that Vallecito had forfeited its rights to the Hogback Lease. In short, Tiffany asserted that the purchase and sale agreement between the parties required Vallecito to obtain approval of the transfer from Tiffany to Vallecito by the Bureau of Indian Affairs ("BIA") by a date certain, that Vallecito (now a Chapter 11 debtor) had failed to timely obtain such approval, and therefore Tiffany was entitled to a return of the Hogback Lease upon its repayment of the purchase price previously paid to it by Vallecito. On August 29, 2008, the Court entered its Memorandum Opinion and Order on the Trustee's motion for summary judgment, in which the Court concluded, as a matter of contract interpretation, that Tiffany was not entitled to a forfeiture of the Hogback Lease. Tiffany appealed the Court's Memorandum Opinion and Order (the "Tiffany Appeal").[6]

Thus, with the exception of the Tiffany Appeal, all of the apparent impediments to confirmation of a plan that would liquidate the Hogback Lease for the benefit of Vallecito's creditors were thought to have been removed. Accordingly, the Trustee proposed the First Amended Plan of Liquidation for the Debtor (the "Plan"). Essentially, the Plan provided that the Hogback Lease would be sold to Vision Energy, LLC ("Vision") in exchange for approximately $6.6 million in cash, subject to certain terms and conditions, with the proceeds to be distributed in accordance with the various settlements with the relevant parties, who agreed to disclaim their alleged interests in the Hogback Lease in order to permit the sale to Vision to occur. One of the conditions to the Plan becoming effective, and the closing of the sale to Vision, was that the Tiffany Appeal be resolved in the Trustee's favor. Another was that the conveyance of the Hogback Lease would be finalized pursuant

---

[6] On June 29, 2009, United States District Judge Godbey affirmed this Court's order. *See* Docket No. 10 in Case No. 3:08-CV-1936-N. Tiffany appealed Judge Godbey's decision to the Fifth Circuit. However, in March, 2010, the Trustee and Tiffany settled the appeal on terms that required the estate to pay Tiffany $95,000 in full and final satisfaction of any claims Tiffany has arising out of or related to the Vallecito case, and Tiffany agreed to dismiss the Tiffany Appeal upon receipt of that payment. *See* Order Granting Mot. To Approve Compromise and Settlement Pursuant to Fed. R. Bankr. P. 9010 [sic] with Tiffany Gas Co., LLC, Docket No. 384 in Case No. 07-35674-BJH-11.

to an asset purchase agreement that would provide, among other things, for the sale of 100% of the working interest and net revenue interest in the Hogback Lease, subject only to the royalty interest of the Navajo Nation, and that except for the Navajo Nation, all other interests in the Hogback Lease, including but not limited to those of B-C, Briggs, Cockerham, Vallecito, and other named settling parties, would be extinguished upon the transfer of the Hogback Lease to Vision. The Plan was confirmed by Order entered on March 17, 2009 (the "Confirmation Order"). Due to the continued pendency of the Tiffany Appeal, the Plan was not consummated.[7]

In December of 2009, another obstacle to consummation of the Plan and the sale to Vision became apparent. Specifically, the Trustee filed a pleading alleging that despite the April 17, 2008 "disclaimer" of any interest in the Hogback Lease by Briggs, Cockerham, and B-C, Briggs

> acting on behalf of Briggs-Cockerham LLC, has purported to sell overriding royalty interests in the Hogback Lease (collectively the "ORRI Interests") to third-parties. Briggs not only purported to sell previously undisclosed ORRI Interests in the Hogback Lease prior to the Vallecito Bankruptcy, but continued to do so post-petition. Even more disturbing, Briggs sold ORRI Interests and executed ORRI Interests months after he disclaimed any interest in the Hogback Lease in open court . . . Based on information provided to the Trustee, it appears throughout 2008, after Briggs' disclaimed all interest in the Hogback Lease, Briggs continued to communicate with, upon information and belief, approximately 30 people that may have purportedly purchased ORRI Interests in the Hogback Lease from Briggs-Cockerham LLC. In these communications, Briggs advised these individuals the Hogback Lease, among other things, was: (1) owned by Briggs-Cockerham LLC; (2) Briggs-Cockerham LLC was obtaining drilling permits for wells on the Hogback Lease; (3) Briggs-Cockerham LLC was days away from starting to drill on the Hogback Lease, even sending pictures of drilling rigs purportedly en route to New Mexico for drilling; (4) Briggs was making trips to Europe and China purportedly to obtain funding for the Hogback Lease development; and (5) Briggs allegedly had entered into contracts for production of Helium on the Hogback Lease.

Trustee's Expedited Mot. For Order to Show Cause as to Why Michael Briggs, Briggs-Cockerham

---

[7] To date, the Plan has not been consummated.

LLC and Joel Pugh Should Not be Held Contempt [sic] and Sanctioned (Docket No. 329 in Case No. 07-35674-BJH-11)(the "Motion for Order to Show Cause"), pp. 2-3. The Court granted the Motion for Order to Show Cause, and issued its Order to Show Cause on December 23, 2009. See Docket No. 338 in Case No. 07-35674-BJH-11.

At a hearing held on February 1, 2010 on the Order to Show Cause, Briggs did not appear.[8] The Trustee proceeded with his evidence, and after hearing the evidence, the Court found, among other things, that (i) the Arcturus Injunction "remains in force today and has at all times since April 27, 2007," (ii) during the April 17, 2008 hearing, Briggs, Cockerham, and B-C "disclaimed any and all interest in Vallecito, including, but not limited to, any interest in the Hogback Lease," (iii) Briggs received relevant notices of the Arcturus Injunction and the Plan, (iv) Briggs "made a myriad of transfers of interests in the Hogback Lease after the entry of the [Arcturus Injunction] purporting to transfer overriding royalty interests in the Hogback Lease," and (v) the transfers were made in knowing and direct violation of the Arcturus Injunction. Amended Order Relating to Order to Show Cause (Docket No. 351 in Case No. 07-35674-BJH-11), ¶¶ 9, 16, 21, 22 and 23.

On March 9, 2010, the Trustee filed the above-captioned adversary proceeding against the Defendants as recipients of assignments of overriding royalty interests ("ORRIs" or "ORRI Assignments") in the Hogback Lease. The complaint has been amended twice, and at issue for trial

---

[8] The Court notes that the Order to Show Cause originally scheduled the hearing for January 22, 2010. Briggs requested time to obtain counsel and indicated that he would not appear on January 22, 2010. Accordingly, the Court continued the hearing to February 1, 2010 and directed certain service upon Briggs of the re-set hearing. The Trustee duly served Briggs with notice of the February 1, 2010 hearing. On the morning of February 1, 2010, Briggs responded to an e-mail from the Trustee asking for Brigg's counsel's contact information. In that e-mail, Briggs (1) stated that he still did not have counsel, (2) asked that the hearing be re-scheduled again, (3) stated that he would not appear, and (4) stated that if he were required to appear, he would decline to answer questions on Fifth Amendment grounds. *See* Tr. 2/1/10, 6:15-19.

were Counts I-IV of the Trustee's Second Amended Adversary Complaint (the "Complaint").[9] The Trustee's first cause of action seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that Pugh's ORRI is void or voidable on various grounds detailed below.[10] The Trustee's second cause of action seeks a declaratory judgment that all ORRI Assignments recorded on March 20, 2008 (the holders of which will be referred to as the "March 20 Claimants") are void and/or subject to avoidance. The Trustee's third cause of action seeks the same declaration with respect to those ORRI Assignments recorded on April 15, 2009 (the holders of which will be referred to as the "April 15 Claimants") and the Trustee's fourth cause of action seeks a declaration "that the Purported Interest of Defendants Tom and Kyle Kievit Recorded June 7, 2007 is Void and/or Subject to Avoidance by the Trustee" (Tom and Kyle Kievit recorded their interest on June 7, 2007, pre-petition, and will be referred to collectively as "Kievit").

As to Pugh, the March 20 Claimants, the April 15 Claimants, and Kievit, the Trustee alleges that (i) any assignment of the Hogback Lease requires the approval of both the Navajo Nation and the United States Secretary of the Interior (through the Bureau of Indian Affairs (the "BIA")), and that an assignment is not valid without such approvals; (ii) as of June 18, 2008, the Trustee had obtained all necessary approvals for the assignment from Tiffany to Vallecito and, as a result, Vallecito owns the Hogback Lease; (iii) the pre-petition B-C Assignment was never submitted to, or approved by, either the Navajo Nation or the BIA and, therefore, the B-C Assignment is void ab

---

[9] As noted previously, Count V was severed for separate trial. *See* n. 3, *supra*.

[10] 28 U.S.C. § 2201(a) provides that "in a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." As such, declaratory judgment actions are permissive, not mandatory, and a court need not provide declaratory judgment relief on request. Rather, the matter is left to the court's discretion. *In re Mirant Corp.*, 327 B.R. 262 (Bankr. N.D. Tex. 2005).

initio as a matter of law; and (iv) Briggs's transfers on behalf of B-C of ORRIs to the Defendants, which were done in violation of the Arcturus Injunction and/or the Vallecito automatic stay, are void and transferred no right, title or interest in the Hogback Lease, since B-C had no right, title or interest to transfer. Similarly, as to all four groups of Defendants, the Trustee alleges that their ORRI Assignments are void under § 605(a)(6) of Title 18 of the Navajo Nation Code, which provides that "[n]o overriding royalty may be created by any transfer authorized hereby without the written consent of the Minerals Department of the Navajo Nation," because the Trustee alleges that the Defendants did not obtain Navajo Nation consent to the creation of their ORRIs. As to Pugh, the March 20 Claimants and the April 15 Claimants (but not Kievit, whose interest was recorded pre-petition) the Trustee further alleges that their interests were recorded post-petition and are therefore subject to avoidance under 11 U.S.C. §§ 362, 544 and/or 549.[11] As to Pugh, the Trustee alleges that Pugh had actual knowledge of the Vallecito bankruptcy case and the Confirmation Order, and is thus bound by its terms. Accordingly, for any or all of these reasons, the Trustee seeks a determination that the Defendants have no right, title or interest in the Hogback Lease.

In response, the Defendants argue that (i) their assignments are valid and enforceable against the relevant assignor, B-C in the case of the ORRI Assignments and Vallecito in the case of the B-C Assignment, (ii) they may still seek and obtain approval of their respective assignments from the Navajo Nation, (iii) the Trustee has a contractual obligation to assist B-C in seeking and obtaining approval of the B-C Assignment, which will inure to their benefit as their assignor (B-C) will then be the owner of the Hogback Lease, (iv) the Hogback Lease does not constitute property of the

---

[11] The Trustee conceded at closing arguments that he no longer asserts any claim under § 544 against any of the Defendants. This is so because the transfers he seeks to avoid, *i.e.*, the ORRI Assignments, were transfers by B-C, not the Debtor, Vallecito.

**Memorandum Opinion** 10

Vallecito bankruptcy estate and thus the automatic stay does not apply to void their assignments and § 549 does not permit avoidance of their interests, (v) even assuming that the automatic stay and § 549 apply, they are good faith purchasers without knowledge of the commencement of Vallecito's bankruptcy case and are entitled to the benefit of the defenses to avoidance provided by 11 U.S.C. §§ 549(c) and 550(b)(1), and (v) the statute of limitations provided by 11 U.S.C. § 549 applies to preclude the Trustee from seeking to avoid the transfers identified on Exhibit A to the Joint Pre-Trial Order as ORRI Assignment Nos. 11- 27.[12]

## II.    LEGAL ANALYSIS

As admitted by the Trustee's counsel during closing arguments, to dispose of this adversary proceeding, the Court must consider and resolve five overarching legal issues.  First, is the Hogback Lease property of the Vallecito bankruptcy estate?  Second, are the B-C Assignment and the ORRI Assignments void due to the absence of Navajo Nation and BIA approval in the case of the B-C Assignment and Navajo Nation approval in the case of the ORRI Assignments?  Third, if not, (a) is it possible for B-C and/or the ORRI Assignment holders to seek such approval now, given confirmation of the Plan, and (b) what obligation, if any, does Vallecito have to assist B-C and/or the ORRI Assignment holders in this process?  Fourth, assuming that Vallecito had a sufficient interest in the Hogback Lease on the Petition Date such that the automatic stay applied to the ORRI Assignments, (a) are those assignments void as having been taken in violation of the automatic stay, and (b) are the Defendants good faith purchasers entitled to assert the defenses provided by §§ 549(c)

---

[12] The Defendants also argued that the statute of limitations provided by 11 U.S.C. § 546 prevented the Trustee from seeking to avoid, pursuant to 11 U.S.C. § 544, the transfers identified on Exhibit A to the Joint Pretrial Order as ORRI Assignment Nos. 1-10.  As the Trustee has conceded that he is no longer asserting § 544 claims against the Defendants, the Court need not address this statute of limitations issue.

**Memorandum Opinion**                                                                                  **11**

and 550(b)(1) of the Bankruptcy Code.  Fifth, is the Trustee is barred by the statute of limitations set

forth in § 549 from seeking to avoid certain of the transfers to certain of the Defendants?

> **A.    Is the Hogback Lease Property of the Vallecito Bankruptcy**
> **Estate; Are the B-C Assignment and the ORRI Assignments Void**
> **due to a Lack of BIA and Navajo Nation Approval?**

Many of the arguments respecting the status of the Hogback Lease as property of the estate,

and the validity of the B-C Assignment, have been raised and adjudicated before.  Some further

background about this Court's prior rulings is required.  Specifically, on July 12, 2010, the Trustee

filed a motion for partial summary judgment against Pugh (the "Pugh MSJ") on Count I of the

Complaint, which was asserted solely against Pugh and which sought an order declaring that Pugh

had no interest in the Hogback Lease.  The Trustee argued in connection with the Pugh MSJ that the

Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date and that the B-C

Assignment was void because neither the Navajo Nation nor the BIA had approved it.  According

to the Trustee, because B-C had no interest in the Hogback Lease (since the B-C Assignment was

void for lack of Navajo Nation/BIA approval), B-C could transfer nothing to Pugh.  Pugh responded

that the B-C Assignment was fully enforceable between the parties to it – *i.e.*, Vallecito and B-C –

and, when that assignment was accorded its proper effect, the Hogback Lease was not property of

the Vallecito bankruptcy estate on the Petition Date.

The starting point in the Trustee's analysis was Vallecito's interest in the Hogback Lease on

the Petition Date.  The parties agreed that Vallecito purchased the Hogback Lease from Tiffany prior

to the Petition Date.  The Trustee argued that although Vallecito had not yet received BIA approval

on the Petition Date, Vallecito had an interest in the Hogback Lease on the Petition Date subject to

the satisfaction of one contingency – *i.e.*, BIA approval (which was received post-petition).[13] Looking to the broad definition of the phrase "property of the estate" in § 541 of the Bankruptcy Code, and the case law indicating that the phrase is to be given the "broadest possible definition," the Trustee argued that, at a minimum, Vallecito had an equitable interest in the Hogback Lease on the Petition Date. The Trustee also argued that the B-C Assignment (executed pre-petition from Vallecito to B-C) did not change this result because it was void for lack of either BIA or Navajo Nation approval.[14] Pugh responded that Navajo Nation and/or BIA approval was not required in order to make the assignment valid as between the parties to it. The Court entered its Memorandum Opinion and Order on November 17, 2010 (the "November Opinion") and ultimately agreed with Pugh, as explained below.

The Court first noted that the Secretary of the Interior and Commissioner of Indian Affairs are statutorily charged with the management of all Indian affairs. 25 U.S.C. §§ 1, 2. Section 2102 of title 15, United States Code, provides that any Indian tribe, subject to the approval of the Secretary of the Interior, may enter into leases for the development of mineral resources on Indian land, and § 2107 provides that the Secretary of the Interior shall promulgate rules and regulations to facilitate the implementation of that right. One such regulation provides that

---

[13] Navajo Nation approval of the Tiffany sale to Vallecito was received pre-petition.

[14] The Trustee's position on the Pugh MSJ was diametrically opposed to the position he took in the Tiffany Adversary. In the Tiffany Adversary, the Trustee vehemently argued that assignments that are not approved by the BIA or Navajo Nation are still effective as between the parties. The Trustee asserted there that "[t]here is a subtle undercurrent that runs throughout Tiffany's claims that needs to be debunked at the outset. Specifically, Tiffany's argument is premised on the notion that because the BIA has not approved the Agreement it is void. This is wholly incorrect. In fact, the law is clear: as between Vallecito and Tiffany there is an enforceable contract." *See* Tr. Mot. For Summ. J., Adv. Pro. No. 08-3132-BJH, p. 8. Tiffany, however, argued vehemently that the lack of BIA/Navajo Nation approval rendered the assignment void. In the Pugh MSJ, the Trustee literally cited to the Court the same two cases in support of his position that Tiffany had cited in opposing the Trustee in the Tiffany Adversary. The irony of the Trustee's dramatic shift in position is not lost upon the Court.

an assignment of a minerals agreement, or any interest therein, shall not be valid without the approval of the Secretary and, if required in the minerals agreement, the Indian mineral owner. The assignee must be qualified to hold the minerals agreement and shall furnish a satisfactory bond conditioned on the faithful performance of the covenants and conditions thereof as stipulated in the minerals agreement. A fully executed copy of the assignment shall be filed with the Secretary within five (5) working days after execution by all parties. The Secretary may permit the release of any bonds executed by the assignor upon submission of satisfactory bonds to the Bureau of Indian Affairs by the assignee, and a determination that the assignor has satisfied all accrued obligations.

25 C.F.R. § 225.33. The effect of this regulation was in dispute in connection with the Pugh MSJ.

In support of his argument that the B-C Assignment was void (or as the regulation puts it – not valid), the Trustee relied upon several cases. The first was *HCB Industries, Inc. v. Muskogee Area Director*, 1990 WL 321035 (IBIA Mar. 28,1990). In that case, HCB Industries, Inc. ("HCB"), appealed a decision of the BIA declining to approve an assignment of a lease to HCB by Arrow Production Company ("Arrow"). The BIA declined to approve the assignment on the ground that the leases were being cancelled. At some point after the assignment, the BIA had advised Arrow, but not HCB, that the leases had expired by their own terms over a year prior to the assignment. On appeal, HCB argued that it had been denied due process, because it was not given notice of, or the opportunity to respond to, the BIA's determination that the leases had expired, since that notice had been given to Arrow but not to HCB. HCB argued that because the BIA was on notice of the assignment from Arrow to HCB, it should have given notice to HCB. The Board of Indian Appeals (the "Board") noted that the federal regulation governing assignments of leases of the type there at issue[15] provided that leases may be assigned only with the approval of the Secretary of the Interior,

---

[15] The federal regulation at issue in the *HCB* case was 25 C.F.R. § 213.38(a), which governs the leasing of restricted lands of members of the Five Civilized Tribes for mining purposes. In the present case, the Trustee relies on 25 C.F.R. § 225.33. Although worded slightly differently, both regulations require the approval of the Secretary of the Interior for assignments of leases on Indian lands. The court noted in the November Opinion that in this adversary proceeding, the applicable federal regulation contains even stronger language than the regulation at issue

and that such approval had not been obtained.  The Board stated:

> [HCB's] due process argument assumes that even though its lease assignments were
> not approved as required . . .  it nevertheless acquired a property interest in the leases.
> [HCB] contends that because the Secretary has authority to approve a conveyance of
> trust or restricted lands retroactively, with approval relating back to the date of the
> execution of the attempted conveyance, its "title" is not void, but merely imperfect
> until approved. [HCB] cites *Lykins v. McGrath*, 184 U.S. 169 (1902), and *Pickering
> v. Lomax*, 145 U.S. 310 (1892), in support of this argument.  In *Wishkeno v. Deputy
> Assistant Secretary--Indian Affairs (Operations)*, 11 IBIA 21 (1982), the Board
> addressed retroactive approval of conveyances of trust or restricted lands.
> Retroactive approval is predicated on the requirement that "the transaction [be] fair
> in all respects," although the conveyance document was not properly presented to
> BIA for approval. *George Big Knife*, 13 L.D. 511, 515 (1891). As the Supreme Court
> has held, however, "[t]he doctrine of relation [back in retroactive approval of
> conveyances of trust or restricted lands] is a legal fiction, resorted to for the purpose
> of accomplishing justice." *Kendall v. Ewert*, 259 U.S. 139, 148 (1922). The doctrine
> of retroactive approval of conveyances of trust or restricted lands has no effect in the
> present situation. The doctrine provides that, under appropriate conditions and for
> equitable reasons, a conveyance that initially had no force or effect for failure to be
> approved may be revived through the application of a legal fiction. This does not
> equate with a finding that the initial unapproved conveyance actually passed some
> form of legal title or property interest to the grantee. Such a holding would be
> antithetical to the very essence of the statutory and regulatory proscriptions against
> the conveyance of trust or restricted lands without Secretarial approval. The Board
> has previously held that an unapproved conveyance of trust or restricted lands is void
> ab initio, has no force or effect, and grants no rights to either the attempted grantor
> or grantee. *Smith v. Acting Billings Area Director*, 17 IBIA 231, 235 (1989).
> Although Smith dealt with an initial lease of trust or restricted lands, the Board finds
> that the same rule applies to assignments. Because an assignment of a lease of trust
> or restricted lands is not effective until it has been approved, appellant acquired no
> interest in the leases and was not a party to them. Accordingly, appellant was not a
> person to whom BIA was required to give notice of actions affecting lease
> management and lacks standing to object to any such actions.

*HCB*, 1990 WL 321035 at *3.  The Board therefore dismissed HCB's appeal.

The Trustee also relied on *Chisum v. Acting Muskogee Area Director*, 1996 WL 287746

---

in *HCB*.  The regulation at issue here, 25 C.F.R. § 225.33, provides that an assignment of a minerals agreement *shall
not be valid* without the approval of the Secretary, while the regulation at issue in *HCB* merely required Secretary
approval of assignments, without specifying any consequence from the failure to obtain such approval.

(IBIA May 16, 1996). In that case, the BIA issued a notice to BKANS Oil, Inc. stating that a lease had expired for failure to produce oil in paying quantities. The notice stated: "it is our understanding that this lease was sold and commercially assigned to Mr. Gerald Chisum . . . however, as this transfer of title was not approved by the Secretary of the Interior, BKANS Oil, Inc. remains lessee of record." *Chisum*, 1996 WL 287746 at *1. The assignee, Chisum, sought review of the BIA's decision. The Board cited its earlier *HCB* case to Chisum and gave Chisum a deadline to "show that he had standing to bring this appeal." *Id.* Chisum did not respond, and the Board dismissed his appeal.

In connection with the Pugh MSJ, the Court noted that the Board of Indian Appeals has continued to cite to its own decision in *HCB*. *See e.g., Uinta Oil & Gas, Inc. v. Acting Phoenix Area Director*, 1994 WL 682956 (IBIA Nov. 4, 1994) (dismissing appeal for lack of standing where appellant did not show BIA approval of an assignment to it and thus failed to show "it had a valid interest in the lease"); *Pacific Enterprises Oil Co. v. Muskogee Area Director*, 1994 WL 593093 (IBIA Oct. 20, 1994). In *Pacific Enterprises*, Pacific Enterprises Oil Co. ("Pacific") appealed a BIA decision that an oil and gas lease had expired for failure to produce oil in paying quantities. Pacific, the lessee of record, had been notified by the BIA of its determination in May of 1994, and had also been notified that an appeal must be mailed within thirty days. In September, Pacific filed its notice of appeal, and contended that the appeal should be considered as timely filed in part because Pacific had sold and/or assigned its interest in the lease in 1985 and had instructed the assignee to obtain approval of that assignment from the BIA. The Board dismissed the appeal as untimely, noting:

> [t]he lessee's duties do not end until the assignment is approved. [Pacific's] belief concerning what another person might have been informed and/or might have done does not support a finding that [Pacific] has no responsibility toward this lease based on an assignment . . . [Pacific] has not submitted any evidence or argument sufficient to warrant a finding that it is not the lessee of record for this lease; that it was not responsible for providing BIA with its current address; or that it should not be

charged with receipt of a BIA letter sent to it at its address of record, and signed for at that location.

*Pacific Enterprises*, 1994 WL 593093 at *2.

In response to the Trustee's argument that the B-C Assignment was invalid and void ab initio, Pugh distinguished these cases on the ground that each involved a dispute between one of the parties to the unapproved assignment and the government, and not a dispute between two private parties over the validity of an unapproved assignment as between them. Pugh argued, citing *Wood v. Cunningham*, 147 P.3d 1132 (N.M. Ct. App. 2006), that this distinction was significant, and the Court ultimately agreed in the November Opinion.

In *Wood*, a seller tried to rescind a purchase and sale agreement ("PSA") under which the seller sold its interest in oil and gas leases on Navajo Nation land to the buyer. The *Wood* court first noted that it was undisputed that the assignments of the oil and gas leases had to be approved by the BIA and the Navajo Nation. The seller argued that such approval was a condition precedent to the effectiveness of the PSA. In rejecting this argument, the *Wood* court first noted that the contract itself did not evidence such an intent. There was no performance made contingent upon BIA approval; there was no deadline in the agreement for obtaining such approval. And, because the lack of BIA approval resulted in no injury to the seller, the *Wood* court held that the seller could not rescind its sale. The court further noted that the case before it was *not* a case in which the *buyer* was seeking rescission for a failure to receive good title. In this context, the *Wood* court concluded that the purpose of BIA approval is to effectuate the fiduciary duty the United States owes to Indian tribes, and the PSA's validity or lack thereof for failure to obtain BIA approval was solely a matter between the buyer and the government. However, as between *the parties to the agreement*, the lack of BIA approval did not render the PSA invalid or ineffective.

Memorandum Opinion                                                                                                    17

This Court concluded, in its November Opinion, that like the seller in *Wood*,[16] the Trustee, standing in Vallecito's shoes as assignor, was seeking to hold Vallecito's assignment invalid, and that it would be odd to find that Vallecito could argue that its own assignment was invalid for lack of BIA approval, when BIA approval is required in order to protect *the Indian tribe*, not Vallecito. *See* November Opinion, p. 23. Therefore, the Court concluded that it made perfect sense that the government (*i.e.*, the BIA) could assert rights that the parties to the agreement could not. *Id.; see also Chuska Energy Co. v. Mobil Exploration & Producing North America, Inc.*, 854 F.2d 727, 732 (5th Cir. 1988) ("That the Navajos or the Secretary of the Interior could have standing in federal court to challenge the assignment does not confer a similar right on non-tribal or non-governmental litigants whom it was not designed to protect").

The Court also relied in its November Opinion on *Ganas v. Tselos*, 11 P.2d 751 (Ok. 1932), in which the court rejected an argument that an assignment of an interest in an oil and gas lease on Indian land was void for lack of approval of the Secretary of the Interior. The plaintiff in *Ganas* alleged that at the defendant's request, plaintiff drilled wells and operated oil and gas leases for the defendant, who had invested funds. The parties had an oral agreement whereby the plaintiff would operate the lease and pay its expenses and the defendant would receive the oil and gas proceeds, but when plaintiff's expenses reached a certain amount, the defendant agreed to assign a one-half interest in the lease to the plaintiff. The defendant thereafter argued that its agreement to assign the lease interest was void. After noting that the action before it was *not* an action to enforce specific

---

[16] The *Wood* court cited to two administrative appeals decisions of the Interior Board of Land Appeals as further support for its holding. While the Court finds the *Wood* decision persuasive, these other two cases are not particularly helpful here because neither directly addresses the validity of an unapproved assignment of Indian leases as between the parties to the assignment. *See Petrol Resources Corp.*, 1982 WL 34736 (Bd. of Land Appeals, June 24, 1982) and *Frederick J. Schlicher*, 1981 WL 28612 (Bd. of Land Appeals, Apr. 10, 1981).

performance of the agreement to assign, but rather an action seeking an accounting, the court held that a lessee of an oil and gas lease on Indian land may contract for the sale or disposal of the lease on the same terms as he might contract respecting an ordinary commercial lease. "If the proposed assignment be approved by the Secretary of the Interior, the conditions and terms of the contract for the sale thereof will be given the same effect as if the assignment had passed the title to the assignee at the time of execution and delivery." The *Ganas* court cited with approval the rule announced by the Eighth Circuit in *Hertzel v. Weber*, 283 F. 921 (8th Cir. 1922), which was that a lease of Indian land that had not been approved by the Secretary of the Interior was not void, and the Eighth Circuit's statement in *Hertzel* that "while such a contract was subject to approval by the Secretary of the Interior . . . it was not in violation of the act. The plaintiff had a right to the assignment as per the agreement, and it would then be a matter between the plaintiff and the Secretary of the Interior as to its approval." *Ganas*, 11 P.2d at 753. As announced by the *Hertzel* court, a general rule of statutory (and contractual) construction is that:

> an act declared to be void by statute which is malum in se or against public policy is utterly void and incapable of ratification, but an act or contract so declared void, which is neither wrong in itself nor against public policy, but which has been declared void for the protection or benefit of a certain party, or class of parties, is voidable only and is capable of ratification by the acts or silence of the beneficiary or beneficiaries . . . Such an act or contract is valid until avoided, not void until validated, and it is subject to ratification and estoppel.

*Hertzel*, 283 F. at 928.[17]

---

[17] The *Hertzel* case involved a lease by two Cherokee to third-party lessees. The lease was made pursuant to a federal statute that originally allotted lands to the Cherokee, and was approved by the Secretary of the Interior, as required by that statute. The lease also contained a provision stating that no sublease or assignment could be made without the approval of the Secretary of the Interior, or any such sublease or assignment would be void. After the lease, the lessees reached a verbal agreement with Weber for drilling oil and gas. Weber allegedly made a further agreement with Hertzel respecting a division of the drilling expenses and oil and gas proceeds. A dispute arose between Hertzel and Weber, and Hertzel subsequently purchased the leased lands from the Cherokee, and sued Weber in federal court seeking to evict him on the ground that the verbal agreement between the original lessees and Weber was void. The

In its November Opinion, the Court found the *Wood*, *Ganas* and *Hertzel* cases persuasive. In addition, the Court concluded that there was no policy reason to permit private parties who have negotiated their contract to escape the consequences of an otherwise valid assignment by asserting a statutory right enacted and designed to protect a class of persons to which they did not belong. *See* November Opinion, p. 26. The Court also noted that had Vallecito and B-C wanted to negotiate an assignment that was conditioned upon BIA approval, they could have done so. Having failed to include such a provision in their otherwise valid and binding assignment, the Court concluded that neither party should be able to avoid being bound by their agreement by taking advantage of the regulations requiring BIA approval of that assignment, since the purpose of the requirement that the BIA approve assignments of oil and gas leases on Indian land is "to effectuate the fiduciary duty the United States Government as trustee owes the beneficiary Indian tribes," *Wood*, 147 P.3d at 1136, not to protect private contracting parties from their own bargain. *See* November Opinion, p. 26. Ultimately, therefore, the Court concluded that the B-C Assignment was not void ab initio at the time of the Pugh MSJ. The Court recognized, however, that the B-C Assignment may ultimately be avoided if the Navajo Nation and/or the BIA fails to approve it. Therefore, the Court denied the Pugh MSJ to the extent it sought a declaration that Pugh's ORRI Interest was void because the B-C Assignment was void (and therefore B-C had no title to transfer to Pugh).

Having concluded that the B-C Assignment was valid as between Vallecito and B-C, the Court noted that the ordinary result would be that the Hogback Lease was not property of the estate on the Petition Date, as it had been transferred away. *In re Onasni Property Group, LLC*, 425 B.R.

---

Eighth Circuit rejected that argument, despite the requirement of the approval of the Secretary of the Interior and the contractual language stating that unapproved assignments would be void.

237 (Bankr. W.D. Pa. 2010) (rents that had been assigned pre-petition were not property of the estate); *In re Jones Const. & Renovation, Inc.*, 337 B.R. 579 (Bankr. E.D. Va. 2006) (debtor's pre-petition assignment of construction contract proceeds to surety prevented proceeds from becoming property of the estate); *In re Brooks*, 248 B.R. 99 (Bankr. W.D. Mich. 2000) (debtor's pre-petition assignment of right to receive payments under settlement agreement prevented payments from inclusion in property of the debtor's estate); *cf., Kapila v. Deutsch Bank AG (In re Louis J. Pearlman Enters., Inc.)*, 398 B.R. 59 (Bankr. M.D. Fla. 2008) (an individual's pre-petition transfer of all interests in a limited liability corporation to a bank without the consent of the majority of members in the LLC, which was required by the LLC's operating agreement in order to effectuate such a transfer, was void, such that no interest was in fact transferred to the bank and thus the membership interests were property of the individual's bankruptcy estate on the petition date). The Court noted in its November Opinion, however, that the B-C Assignment is no ordinary assignment, since it was required by federal law to be approved by the BIA.[18] The Trustee and the Defendants had agreed that such approval had neither been sought nor obtained, but the Court noted that in the words of the *Hertzel* court, the B-C Assignment was "valid until avoided." *Hertzel*, 283 F. at 928. It was this possibility of avoidance (if the BIA refused to approve the B-C Assignment), that changed the outcome of the analysis as to whether the Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date. As the Court noted in the November Opinion, the outcome changed because under § 541(a) of the Bankruptcy Code, the Vallecito estate was comprised of "all

---

[18] The Trustee argued in the Pugh MSJ that approval by the Navajo Nation was also required, and Pugh did not appear to dispute that claim. The Court noted in its November Opinion that the regulation upon which the Trustee relied, 25 C.F.R. 225.33, requires approval of the Indian mineral owner only "if required in the minerals agreement." The Court noted that neither side had provided the Court with a copy of the original minerals agreement. It has now been provided, *see* Ex. 1, and it does not appear to require the consent of the Indian mineral owner (*i.e.*, the Navajo Nation) to assignments.

**Memorandum Opinion**

legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." 11 U.S.C. § 541(a). The Court noted that legions of cases have stated that Congress's intent was to define "property of the estate" in the broadest possible sense. *See, e.g., In re Graves*, 609 F.3d 1153, 1156 (10th Cir. 2010); *In re Builders Transport, Inc.*, 471 F.3d 1178, 1185 (11th Cir. 2006); *In re Burgess*, 438 F.3d 493, 509 (5th Cir. 2006). It further noted that legions of cases have held that even contingent interests are property of the estate, citing *In re Dittmar*, 618 F.3d 1199, 1207 (10th Cir. 2010) (an interest may be property of the estate even if it is novel or contingent); *In re McClain*, 516 F.3d 301 (5th Cir. 2008) (§ 541 brings into the estate all interests held by the debtor, even future, non-possessory, contingent, speculative and derivative interests); *In re Wick*, 276 F.3d 412 (8th Cir. 2002) (unvested options contingent on continued employment are property of the estate); and *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993) ("every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within reach of section 541"). The Court concluded in its November Opinion that if the B-C Assignment was not ultimately approved by the BIA, title to the Hogback Lease would revert to Vallecito, the last party to hold title that had received such approvals.[19] The Court also concluded that even a contingent, reversionary interest is included within the bankruptcy estate, relying upon *In re Graves*, 609 F.3d 1153 (10th Cir. 2010); *Askanase v. LivingWell, Inc.*, 45 F.3d 103 (5th Cir. 1995); *In re Spring Ford Indus., Inc.*, 338 B.R. 255 (E.D. Pa. 2006); and *DCRI L.P. No. 2, Inc.*, 299

---

[19] In connection with the Pugh MSJ, neither side provided any evidence, or briefed the issue, as to what happens if the BIA does not ultimately approve the B-C Assignment. That remains true today. As the Court noted in its November Opinion, however, logic dictates that if the BIA refuses to approve the B-C Assignment, it will at that point be invalid and therefore Vallecito will be the full and rightful holder of the Hogback Lease.

B.R. 146 (Bankr. N.D. Tex. 2003).[20] For these reasons, and notwithstanding the B-C Assignment, the Court concluded in its November Opinion that Vallecito retained a sufficient interest in the Hogback Lease to make it property of the estate on the Petition Date.

Both the Trustee and the Defendants ask this Court to re-visit these rulings, to a certain extent,[21] in light of events that occurred in this adversary proceeding after the issuance of the November Opinion. Specifically, on October 28, 2010, while the Pugh MSJ was pending but the Court had not yet ruled, the Trustee filed a motion for summary judgment against B-C on Count V of the Complaint (the "B-C MSJ") and sought a declaration that B-C: (a) was bound by the Confirmation Order, (b) was barred by res judicata from asserting any interest in the Hogback Lease, and/or (c) had no interest in the Hogback Lease at any time because B-C never sought or obtained

---

[20] In coming to its conclusion that the Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date in the November Opinion, the Court considered and rejected several of Pugh's arguments. First, the Court rejected Pugh's argument that B-C's recording of the B-C Assignment in the San Juan County Clerk's Office seven months prior to the Petition Date had any effect on title to the Hogback Lease, on the ground that while recording is relevant in determining priority between competing lien claimants, it does nothing to create title. Second, the Court rejected Pugh's argument that because Vallecito did not obtain BIA approval of the assignment from Tiffany until after the Petition Date, Vallecito did not hold title on the Petition Date, citing *Wood v. Cunningham*, 147 P.3d 1132, 1136 (N.M. Ct. App. 2006) ("if the proposed assignment be approved by the Secretary of the Interior, the conditions and terms of the contract for the sale thereof will be given the same effect as if the assignment had passed the title to the assignee at the time of its execution and delivery"). Third, the Court rejected Pugh's argument that Vallecito's failure to schedule the Hogback Lease as an asset of the estate on the Petition Date precluded it from being property of the estate under § 541, since the fact that Vallecito may have taken the position on the Petition Date that the Hogback Lease was not its property was not conclusive as to its actual interest in the Hogback Lease. Fourth, the Court rejected Pugh's argument that the fact that the Trustee later sought to have B-C "disclaim" any interest in the Hogback Lease affected its character as property of the estate on the Petition Date, since the Trustee's desire to obtain a "disclaimer" from Briggs, Cockerham, and B-C was no doubt the result of a belt-and-suspenders approach in recognition of the fact that B-C claimed, at that time, an interest in the Hogback Lease by virtue of the B-C Assignment. For the same reason, the Court also rejected Pugh's argument that the Trustee's inclusion of provisions in the Plan and Confirmation Order purporting to require a transfer "back" to Vallecito from B-C had any effect on title as of the Petition Date.

[21] The Trustee "recognizes that the Court determined previously that the lack of approval of the BIA could not be raised to void a purported transfer by the Trustee . . . the Trustee respectfully submits, however, that the posture of this case warrants the Court reviewing its prior ruling." *Trustee's Trial Br.*, p. 10. Similarly, the Defendants assert that they "are aware that the Court addressed the issue of whether the Hogback Lease was property of the Vallecito bankruptcy in connection with the Trustee's motion for partial summary judgment against Mr. Pugh. The Kievet Defendants and the Wolz Defendants incorporate the arguments raised by Pugh in the summary judgment so as not to be considered as to have waived the argument." *Defs' Trial Br.*, p. 5.

**Memorandum Opinion**                                                                                              23

approval of the Navajo Nation and/or the BIA.[22]  By the time the B-C MSJ was heard, the Court had

ruled on the Pugh MSJ, and the Court's ruling on the Pugh MSJ mooted the Trustee's request for a

judgment that the B-C Assignment was void for lack of Navajo Nation/BIA approval.  Accordingly,

by the time the B-C MSJ was argued on December 7, 2010, the November Opinion had been entered

and the Court was only required to rule on the first two grounds asserted by the Trustee in the B-C

MSJ.  On December 21, 2010, the Court issued an oral ruling on the B-C MSJ (the "December

Opinion").  *See* Transcript of hearing held 12/21/10, Docket No. 142.

In its December Opinion, the Court first ruled that B-C was bound by the Plan and

Confirmation Order because B-C was a creditor of Vallecito, had received copies of the disclosure

statement, Plan, notices of hearing and the order setting deadlines to object to confirmation, yet had

failed to object to confirmation of the Plan or appeal the Confirmation Order.  Second, the Court

ruled that because B-C was bound by the Plan and the Confirmation Order, B-C could no longer

contest approval of the settlement between the Trustee and B-C embodied in the Plan, even if that

settlement as described in the Plan was inconsistent with, and allegedly went beyond, B-C's disclaimer

of its interest in the Hogback Lease in open court on April 17, 2008, because the Confirmation Order

was res judicata as to those issues.  The Court therefore granted the B-C MSJ in part, and concluded

that B-C "has no right, title or interest in or to the Hogback lease [sic] that it may assert, given

confirmation of the Plan.  And anyone acting or purporting to act on its behalf cannot legally assert

any right, title, or interest in or to the Hogback lease [sic]."  *Tr*. 12/21/10, p. 24:8-14.

The Trustee now argues that in light of the Court's ruling in the December Opinion, it is clear

that B-C can no longer seek approval of the B-C Assignment, and cannot assist the ORRIs in seeking

---

[22] In other words, the Trustee sought a summary judgment on his Count V claims against B-C.

approval of the ORRI Assignments that are consequently void for lack of Navajo Nation approval. Further, the Trustee asserts that despite this Court's conclusion in the November Opinion that the Trustee lacked standing to raise the lack of approval of the B-C Assignment because his predecessor-in-interest, Vallecito, was a party to that assignment, he can nevertheless raise the same issue as to the ORRI Assignments because Vallecito was not a party to any of the ORRI Assignments; thus, the cases this Court relied upon in its November Opinion are distinguishable. The Trustee argues that "this is not a case in which one party to a transaction is attempting to use the approval process as a way to escape a deal it entered into." *Trustee's Pre-Trial Br.*, p. 10. The Trustee does not, of course, take issue with the Court's conclusion in the November Opinion that Vallecito retained a sufficient interest in the Hogback Lease, even after assigning it to B-C, such that the Hogback Lease was property of Vallecito's estate on the Petition Date.

The Defendants, most of whom were not parties to the Pugh MSJ where the issue was decided, continue to assert that the Hogback Lease was not property of the estate on the Petition Date. They further assert that even if, as the Court concluded in the November Opinion, Vallecito's contingent, reversionary interest in the Hogback Lease was sufficient to cause it to be property of the estate on the Petition Date, that interest has not vested and thus the assignments of ORRIs to the Defendants were not in violation of the automatic stay and the ORRI Assignments were not transfers of property of the estate and thus are not avoidable under § 549. They further assert that the Trustee cannot raise the lack of Navajo Nation approval of their ORRIs as a basis for invalidating their interests, for the same reasons found by the Court in the November Opinion. Lastly, the Defendants assert that even if B-C is excused from seeking BIA/Navajo Nation approval of its assignment, the Trustee is contractually obligated to apply for Navajo Nation consent to the ORRIs, because there

is a warranty clause in the ORRI Assignments that binds the Trustee.

The Trustee responds that any obligation to assist B-C in obtaining BIA/Navajo Nation approval of the B-C Assignment was released under the Plan.

As noted earlier, the Court relied, in part, on the *Graves* case for its conclusion that the Hogback Lease was property of the estate on the Petition Date. In a supplemental trial brief, the Defendants attempt to distinguish the *Graves* case. In *Graves*, James and Kathryn Graves filed their 2006 tax return, which showed that they were entitled to a $3,000 tax refund. Rather than receive the refund, the Graveses elected to leave the funds on deposit with the IRS and have them applied to their 2007 tax liability. Under the Internal Revenue Code, that election is irrevocable, and "no claim for credit or refund of such overpayment shall be allowed for the taxable year in which the overpayment arises." *See* 26 U.S.C. § 6513(d). In other words, having made the election to have their 2006 refund held by the IRS and applied towards their 2007 tax liability, if any, the Graveses gave up any right to possess the $3,000 until after their 2007 tax liability was determined. Two months after filing their 2006 return, the Graveses filed for relief under chapter 7 of the Bankruptcy Code. Their chapter 7 trustee filed a motion for turnover of the 2006 refund, arguing that since the debtors were receiving the benefit of the application of the refund, the refund should be treated as an account receivable of the debtors, and the debtors should therefore be required to turnover $3,000 to the estate. The bankruptcy court denied the motion, and the trustee appealed. The Bankruptcy Appellate Panel for the Tenth Circuit affirmed, *Weinman v. Graves*, 396 B.R. 70 (10th Cir. BAP 2008), and the trustee appealed. The Tenth Circuit affirmed, noting first the breadth of § 541 and the resulting rule that property of the bankruptcy estate is broad enough to include the debtor's interests which cannot be liquidated and transferred by the debtor. The Circuit then noted "one of

the central precepts of bankruptcy law":

> a bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition. Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest. Further, a trustee takes the property subject to the same restrictions that existed at the commencement of the case. To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate.

*Graves*, 609 F.3d at 1156. The Circuit then noted that the trustee's interest in the application of the tax refund was limited to the same extent as the debtors' – *i.e.*, by the Internal Revenue Code, and since the debtors had no right to any of the cash prior to the determination of their 2007 liability (and would only have a right to any of the cash if any funds were left over after application to their 2007 taxes), the trustee had no such right either. The Circuit then stated: "The portion of that further refund attributable to pre-petition earnings would become property of the estate. Thus, we hold that the estate's interest in the pre-payment is limited to debtors' contingent reversionary interest in the pre-payment attributable to pre-petition earnings." *Id*. The Court then analyzed the language of § 542, which requires that the "turnover targets" be "in possession custody, or control, during the case, of property that the trustee may use, sell, or lease under" § 363, and concluded that the debtors had never been in possession, custody, or control of their contingent reversionary interest in the prepayment of their 2007 taxes and thus the trustee's turnover motion was denied because at no time during the case did the debtors have the right to obtain their refund from the IRS.

Here, the Defendants take issue with this Court's analysis of the *Graves* case, cited by the Court for the proposition that a contingent reversionary interest is property of the estate. The Defendants assert that the Court did not place as fine a point on the issue as the *Graves* court did.

They argue:

In the instant matter, assuming that a contingent reversionary interest can be property of the estate, the Trustee's interest in the Hogback Lease at the time of the assignments of the overriding royalty interests was, at best, a future contingent reversionary interest which was, and has not, vested in the estate. The assignment of the Hogback Lease from Vallecito to Briggs-Cockerham and then Briggs-Cockerhams' [sic] assignments of the overriding royalty interest to the Defendants were irrevocable transfers. After Vallecito's assignment to Briggs-Cockerham, the Trustee had no rights of possession or control over the Hogback Lease, and, further, the Trustee has no current rights of possession of, or control over, the interests assigned to the Defendants. The assignments of the overriding royalty interests were not violations of the automatic stay because the contingent reversionary interest of the estate had not, and still has not, vested. The assignments were not an attempt to obtain possession or control of property of the estate. Just as in the *Graves* case, once the deposit was irrevocably transferred to the IRS, the IRS' application of the funds to future tax liability of the debtors was not a violation of the stay. The only property of the estate is the contingent reversionary interest, and it was not assigned or conveyed. Therefore, the transfers of the overriding royalty interests were not transfers of property of the estate, and therefore, not avoidable under §544 or §549(a), nor were the transfers violations of §362(a)(3) as they were not acts to obtain possession of property of the estate, from the estate or to exercise control over property of the estate.

*Defs' Supp. Trial Br.*, p. 4.

The Court disagrees. First, the *Graves* court did not speak in terms of the "vesting" of any interest. More importantly, the nature of the interest that the debtors retained in *Graves* differs significantly from the nature of the interest held by Vallecito on the Petition Date. In *Graves*, the debtors irrevocably transferred their interest in the 2006 tax refund, just as Vallecito irrevocably transferred its interest in the Hogback Lease to B-C. However, in *Graves*, the Internal Revenue Code also provided that the debtors would have no interest at all in the funds transferred, unless there was a refund due to them after their 2007 taxes were determined. However, if their 2007 tax return showed that the debtors, for example, owed $5,000, then the full $3,000 tax refund would have been applied to their 2007 taxes and the debtors would have been entitled to nothing. If their 2007 return showed that the debtors owed $2,000, then $2,000 of the 2006 overpayment would have been applied

to the 2007 taxes, and the debtors would have received $1,000 back from the IRS. It is this potential "leftover" amount that the debtors would receive back, if anything, once the contingency of their 2007 tax liability was resolved, and it is only this "leftover" amount that the Circuit held was property of the estate. Here, however, Vallecito transferred the entirety of its interest to B-C (concededly irrevocably). But if the Navajo Nation and/or BIA failed to approve the assignment, the entirety of what had been transferred would be returned. Therefore, the entirety of what was transferred away would come back, and Vallecito (and therefore, the Trustee) had, and has, a contingent reversionary interest in the entire Hogback Lease – vested or not. The Circuit in *Graves* did not hold that the overpayment was not property of the estate because the debtors' contingent, reversionary interest had not vested – it held that the portion of the refund which would end up being applied to the 2007 taxes would never be property of the estate, but the portion of the refund which could, statutorily, come back – would be property of the estate.

The Court therefore adheres to its original ruling, as announced in the November Opinion – that Vallecito's contingent reversionary interest in the Hogback Lease meant that it was property of the estate on the Petition Date.[23] It was property of the estate on the Petition Date, as opposed to when the contingency gets resolved, because unlike the *Graves* case, Vallecito did not transfer it away in the face of a statute that provided that only some of what had been transferred may come back. Therefore, Vallecito held a contingent, reversionary interest in the entire Hogback Lease on the

---

[23] The Court also adheres to its ruling in the November Opinion that a contingent, reversionary interest in property is property of the estate. Defendants in the supplemental trial brief note that they "do not concede that contingent reversionary interests are property of the estate," and cite the Court to three cases – *Mid-Jersey Nat'l Bank v. Fidelity-Mortgage Investors*, 518 F.2d 640 (3rd Cir. 1975), *Saper v. West*, 263 F.2d 422 (2nd Cir. 1959), and *Grubb v. FDIC*, 833 F.2d 222 (10th Cir. 1987). First, none of these cases are within this Circuit and none are therefore binding on this Court. More importantly, the first two were decided prior to the enactment of § 541 which, as noted earlier, is intended to define the term "property of the estate" in the broadest possible sense. The third was not a bankruptcy case, involving § 541, but was a receivership case.

Petition Date.

Next, as noted earlier, the Trustee asserts that despite this Court's conclusion in the November Opinion that the Trustee lacked standing to raise the lack of approval of the B-C Assignment because his predecessor-in-interest, Vallecito, was a party to that assignment, he can nevertheless raise the same issue as to the ORRIs, because Vallecito was not a party to any of the ORRI Assignments and thus the cases this Court relied upon in its November Opinion are distinguishable.  The Trustee argues that "this is not a case in which one party to a transaction is attempting to use the approval process as a way to escape a deal it entered into." *Trustee's Pre-Trial Br.*, p. 10.  In response, the Defendants assert that the Trustee cannot raise the lack of Navajo Nation  approval of their ORRIs as a basis for invalidating their interests for the same reasons found by the Court in the November Opinion.  The Court agrees with the Defendants, as explained below.

The Court does not believe that the fact that the Trustee is not a party to the ORRI Assignments he now seeks to avoid assists the Trustee in his quest for avoidance.  It is true that in most of the cases that raise the issue of whether a private party can use the lack of Navajo Nation approval as a basis for invalidating an agreement, it is one of the parties to the agreement that is raising the issue.  However, the Court notes that in *Hertzel v. Weber*, 283 F. 921 (8th Cir. 1922), cited by the Court in its November Opinion, the party contesting the validity of an unapproved assignment was *not* one of the parties to the unapproved assignment.  *See supra,* n. 3.  Despite the fact that the person challenging the validity of an assignment on the basis of lack of approval by the Secretary of the Interior was *not* a party to the challenged assignment, the Eighth Circuit held that he could not do so, because the regulations requiring Secretary approval were enacted for the benefit of the Indians, not the challenger.

Such is the case here.  In its November Opinion, the Court held that the Trustee could not challenge the B-C Assignment because the requirements for Navajo Nation/BIA approval were for the benefit of the Navajo Nation.  It is true that in the course of doing so, the Court cited to cases, including *Hertzel*, that have held that "as between the parties to the agreement," the lack of government approval does not render an agreement invalid.  By using that language, neither the cases cited by the Court in its November Opinion nor this Court meant that *only* the parties to an agreement are precluded from challenging its validity on this basis.  Rather, the real holding of this Court was that no one, other than the BIA or the tribe for whose benefit the regulation requiring tribal and BIA approval was promulgated, could raise the issue.  Moreover, it would be anomalous to conclude that non-protected third parties, who are strangers to the agreement, have greater rights than the parties to the agreement themselves.  Therefore, the Court adheres to its earlier ruling in the November Opinion that the Trustee may not invoke the lack of Navajo Nation consent to the B-C Assignment and/or the ORRI Assignments as a basis to challenge B-C's assignment of ORRIs to the Defendants and invalidate the Defendants' interests in the Hogback Lease.

The Court's conclusion that the Trustee may not invoke the lack of Navajo Nation consent as a basis to challenge either the B-C Assignment or B-C's assignment of the ORRIs disposes in full of the Trustee's fourth cause of action against Kievit, as that is the sole basis upon which the Trustee asserts that he is entitled to a declaration that Kievit's interest is "void or voidable" and that Kievit has "no right, title or interest in the Hogback Lease as a result of" the ORRI Assignment to Kievit.[24]

---

[24] The fourth cause of action also asserts that Kievit had constructive notice of (1) the Land Titles and Records Office of the Bureau of Indian Affairs and (2) the real property records in San Juan County, New Mexico, both of which the Trustee alleges gave Kievit notice of a title problem regarding the Hogback Lease.  However, constructive notice of such records, which might be relevant to Kievit's status as a bona fide purchaser, does not serve as an independent basis to avoid Kievit's recording of his ORRI Assignment.  The causes of action in the Complaint which put "bona fide purchaser" status at issue are the Trustee's causes of action relating to §§ 362 and 549.  As Kievit's ORRI Assignment

Kievit is entitled to the entry of a judgment that the Trustee take nothing on this claim.

Since the Court has concluded that the Trustee cannot raise the issue of lack of Navajo Nation consent to the ORRI Assignments as a basis to attack their validity, the Court need not consider whether the ORRIs are void, or invalid, absent Navajo Nation consent. However, the Court will nevertheless address that issue, to facilitate any appellate review.

The Trustee asserts that the Defendants lack an interest in the Hogback Lease, citing § 605 of the Navajo Nation Code. As is relevant here, that statute provides:

> A. Any transfer of a Navajo Nation mining interest or all rights arising under leases, permits, other agreements including farm-out and operating agreements heretofore approved by the Navajo Nation, or an interest in the aforementioned . . . may be done either by assignment, reassignment or by entering into a working agreement or in any other manner, only if the following requirements are fully complied with:
> * * *
> 1. The assignor and assignee shall complete and file a Navajo Nation Assignment of Mining Interest form with the Minerals Department. Forms and updated instructions shall be available from the Minerals Department of the Navajo Nation.
> * * *
> 6. No overriding royalty may be created by any transfer authorized hereby without the consent of the Minerals Department of the Navajo Nation nor shall such overriding royalty be approved if it is determined by the Minerals Department that it will have such an adverse economic impact that it may prevent full recovery of the mineral resources.

18 N.N.C. § 605( (West 2005 & Supp. 2009).

It is undisputed that the Navajo Nation has not been asked to consent to, and has not consented to, the ORRI Assignments. However, it is also undisputed that there is no deadline imposed by either the statute or the assignment documents themselves within which the Defendants must seek such approval. For this reason, the Court concluded in the November Opinion that the fact

---

was recorded pre-petition, these causes of action are not, and could not be, asserted against Kievit.

that the Navajo Nation had not yet approved the ORRI Assignments did not render them void ab initio because there was no evidence in the summary judgment record that Navajo Nation consent could not still be obtained.

The Court notes that the parties have not cited to any cases interpreting § 605 of the Navajo Nation Code, and the Court's independent research has failed to locate a single case interpreting this statute.[25] The Court must therefore look solely to the text of the statute itself and any other aids of construction to divine its meaning. All inquiries respecting statutory interpretations must begin "with the language of the statute itself." *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). Where a statute's language is plain, "the sole function of the courts is to enforce it according to its terms." *Id*. If a statute is susceptible to different meanings, the "fundamental question . . . is legislative intent and the reasons that prompted the legislature to enact the law," and the statute must be "interpreted as having the meaning that best conforms to the purpose of the law." *In re Whitaker Const. Co.*, 411 F.3d 197, 204-5 (5th Cir. 2005) (internal citations and quotations omitted).

Here, the dispute centers on the validity of the ORRI Assignments absent Navajo Nation consent. As noted above, the statute provides that "no overriding royalty may be created . . . without the consent" of the Navajo Nation. The words of the statute are plain. The word "created" must be given its ordinary meaning. *Castro v. Collecto, Inc.*, 634 F.3d 779, 786 (5th Cir. 2011) ("when terms used in a statute are undefined, we give them their ordinary meaning"). To "create" is "to make or bring into existence something new." Webster's Third New International Dictionary of the English Language 532 (Philip B. Gove, ed. 1993). Therefore, the Court concludes that in the event that the

---

[25] In fact, the Court has obtained the full set of West's Navajo Nation Code Annotated from the library of the Ninth Circuit, and that set reveals not a single annotation for § 605.

Court has erred and the Trustee *may* assert lack of Navajo Nation consent as a basis to avoid the ORRI Assignments, then in the absence of such Navajo Nation consent, the ORRIs have not yet been created and do not, therefore, exist and are null and void.

However, the Defendants assert that Navajo Nation consent to the ORRI Assignments can still be obtained and thus all is not lost. But, in response to this assertion, the Trustee correctly notes that § 605(a)(1) requires both the assignees – here, the Defendants, *and* the assignor – here, B-C, to complete and file a Navajo Nation Assignment of Mining Interest form. The Trustee argues that it is impossible, in light of the Court's December Opinion, for B-C to now complete and file for Navajo Nation consent to its assignment of the ORRIs to the Defendants. The Court agrees. As noted earlier, *see supra* p. 24, the Court in its December Opinion ruled that in view of the Plan and Confirmation Order, B-C "has no right, title or interest in or to the Hogback lease that it may assert, given confirmation of the Plan. And anyone acting or purporting to act on its behalf cannot legally assert any right, title, or interest in or to the Hogback lease." *Tr.* 12/21/10, p. 24:8-14. The Court concludes that B-C is, at this point, unable in light of the Court's December Opinion to complete and file an application for Navajo Nation consent, as such would be tantamount to an assertion that it has something to assign. Therefore, the Court agrees with the Trustee that it is no longer possible for B-C to seek Navajo Nation consent to its assignment of any interest in the Hogback Lease to the Defendants.

The Defendants also assert that even if *B-C* is unable to seek, or is excused from seeking, Navajo Nation consent to the ORRI Assignments, the *Trustee* is required to seek such consent – on two theories. First, the Defendants argue that the B-C Assignment contains a provision that states that:

Assignor shall, upon request, deliver to Assignee such additional documents as may be required by applicable government regulations, including, but not limited to, the rules and regulations of the Bureau of Indian Affairs and/or Bureau of Land Management, United States Department of the Interior, in order to filly [sic] effectuate or properly evidence the conveyance made herein, and Assignor shall cooperate with Assignee in obtaining the timely approval by such agency or agencies of any such documents. This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assign [sic].

*See* Ex. 7. The Defendants therefore argue that the Trustee, as successor to the "Assignor" (Vallecito) is bound by this provision and must assist B-C in obtaining approval of the B-C Assignment. In response, the Trustee argues that any obligation to assist B-C in obtaining approval of the B-C Assignment has been released under the settlement with B-C, as approved in the Plan.[26]

The Court agrees with the Trustee. Article 11.3 of the Plan, entitled "Compromise and Settlement of Certain Claims" provides:

(a) B-C, Briggs, Cockerham – In order to effectuate the Plan, any and all claims of B-C, Briggs, Cockerham and their Affiliates against the Debtor, shall be released, including, but not limited to B-C's allowed administrative expense claim pursuant to the Court's Order of January 11, 2008, in the amount of $158,500.00 and B-C's scheduled unsecured claim of $400,000.00. In addition, B-C, Briggs, and/or Cockerham expressly disclaim any right, title or interest in any and all property of the estate as defined in 11 U.S.C. § 541.

*See* Ex. 17 (Plan, Art. 11.3). This Court has ruled, in its December Opinion, that this settlement with B-C was approved as of the time of confirmation. As of that date, B-C released Vallecito from "any and all claims" and disclaimed any right, title or interest in any and all property of the estate, which the Court has held included Vallecito's contingent, reversionary interest in the entirety of the

---

[26] The Trustee further asserted at oral argument that unless the B-C Assignment is "validated" by approval of the Navajo Nation, B-C had nothing to assign, and therefore the ORRI Assignments are invalid because B-C had nothing to give them. Of course, the Court has already ruled in its November Opinion that the Trustee may not contest the validity of the B-C Assignment on the ground of lack of Navajo Nation/BIA approval and the B-C Assignment is valid as between Vallecito (and therefore the Trustee) and B-C, whether approved or not. The Court adheres to that ruling today. *See supra* pp. 13-20.

Hogback Lease. The Court concludes that the language of the Plan is broad enough to release Vallecito (and thus the Trustee) from any claims arising from his failure to assist B-C in obtaining Navajo Nation/BIA approval of the B-C Assignment. If B-C cannot assert such claims, neither can those who obtained their interests in the Hogback Lease through B-C.[27]

Second, the Defendants point out that it is undisputed that Vallecito assigned the Hogback Lease to B-C pre-petition. They then assert that

> there has never been a reconveyance yet back from Briggs-Cockerham to the estate. Confirmation is binding on . . . Briggs-Cockerham. At some point in time, and I believe if you read the plan, the plan says upon the effective date there will be a reconveyance back to the estate and a conveyance to the purchaser. At that point in time . . .that reconveyance back to the estate takes subject to anything in existence that Briggs-Cockerham had transferred, including our interest . . . and that what the trustee takes, at that point in time, is subject to the assignments from Briggs-Cockerham to the ORRIs which contains provisions that the assignor, Briggs-Cockerham, will assist in obtaining approvals. The trustee takes subject to that provision because the assignment says it inures to the benefit, it binds and inures to the benefit of the assignor and assignees. So we are saying that that binds whomever takes from Briggs-Cockerham, the estate, to assist in that approval process.

Audiotape of hearing held 5/9/11 at 11:54:25-11:55:58 (on file with Court). The Trustee's sole response to this argument is that there need not be a re-conveyance back to the estate. The Trustee points the Court to decretal paragraph 17 of the Confirmation Order, which provides as follows:

> Upon the Trustee's or Purchaser's request, any and all holders of any liens or encumbrances filed of public record or arising by statute, including but not limited to (a) Harold O'Connor; (b) Barrons Resources; (c) Sandia Development & Consulting, Inc.; (d) Michael Briggs; (e) John Cockerham; (f) Briggs-Cockerham LLC; (g) John Burle; and/or (h) Mary Clare Moser, shall execute a release of such liens and

---

[27] It is true that all of the Defendants got their ORRI Assignments from B-C prior to the date of confirmation and thus, at the time they got their interests, Vallecito was contractually obligated to assist B-C in obtaining Navajo Nation/BIA approval for the B-C Assignment. However, the Defendants are asserting that the Trustee is obligated to seek approval of the B-C Assignment *now*. The Court disagrees. In addition, the Court is at a loss to understand how, in the absence of evidence that the Defendants were third party beneficiaries of the B-C Assignment, the Defendants have standing to seek to enforce its terms. B-C itself is clearly precluded from doing so at this juncture by confirmation of the Plan.

encumbrances as, but only to the extent that, they affect the Hogback Lease or any other Hogback Assets. If any person or entity that has filed financing statements, mortgages, mechanics liens, maritime liens, abstracts, *lis pendens* or other documents evidencing a lien or encumbrance in the Hogback Lease or any Hogback Assets shall not have delivered to the Trustee prior to the closing of the sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such liens, claims, interests or encumbrances, the filing or recording of a certified copy of this Order shall constitute conclusive evidence of the release of all liens and encumbrances against the Hogback Lease and/or the Hogback Assets.

Ex. 18, p. 21.  The Trustee asserts that this provision means that B-C need not re-convey the Hogback Lease to the Vallecito estate, as the Confirmation Order serves as the re-conveyance document, and it is undisputed that the Trustee recorded a copy of the Confirmation Order in the property records of San Juan County, New Mexico on January 25, 2010.  Joint Pretrial Order, § II, ¶ 39.

The Court disagrees with the Trustee's interpretation of paragraph 17 of the Confirmation Order.  First, the Trustee conceded at trial that B-C's interest in the Hogback Lease is not a "lien." The Trustee argued (without citation to any authority) that it is an "encumbrance."  The Court disagrees.  An encumbrance is "a claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right *that is not an ownership interest*." Black's Law Dictionary (9th ed. 2009).[28]  By negative implication, an ownership interest in property is *not* an encumbrance.

More importantly, even if the Trustee was correct – *i.e,* that entry of the Confirmation Order is the event that constitutes the re-conveyance of the Hogback Lease back to the Vallecito estate –

---

[28] While not directly relevant, the Court notes that New Mexico's version of the Uniform Commercial Code defines an encumbrance as "a right, other than an ownership interest, in real property.  The term includes mortgages and other liens on real property.  N.M. Stat. Ann. § 55-9-102 (West 2011).

**Memorandum Opinion**                                                                                                    37

that event occurred on March 17, 2009. By that date, B-C had already granted the Defendants their

ORRIs, *see* Ex. A to Joint Pretrial Order (showing that the last ORRI was granted on January 29,

2009), pursuant to the ORRI Assignments, each of which stated:

> Assignor [B-C] shall, upon request, deliver to Assignee [the Defendants] such additional documents as may be required by applicable governmental regulations, including, but not limited to, the rules and regulations of the Bureau of Indian Affairs and/or Bureau of Land Management, United States Department of the Interior, in order to fully effectuate or properly evidence the conveyance made herein, and Assignor [B-C] shall cooperate with Assignee [the Defendants] in obtaining the timely approval by such agency or agencies of any such documents.

> This Assignment shall bind and inure to the benefit of the Assignor and Assignee and their respective successors and assigns.

*See* Exs. 20-85.

From the Court's perspective, any re-conveyance of the Hogback Lease back to the Vallecito

estate on March 17, 2009 cannot prevent the Trustee from receiving the Hogback Lease back from

B-C subject to the terms of the ORRI Assignments then in place. In other words, the Court

concludes that even assuming the Trustee is correct, such that the Vallecito estate got the Hogback

Lease back on March 17, 2009, the Vallecito estate got it back subject to what B-C had done with

it in the interim – *i.e.*, subject to the ORRI Assignments. Because the Vallecito estate was, at that

point, the successor to B-C, it was therefore bound by the terms of the ORRI Assignments. The Plan

did not, as it could not have, purport to extinguish or release *B-C's* obligations on *its* contracts.

Moreover, the Plan did not, as it could not have, purport to extinguish the interests of the Defendants.

In fact, at the time the Plan was confirmed, the Trustee did not know of the Defendants' existence

or their claim to a right to any portion of the Hogback Lease. Joint Pretrial Order, § II ¶ 37.

For all of these reasons, the Court concludes that the Trustee is not entitled to the declarations

he seeks in his first, second, third or fourth causes of action – to the extent he seeks declarations that

the Defendants' interests are void for lack of Navajo Nation consent. The Court's conclusions may be summarized as follows: (1) the Court adheres to its earlier ruling that despite the validity of the B-C Assignment as between Vallecito and B-C, Vallecito retained a sufficient interest in the Hogback Lease such that the Hogback Lease was property of Vallecito's bankruptcy estate on the Petition Date; (2) the Court adheres to its earlier ruling that the Trustee, as a non-protected third party, cannot raise the lack of Navajo Nation/BIA approval as a basis to invalidate the B-C Assignment; and (3) the Court further concludes that its prior ruling is equally applicable to the Trustee's attempt to invalidate the ORRI Assignments for lack of Navajo Nation consent. Alternatively, if the Court has erred and the Trustee is able to invoke a lack of Navajo Nation consent to the ORRI Assignments as a basis to void those assignments, the Court concludes that (1) at the present time, the interests purportedly conveyed by the ORRI Assignments were not created; (2) B-C is precluded from seeking Navajo Nation consent to the ORRI Assignments by confirmation of the Plan; (3) any obligation the Trustee had as successor to Vallecito to seek approval of the B-C Assignment has been released under the confirmed Plan; (4) B-C's interest in the Hogback Lease is not a "lien" or "encumbrance" such that paragraph 17 of the Confirmation Order excuses the need for a re-conveyance of the Hogback Lease back to the Vallecito estate; and (5) even if the Confirmation Order constituted a re-conveyance of the Hogback Lease back to the Vallecito estate from B-C, the estate received the Hogback Lease subject to B-C's agreement to deliver to the Defendants such additional documents as may be required to obtain Navajo Nation consent to the ORRI Assignments; so, while B-C cannot seek Navajo Nation approval of the ORRI Assignments, the Trustee took the Hogback Lease subject to the ORRI Assignments and B-C's obligation to deliver such additional documents as may be required to obtain Navajo Nation consent to the ORRI Assignments.

**B.    Are the ORRI Assignments Void as having been taken in Violation of the Automatic Stay?**

The Trustee next asserts that the Defendants who received their assignments after the Petition Date lack any interest in the Hogback Lease because B-C's transfers to them occurred post-petition in violation of the Vallecito automatic stay and are therefore void.  As the Court has previously concluded that the Hogback Lease was property of the Vallecito bankruptcy estate on the Petition Date, *see supra* at pp. 25-30, the automatic stay applies to protect Vallecito's interest in the Hogback Lease.  As is relevant here, 11 U.S.C. § 362(a) provides that the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of . . . (3) any act to . . . exercise control over property of the estate."  The stay is effective upon the filing of a bankruptcy case, without regard to notice to anyone of its filing.  *In re Cueva*, 371 F.3d 232 (5th Cir. 2004).

This Court has previously ruled in its November Opinion that B-C's assignment, post-petition, of the various ORRIs in the Hogback Lease to the Defendants was an act to exercise control over property of the estate.  The Court noted in its November Opinion that in this Circuit, actions taken in violation of the stay are "voidable," not "void." *Jones v. Garcia*, 63 F.3d 411, 412 (5th Cir. 1995).  The Court also noted, however, that a transfer made in violation of the automatic stay is invalid when it occurs, although the transfer may be retroactively validated if someone seeks and receives an annulment of the stay under § 362(d).  *Cueva*, 371 F.3d at 236.  None of the Defendants has sought, or received, such relief here; thus, the post-petition transfer by B-C of ORRIs to all but 10 of the Defendants was, and remains, invalid unless the stay is annulled under § 362(d) or some exception to the automatic stay applies.[29]  For the same reasons, the Defendants' recording of the ORRI

---

[29] The transfers of the ORRI Assignments to the first ten Defendants identified on Ex. A to the Joint Pretrial Order occurred pre-petition.

Assignments post-petition also violated the automatic stay and is invalid unless the stay is annulled or an exception to the automatic stay applies.[30]

The Court noted in its November Opinion that § 362(b) provides that the filing of a bankruptcy petition "does not operate as a stay . . . (24) under subsection (a), of any transfer that is not avoidable . . . under section 549." The Defendants who received post-petition ORRIs argued that the transfers of the ORRIs to them by B-C were not avoidable under § 549 and therefore their transfers were excepted from the automatic stay. In connection with the Pugh MSJ, the Trustee argued that § 549 is not an exception to the stay set forth in § 362(a). In its November Opinion, the Court disagreed with the Trustee, noting that all of the cases that the Trustee cited for the proposition that a transfer to a good faith purchaser under § 549(c) is not excepted from the automatic stay were decided before the enactment by Congress in 2005 of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). Prior to BAPCPA, courts had struggled with the interplay of §§ 362 and 549. *See, e.g., U.S. v. Miller*, 5:02-CV-0168-C , 2003 WL 23109906 (N.D. Tex. Dec. 22, 2003) (containing a comprehensive discussion of the varying analyses employed by the courts). The Court noted in its November Opinion that while some courts held that § 549 was an uncodified exception to the automatic stay – others did not – and the Fifth Circuit fell into the latter camp. *In re Cueva*, 371 F.3d 232 (5th Cir. 2004).

With the enactment of BAPCPA, however, § 362(b)(24) was added to the Bankruptcy Code and accordingly, the Court considered in its November Opinion the effect of its addition. The Court considered the two reported and one unreported decisions that considered the interplay between §§

---

[30] Nine of the ten Defendants identified on Ex. A to the Joint Pretrial Order as having received their interest pre-petition nevertheless recorded that interest post-petition; Kievit both received and recorded his ORRI Assignment pre-petition and thus there is no question that the automatic stay cannot serve as a basis to invalidate Kievit's interest.

**Memorandum Opinion**                                                                                                     **41**

362(b)(24) and 549. *See In re Striblin*, 349 B.R. 301 (Bankr. N.D. Fla. 2006); *In re Ducker*, No. 06-70250, 2007 WL 1119640 (Bankr. E.D. Ky. Apr. 3, 2007); and *In re Howard*, 391 B.R. 511 (Bankr. N.D. Ga. 2008). The Court ruled in its November Opinion that both the United States Supreme Court and the Fifth Circuit have held that the starting point for ascertaining Congressional intent is the existing statutory text. *See, e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 533-536 (2004) and *In re SeaQuest Diving, L.P.*, 579 F.3d 411 (5th Cir. 2009). The Court concluded in its November Opinion that there is nothing in the text of § 362 that suggests that the exception applies to anything less than the full panoply of transfers rendered unavoidable by § 549.[31] In turn, there is nothing in the text of § 549 that limits its application to transfers by the debtor, or to voluntary transfers. Therefore, in its November Opinion, the Court concluded that a transfer that is not avoidable under § 549 is excepted from the automatic stay under § 362(b)(24).

The Court next examined in its November Opinion whether the transfer to Pugh (which was the only transfer at issue in the Pugh MSJ) was avoidable under § 549 in order to determine whether that transfer was excepted from the automatic stay. The issue before the Court in the Pugh MSJ was whether the exception to § 549 avoidance contained in subsection (c) thereof applied.[32] Because

---

[31] Section 549(a) provides:
> (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate–
>> (1) that occurs after the commencement of the case; and
>> (2)     (A) that is authorized only under section 303(f) or 542(c) of this title; or
>>          (B) that is not authorized under this title or by the court.

There was no dispute that the transfer to Pugh occurred post-petition and that the transfer was not authorized by the Court or the Code, or that the assignment to Pugh was a "transfer" within the meaning of § 549.

[32] Section 549(c) provides that:
> The trustee may not avoid under subsection (a) of this section a transfer of an interest in real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy or notice of the petition was filed, where a transfer of an interest in such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such real property, against

Pugh had submitted an affidavit that stated that the assignment of the ORRI from B-C was payment for several debts that B-C owed to Pugh, aggregating approximately $2,190,700, and at that time "no facts were known to [Pugh] that would have made me believe that Vallecito Gas, LLC, a third-party, claimed a non-operating ownership interest in the Hogback Lease," the Court concluded that this evidence, when viewed in the light most favorable to Pugh, precluded a grant of summary judgment in the Trustee's favor as to Pugh's § 549(c) defense, such that the Court was unable to conclude that the transfer was avoidable under § 549 and therefore not excepted from the automatic stay. Therefore, the Court denied summary judgment to the Trustee to the extent the Trustee sought a declaration that the B-C Assignment was void as made in violation of the automatic stay.

Of course, the Court has now tried the adversary proceeding, as to all Defendants except B-C, *see supra* notes 3 & 9, and thus this issue is ripe for determination. As noted earlier, the Trustee's first, second, and third causes of action all assert (as against Pugh, the March 20 Claimants and the April 15 Claimants, respectively) that the ORRI Assignments were recorded post-petition and are therefore subject to avoidance under §§ 362 and 549. In connection with the Pugh MSJ, Pugh did not resist judgment on the ground that § 362 cannot afford the Trustee the relief he seeks. The Defendants still do not resist on this ground. Nevertheless, the Court must consider whether the Trustee is entitled to *avoidance* of *anything* under § 362. For the reasons that follow, the Court

---

whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to such interest of such good faith purchaser. A good faith purchaser without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any present value given, unless a copy or notice of the petition was so filed before such transfer was so perfected.

In the Pugh MSJ, it was undisputed that the Trustee had not filed a copy or notice of Vallecito's bankruptcy petition with either the BIA or with the county in which the Hogback Lease is located prior to Pugh's recording of his ORRI Assignment.

concludes that he is not.

In *In re Pointer*, 952 F.2d 82 (5th Cir. 1992), the question before the Circuit was whether Texas ad valorem tax liens, which arise by operation of law, violate the automatic stay when they attach post-petition to property of a bankruptcy estate. The Fifth Circuit held that it was unable to resolve the issue because the creditor before it lacked standing under the Bankruptcy Code to avoid the liens as violative of the automatic stay. The facts in *Pointer,* distilled to those relevant here, were as follows: Pointer held a note and deed of trust on an apartment complex that was owned, at the relevant point in time, by Valwood Village Apartments, Ltd. ("VVAL"). In 1986, VVAL was forced into involuntary bankruptcy. Thereafter, Pointer herself filed a petition for relief under chapter 11. She moved for relief from the automatic stay in the VVAL bankruptcy case, which relief was granted, and she thereafter foreclosed her lien on the complex. She was the high bidder at the foreclosure sale and therefore purchased the complex. The city's taxing authorities (the "Taxing Authorities") filed a proof of claim in Pointer's case seeking payment of the taxes allegedly securing their liens on the apartment complex that Pointer now owned. Pointer filed an adversary proceeding against the Taxing Authorities, arguing that the Taxing Authorities were prevented from obtaining liens on the complex due to the automatic stay in VVAL's bankruptcy case. The relief Pointer sought in her adversary proceeding included a request for a determination that the Taxing Authorities be found to have no liens on the property. The Fifth Circuit initially framed the question as "whether a creditor has standing to seek relief for an alleged violation of the automatic stay by another creditor." *Pointer*, 952 F.2d at 85. The Fifth Circuit first examined Constitutional standing, and concluded that Pointer had such standing. The Fifth Circuit next examined Pointer's statutory standing under the Bankruptcy Code. It was in this context that the Fifth Circuit stated:

We turn to two sections in the Bankruptcy Code which address the question of standing to bring suit for violations of the automatic stay. The first section need not long concern us because it authorizes suits to obtain a form of relief different from that sought by Pointer. Specifically, § 362(h), which was added to the Bankruptcy Code in 1984, provides that 'an individual injured by any willful violation of a stay provided by [§ 362] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.'. . . . Pointer, however, seeks a different form of relief from that authorized by § 362(h). Rather than seeking damages, Pointer seeks instead to invalidate the Taxing Units' post-petition liens as violative of the automatic stay. The Code specifically addresses standing to enforce this type of alleged stay violation – unauthorized post-petition transfers of property of the estate – in § 549.

*Pointer*, 952 F.2d at 86-86. The Fifth Circuit then held that Pointer could not exercise avoidance powers under § 549 because that power belonged solely to the trustee or debtor-in-possession, and not to creditors. Therefore, the Circuit concluded that she lacked standing to avoid the Taxing Authorities' liens.[33] More recently, the Fifth Circuit relied upon its earlier decision in *Pointer*:

Although T.A. Grant contends that the Trustee's authority to set aside the sale is found in § 362, this section on its face does not give the trustee the right to set aside a transfer, and appellants cite no persuasive authority that the Trustee has that power under § 362. The section of the Bankruptcy Code that gives the Trustee the authority to avoid a post-petition transfer is 11 U.S.C. § 549 . . . The Trustee's right to avoid post-petition transfers in this case is granted by § 549. Thus, the analyses of the bankruptcy court and district court of whether the Trustee's assignee had the right under § 362 to avoid the tax sale is flawed. Whatever authority the Trustee had to set aside the sale emanates from § 549, and we must remand . . . .

*In re Paxton*, 440 F.3d 233, 237 (5th Cir. 2006).

This Court is unwilling to engage in similarly "flawed analysis" despite the invitation to do so by the Trustee's Complaint and the Defendants' silence. Accordingly, the Court concludes that the Trustee may not rely upon § 362 to avoid the ORRI Assignments or anything else. This conclusion

---

[33] The Fifth Circuit did acknowledge that in certain circumstances, a creditor may seek Court authority to act on behalf of the trustee or debtor-in-possession, but Pointer had not sought such authority in VVAL's bankruptcy case and thus lacked standing to sue to avoid the tax liens.

is fatal to the Trustee's attempt to avoid the ORRI Assignments as to the ORRI Defendants identified on Ex. A to the Joint Pretrial Order as ORRI Assignment Nos. 1 - 10, because those transfers occurred pre-petition, and thus § 549 does not apply.[34]

### C.    Avoidance under Section 549

Therefore, the Court turns to the Trustee's claims under § 549.  A discussion of these claims will require some further factual background, because additional facts are relevant to the remaining Defendants' assertion of their "good faith purchaser" defense to the Trustee's § 549 claims.  *See* 11 U.S.C. § 549(c).[35]

As noted earlier, in 2006, Vallecito got the Hogback Lease from Tiffany, prior to Vallecito's bankruptcy filing.  Shortly thereafter, Vallecito executed several assignments of various rights in the Hogback Lease.  Specifically, in addition to the B-C Assignment, Vallecito executed an "Assignment, Conveyance and Bill of Sale" dated May 9, 2006 conveying to Sandia Development and Consulting Service, Inc. ("Sandia") an "undivided fifty and one-tenth percent (50.1%) of the operating rights in [the Hogback Lease] insofar as" that lease covered the land from the surface down to, but not below, the base of the Dakota formation – *i.e.,* the operating rights to the "shallow."  Ex. 5; Joint Pretrial Order, ¶ 4.  On that same date, Vallecito executed a similar assignment to John Burle ("Burle") – this

---

[34] For the reasons set forth in note 38, *infra*, the Court concludes that the relevant date for § 549 avoidance purposes is the "Grant Date," not the "Recording Date."

[35] The Court notes that the Trustee may have been able to cut off any § 549(c) defense by simply recording a copy of the Vallecito bankruptcy petition in the San Juan County real property records.  *See* 11 U.S.C. § 549(c); 5 Collier on Bankruptcy, ¶ 549.06 (16th ed. 2011) ("In light of section 549(c), the trustee should file a copy or notice of the petition in the recorder's office in every county where the debtor owns or has an interest in real property.  If such a copy or notice is not recorded in a particular county, the trustee may not, under section 549(a), avoid a transfer of an interest in the estate's real property located in that county to a transferee who is a good faith purchaser for fair equivalent value who had no knowledge of the commencement of the case.  The trustee may avoid such a transfer, however, if a copy or notice of the petition is filed before the transferee takes the necessary steps to perfect the interest that it acquired from the debtor against a hypothetical bona fide purchaser for value").  Here, each of the Defendants who received post-petition ORRI Assignments recorded their interest well after the Petition Date.

time of an undivided 5% of the operating rights to the shallow land covered by the

Hogback Lease.  Ex. 6; Joint Pretrial Order, ¶5.  Also prior to Vallecito's bankruptcy filing, on

September 6, 2006, litigation was filed in the United States District Court for the District of New

Mexico captioned *Philip John Burle, Mary Clare Moser, Sandia Development and Consulting*

*Services, Inc., Tse Ndeeshglish Enterprises, Inc. v. Michael W. Briggs and Vallecito Gas, LLC*, Case

No. 6:06-cv-00838 (the "Burle Litigation" and, when referring to the plaintiffs in the Burle Litigation,

the "Burle Plaintiffs").  Joint Pretrial Order, ¶ 8.  The Trustee and the Defendants have stipulated that

the Defendants did not have actual notice of the Burle Litigation.  Joint Pretrial Order, ¶ 17.

The complaint in the Burle Litigation was entitled "Complaint for Damages Resulting from

Fraud and Violation of the Unfair Practices Act or for Specific Performance of a Contract for Sale

of Mineral Interests in Real Estate" (the "Burle Complaint").  Ex. 90.  The Burle Complaint alleged,

in essence, that (i) Tiffany owned the Hogback Lease, which Vallecito wanted to purchase and further

develop; (ii) Vallecito told Tse Ndeeshglish Enterprises, Inc. ("TSE") that Tiffany was willing to sell

its interest in the Hogback Lease for $1.5 million, and that TSE could purchase a 50.1% interest in

the Lease for $1.5 million, and that "major oil companies were interested in purchasing the rights to

drill and develop the Pennsylvanian formation below the Dakota formation, and such 'deep drilling

rights' could be resold immediately to BP Production or others for $9.5 million, so that [TSE] would

recover its purchase price and earn a profit on the resale immediately,"  Burle Complaint, ¶ 2.e (Ex.

90); (iii) those representations were false, because Tiffany was willing to sell its interest for only

$920,000, and there were no major oil companies interested in purchasing the deep drilling rights for

$9.5 million; (iv) TSE was an entity owned by the Navajo Nation and, as such, it was entitled to

receive a loan guaranty from the BIA, because the proceeds of the loan would be used to purchase

a property of which more than 50% would be owned by a Native American tribe or a subsidiary entity controlled by a Native American Tribe; (v) Vallecito represented to TSE that if TSE got a $5 million loan so guaranteed and gave the proceeds to Vallecito, that the proceeds would be used to pay $1.5 million to Tiffany to purchase the Hogback Lease, $1 million for the further development of the existing wells on the land, $500,000 to pay TSE's share of the cost of drilling the new wells, and $2 million for an unrelated project; (vi) TSE applied for the loan guaranty from the BIA, and Vallecito agreed to buy the Hogback Lease from Tiffany, use the loan proceeds as set forth above, and assign the Hogback Lease to TSE; (vii) TSE had agreed to execute a contract with Vallecito whereby Vallecito would manage and develop the lease and, in exchange, Vallecito would be entitled to 49.9% of the revenues from the property; (viii) during the loan application process, Vallecito told TSE that Tiffany was about to change its mind, and to prevent a loss of the chance to buy the Hogback Lease from Tiffany, Philip John Burle ("Burle") agreed to lend Vallecito $1 million, and Mary Clare Moser ("Moser") agreed to lend $80,000 as "bridge loans" to be repaid once TSE obtained the $5 million loan, guaranteed by the BIA, from Compass Bank, and in exchange, Vallecito agreed to assign to Burle and Moser a 5% interest in the working interest in the Hogback Lease; (ix) Vallecito delivered an assignment of the Hogback Lease, but that the assignment "deviated from the assignment promised in that the depth of the rights assigned to Plaintiffs was limited to the Dakota formation, so that [Vallecito] retained all 'deep drilling rights' which it has previously represented to [TSE] it would receive," Burle Complaint, ¶ 2.m (Ex. 90); (x) the assignment was delivered to Compass Bank, which acted as escrow, but that the Burle Plaintiffs' representatives were only allowed to review the assignment for a short period of time and were unskilled in reading those documents and therefore failed to understand that the depth of the drilling rights were limited such that TSE would not be able

to recover its investment shortly, and that TSE therefore authorized the disbursement of the $1 million to Vallecito to purchase the Hogback Lease from Tiffany, but that TSE discovered the "deviation between what was promised and what was delivered" the next day, Burle Complaint, ¶ 2.p (Ex. 90); and (xi) in subsequent discussions, Vallecito agreed to a rescission of the purchase, but was unable to obtain the funds to do so. The Burle Plaintiffs sought (i) a judgment in favor of Burle for $1 million and in favor of Moser for $80,000; (ii) punitive and exemplary damages; (iii) an accounting for revenues from sales of the oil produced; (iv) a judgment for plaintiffs' proportionate share of same; and (v) most significantly, "a decree compelling specific performance of Plaintiffs' contract with Defendants for assignment and conveyance of the contracts between Plaintiffs and [Vallecito] including the 'deep drilling rights.'" Burle Complaint, ¶ 3.a (Ex. 90).

On September 13, 2006, the Burle Plaintiffs filed a Notice of Lis Pendens in San Juan County, New Mexico (the "Burle Lis Pendens") regarding the Burle Litigation related to the Hogback Lease. Joint Pretrial Order, ¶ 8. On November 2, 2006, the Burle Plaintiffs, Briggs and Vallecito entered into a settlement agreement that purported to settle the Burle Litigation (the "Burle Settlement Agreement"). Ex. 92. Significantly, the Trustee and the Defendants currently dispute the precise terms of the Burle Settlement Agreement, as set forth in more detail below.

On March 15, 2007, the Burle Plaintiffs filed in the Burle Litigation a "Motion for Order Determining Enforceability of Settlement Agreement Dated November 2, 2006" (the "Motion to Determine") Ex. 93. The Motion to Determine alleged that the Burle Settlement Agreement required Briggs and Vallecito to "participate in processing the loan for developing the property or, to buy Plaintiffs' interest in the property." Motion to Determine, ¶ 1 (Ex. 93). It further alleged that during November, 2006, Briggs represented to the Burle Plaintiffs "that he elected to purchase Plaintiffs'

interest in the property and would have the money 'at the end of this week or early next week,' but that more than four months had elapsed and Briggs and Vallecito had failed to tender any funds or otherwise effect the settlement. Motion to Determine, ¶¶ 2-3 (Ex. 93). In their memorandum in support of the Motion to Determine, the Burle Plaintiffs similarly alleged that the settlement agreement provides that Briggs and Vallecito "either proceed with their contract to borrow $3 million and use it to develop the Hogback [Lease] or buy out Plaintiffs' interest in the property." Ex. 93. The memorandum further noted that although four months had elapsed since the execution of the Burle Settlement Agreement, no performance had been tendered. The Motion to Determine therefore requested either a determination that the Burle Settlement Agreement was no longer enforceable because of Briggs's and Vallecito's failure to perform within a reasonable time, or that a "cut-off" date be set for their performance.

On September 28, 2007, the judge presiding over the Burle Litigation entered an order finding that the Burle Settlement Agreement was "legally valid and should be reduced to judgment." Ex. 94. On that same date, the judge entered judgment in favor of Briggs and Vallecito and dismissed the Burle Complaint. Ex. 95. The judgment was not appealed. Joint Pretrial Order, ¶15.

On October 5, 2007, the Burle Plaintiffs filed a Motion for Reconsideration. Ex. 96. On October 9, 2007, the Burle Plaintiffs filed a "Motion for Order and Mandatory Injunction," which alleged that on April 23, 2007, Vallecito executed and recorded an assignment of the working interest in the Hogback Lease, and that unless "such transfer is avoided, Plaintiffs will be unable to enforce the Settlement Agreement which this Court determined should be enforced." Ex. 97, ¶¶ 2-3.[36] On

---

[36] This Court notes that the B-C Assignment was executed on April 23, 2007, and thus the Burle Plaintiffs were aware of the B-C Assignment at the time they filed the Motion for Order and Mandatory Injunction.

**Memorandum Opinion** 50

January 8, 2008, the judge presiding over the Burle Litigation entered an order that stated, in full:

> An Order Granting Summary Judgment and a Judgment of dismissal were entered in this case on September 28, 2007. Plaintiffs attempted to file a Motion for Reconsideration [doc. 72], but it was rejected as deficient. No order reopening the case has been entered and therefore no further pleadings are permitted. All pleadings filed after September 29, 2007, are ordered stricken and the file is to remain closed.

Ex. 98; Joint Pretrial Order, ¶20.

On April 14, 2008, after Vallecito had filed its bankruptcy case in this Court and after the Trustee had been appointed as Chapter 11 Trustee of the Vallecito estate, Briggs and Vallecito, through counsel, filed a document with the County Clerk in San Juan County, entitled "Release of Notice of Lis Pendens." Ex. 100; Joint Pretrial Order, ¶22. That document, which bears the caption of the Burle Litigation, provides:

> Defendant, Michael W. Briggs and Vallecito Gas, L.L.C., through counsel, hereby request the County Clerk of San Juan County, New Mexico to discharge the Notice of Lis Pendens filed in the office of the County Clerk of San Juan County, New Mexico, on September 13, 2006 . . . against the above named Defendant and hereby release said Notice of Lis Pendens and discharge all of the real estate as evidenced by the attached Order Granting Summary Judgment attached hereto as exhibit A and the Judgment attached hereto as exhibit B.

Ex. 100. Attached to the Release of Notice of Lis Pendens were the September 28, 2007 order and judgment signed by the judge presiding over the Burle Litigation that determined the Burle Settlement Agreement to be enforceable.

With this further factual background in mind, the Court will turn to the parties' arguments under § 549. It is undisputed that the transfers of the ORRI Assignments that are identified on Ex. A to the Joint Pretrial Order as ORRI Assignment Nos. 11-66 all took place post-petition and were not authorized by the Bankruptcy Code or this Court. Therefore, only the Defendants' defenses are

at issue.[37]

### i. The Statute of Limitations in § 549(d) and Equitable Tolling

The Defendants first assert that the Trustee may not avoid under § 549 the ORRI Assignments that are identified on Ex. A to the Joint Pretrial Order as ORRI Assignment Nos. 11 - 27 because the statute of limitations has expired. Section 549(d) provides:

> (d) An action or proceeding under this section may not be commenced after the earlier of–
> (1) two years after the date of the transfer sought to be avoided; or
> (2) the time the case is closed or dismissed.

The Vallecito bankruptcy case has not been closed or dismissed, so the applicable statute of limitations in the present adversary proceeding is two years after the date of the transfer sought to be avoided. The Court takes judicial notice, and it is undisputed, that this adversary proceeding was filed on March 9, 2010. Therefore, the Defendants argue that ORRI Assignment Nos. 11-27, that were all assigned prior to March 9, 2008, are insulated from avoidance by § 549(d).[38]

---

[37] The Joint Pretrial Order identified as a "Contested Issue of Law" "with respect to each ORRI Purchaser to whom BC purportedly sold an ORRI post-petition, is he or she a 'purchaser' under section 101(43) – *i.e.* was the transfer of each such ORRI from the Vallecito Estate to each such ORRI Purchaser 'voluntary'?" *See* Joint Pretrial Order, IV.52. However, the Trustee did not brief this issue in his pretrial brief, and did not respond in any fashion at trial, in either opening or closing argument, to the Defendants' briefing on this issue. Therefore, the Court concludes that the argument has been abandoned by the Trustee. To the extent it has not been abandoned, the Court rejects it. There is no question that the transfer from Vallecito to B-C was voluntary at the time it was made and the transfers from B-C to the Defendants were voluntary at the time they were made. The latter transfers are only "involuntary" as to Vallecito because there is now a trustee in place in Vallecito's case trying to claw them back.

[38] The "Grant Date" for ORRI Assignment Nos. 11-27 as listed on Ex. A to the Joint Pretrial Order varies – the earliest post-petition transfer was granted "Effective" December 1, 2007, and the latest was "Effective" March 1, 2008. All are listed as being recorded March 20, 2008. The Complaint is not clear as to whether the Trustee seeks to avoid the transfers as evidenced by the assignment documents or their recording. Of course, the recording date was significant to the Trustee to the extent that the recording of the interests of the Defendants occurred post-petition and therefore the Trustee argued that the recording (which was the only act taken by the Defendants) was a stay violation. However, the Court has ruled that § 362 is not an avoidance statute. Neither side has briefed, or argued, about whether the deadline in this case runs from the "Grant Date" or the "Recording Date." For purposes of § 549, the Court concludes that the relevant date is the "Grant Date," not the "Recording Date," since, for the reasons noted in its November Opinion, it is the ORRI Assignment itself, and not its recording, that effected a transfer of title to a portion

In response, the Trustee argues that the doctrine of equitable tolling applies to toll limitations in this adversary proceeding until two years after the date he learned of the ORRI Assignments, which the parties have stipulated occurred in "approximately November 2009."  *See* Joint Pretrial Order, ¶ 37.[39]  Accordingly, the Trustee asserts that his Complaint, filed less than a year later, is timely even as to ORRI Assignment Nos. 11-27.

Although several circuits have specifically held that the deadline set forth in § 549(d) may be equitably tolled, *see, e.g. In re Pugh*, 158 F.3d 530, 537 (11th Cir. 1998) ("there is a strong consensus among courts that sections 546(a) and 549(d) can be equitably tolled"); *In re Olsen*, 36 F.3d 71 (9th Cir. 1994), the Fifth Circuit is not among them.  Nevertheless, for the reasons explained below, the Court is convinced that if faced with the issue the Fifth Circuit would conclude that § 549(d) may be equitably tolled. First, the Fifth Circuit has ruled that if a deadline is a statute of limitations, it may be equitably tolled.  *Fisher v. Johnson*, 174 F.3d 710 (5th Cir. 1999).  Courts recognize a significant distinction between time limits that are jurisdictional as opposed to those that merely operate as a statute of limitations.  If a time limit is a statute of limitations it (i) can be waived, (ii) is subject to estoppel and equitable tolling, and (iii) can be extended by agreement of the parties.  *Granger v. Aaron's Inc.*, 636 F.3d 708 (5th Cir. 2011) (EEOC case); *In re Int'l Admin. Servs., Inc.,* 408 F.3d 689 (11th Cir. 2005); *Int'l Brotherhood of Teamsters, Gen'l Teamsters Union Local 406 v. Fivecap, Inc.*,

---

of the Hogback Lease to the Defendants.  *See also Ames v. Robert*, 131 P. 994 (N.M. 1913) (an unrecorded deed is good as between the parties).  Rather, recording simply constitutes "notice to all the world of the existence and contents of the instruments so recorded from the time of recording."  N.M.S.A. § 14-9-2 (West 2011).  The Court also notes that when asked at trial whether the Trustee agreed that the statute of limitations barred his claims as to ORRI Assignment Nos. 11-27, the Trustee did *not* argue that the Court must go by the recording date, not the grant date.  Instead, the Trustee replied that he agreed the Defendants could raise a statute of limitations defense, but he believed that the doctrine of equitable tolling applies to toll limitations in this adversary proceeding.

[39] Neither side has briefed the applicability of the doctrine of equitable tolling, or its potential application on the facts of this case.

**Memorandum Opinion**                                                                                            53

No. 1:02-cv-928, 2003 WL 22697173 (W.D. Mich. Nov. 14, 2003). Conversely, if a time limit is jurisdictional, it cannot be waived or extended by the parties or the court. *Int'l Brotherhood of Teamsters,* 2003 WL 22697173 at *4.

Second, while the Fifth Circuit has not held that § 549(d) is a statute of limitations as opposed to a jurisdictional bar, it has, along with several other circuits, concluded that § 546(a) is a statute of limitations. *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1337 (5th Cir. 1995); *see, e.g. In re Raynor*, 617 F.3d 1065 (8th Cir. 2010); *In re Pugh*, 158 F.3d 530 (11th Cir. 1998); *In re M&L Business Mach. Co.*, 75 F.3d 586 (10th Cir. 1996). As one court has noted, "the language of §§ 546(a) and 549(d) is almost identical, the sole difference being the event which triggers the start of the time period," thus, cases construing one shed light on the proper construction of the other. *In re Shape, Inc.*, 138 B.R. 334, 337 (Bankr. D. Me. 1992).

Third, the clear weight of authority at the lower court level supports the application of equitable tolling to the deadline set forth in § 549(d). *See, e.g., In re Evenson*, No. 05-37920-svk, 2010 WL 4622188 (Bankr. E.D. Wis. Nov. 3, 2010); *In re Lau Capital Funding, Inc.*, 321 B.R. 287 (Bankr. C.D. Cal. 2005); *In re Dreiling*, 233 B.R. 848 (Bankr. D. Colo. 1999); *In re Arboleda*, 224 B.R. 640 (Bankr. N.D. Ill. 1998); *In re Russ*, No. 4-87-2332, 1997 WL 188449 (Bankr. D. Minn. Apr. 18, 1997). As the United States Supreme Court has noted, limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the test of the relevant statute, and Congress "must be presumed to draft limitations periods in light of this background principle. That is doubly true when it is enacting limitations periods to be applied by bankruptcy courts, which are courts of equity and apply the principles and rules of equity jurisprudence." *Young v. U.S.*, 535 U.S. 43, 49-50 (2002) (internal citations and quotations omitted).

For these reasons, the Court concludes that the doctrine of equitable tolling may, in theory, be applied in this adversary proceeding to the Trustee's avoidance claims under § 549. The question remains whether the doctrine applies in fact.

The Fifth Circuit has, in many other contexts, discussed the contours of the doctrine of equitable tolling. The doctrine applies "only in rare and exceptional circumstances," *Harris v. Boyd Tunica, Inc.*, 628 F.3d 237, 239 (5th Cir. 2010), and should be applied "sparingly." *Manning v. Chevron Chem. Co.*, 332 F.3d 874 (5th Cir. 2003). It most typically applies where the plaintiff "has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass," *id.,* or "is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Melancon v. Kaylo*, 259 F.3d 401, 407 (5th Cir. 2001). In the bankruptcy context, it may apply when the defendants' active or passive concealment prevented the trustee from discovering his causes of action. *In re Juliet Homes, LP*, No. 07-36424, 2010 WL 5256806 (Bankr. S.D. Tex. Dec. 16, 2010) (discussing doctrine in context of fraudulent transfer complaint and § 546(a)). Where equitable tolling is based on passive concealment, the trustee must have exercised reasonable diligence to discover the fraud. If there has been active concealment, the statute of limitations does not begin to run until the trustee gained actual knowledge of the transfer. *Id.* at *11. But, a plaintiff must pursue its rights diligently. *In re Porras,* 312 B.R. 81 (Bankr. W.D. Tex. 2004). In this context, "diligence is measured by an objective standard." *Juliet Homes,* 2010 WL 5256806 at *13; *Porras,* at 108. In the *Juliet Homes* case, the court stated:

> The Court must determine whether the Trustees discovered or should have discovered that the alleged fraud occurred, but nonetheless failed to file a timely suit. *Id.* In a fraudulent transfer case, courts consider whether the bankruptcy trustee had "inquiry notice" of the alleged fraudulent transfer. *Id.* Inquiry notice consists of "sufficient

storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions" involved in a transfer. *Sterlin v. Biomune Systems,* 154 F.3d 1191, 1196 (10th Cir.1998). The Court considers (i) when the Trustees had inquiry notice of the alleged facts underlying the claims against the new defendants and (ii) whether investigation at that time would have allowed the Trustees to discover the claims before the limitations period had run. If the underlying facts should have been discovered before the limitations period had ended, equitable tolling is not appropriate.

*Juliet Homes*, 2010 WL 5256806 at *13. Similarly, where despite the exercise of due diligence, a trustee fails to timely bring an avoidance action due to fraud or extraordinary circumstances beyond the trustee's control, the doctrine will prevent the expiration of the limitations period. *In re IFS Fin'l Corp.*, No. 02-39553, 2010 WL 4614293 (Bankr. S.D. Tex. Nov. 2, 2010). However, it does *not* apply to a "garden variety act of attorney negligence." *Harris*, 628 F.3d at 240.

It is the party seeking to invoke the doctrine that bears the burden to provide justification for its application. *Granger v. Aaron's, Inc.*, 636 F.3d 708 (5th Cir. 2011) (Title VII case); *Stroman v. Thaler*, 603 F.3d 299 (5th Cir. 2010) (habeas petition); *U.S. v. Petty*, 530 F.3d 361 (5th Cir. 2008) (action under Antiterrorism and Effective Death Penalty Act); *Ramirez v. City of San Antonio*, 312 F.3d 178 (5th Cir. 2002) (employment discrimination case under the Americans with Disabilities Act); *In re Price*, 244 B.R. 398 (Bankr. S.D. Tex. 1998) (bankruptcy case).

Here, the Court concludes that the Trustee has not met that burden. First, it is undisputed that there has been no wrongful conduct or concealment on *the Defendants'* part. It is also undisputed that the circumstances leading to the dispute here were, at least in large measure, beyond the Trustee's control. The Trustee did not control Briggs or his entity, B-C, which is the entity that made the transfers at issue; many of them *after* Briggs had disclaimed his and B-C's interest in the Hogback Lease in open court. However, the Trustee has not put on sufficient, or even any, evidence of diligence. The Trustee did not conduct a title search in the San Juan County records. Joint Pretrial

Order, ¶31. Had he done so at the time of confirmation of the Plan (March 2009), he would have found every one of the ORRI Assignments now at issue – *i.e.*, ORRI Assignment Nos. 11-27 – as they had been recorded a year earlier. The Trustee learned of the existence of the ORRI Assignments in November 2009 – at least several weeks prior to the expiration of § 549's limitations period as to the transfers at issue – but did not file this adversary proceeding until March 9, 2010, after it had expired.[40]

The Court further finds that there were sufficient "storm warnings" to put the Trustee on notice that he should conduct an investigation into the San Juan County records respecting the Hogback Lease. Vallecito's schedules disclosed that Vallecito and Briggs were defendants in the Burle Litigation, and described the nature of the proceeding as "[s]uit alleging fraud and requesting specific performance, preliminary injunction, and appointment of a referee and interim receiver concerning the Hogback Lease." Ex. 101. A cursory review of the pleadings filed in the Burle Litigation would have revealed that the Burle Plaintiffs alleged, in their Memorandum in Support of Plaintiffs' Motion for Reconsideration, that Vallecito had transferred the Hogback Lease to B-C which was "likely intended to place the Hogback [Lease] beyond the reach" of the New Mexico court. Ex. 100.

Moreover, the record reflects that in February, 2008, the Trustee filed a "Motion for Turnover

---

[40] To be fair, the statute of limitations in this case was a "rolling" statute, as the ORRI Assignments took place on different dates. As to five of the ORRI Assignments, *i.e.*, ORRI Assignment Nos. 11-15, the date of the transfer was December 1, 2007. Thus, § 549 would have required the Trustee to have filed his adversary proceeding no later than December 1, 2009 – only a few weeks after he learned in November 2009 of their existence. However, the Court concludes that a few weeks is sufficient for a reasonably diligent litigant to either get those potential defendants to execute a tolling agreement, a common circumstance in bankruptcy cases, or to get a bare-bones adversary proceeding on file – particularly in the absence of any evidence to the contrary. As to one of the other transfers at issue here, *i.e.*, ORRI Assignment No. 16, the Trustee would have had at least six weeks. As to another five, *i.e.*, ORRI Assignment Nos. 17-21, the Trustee would have had two and a half months, and as to the balance, the Trustee would have had three and a half months.

**Memorandum Opinion**                                                                                          57

of Estate Property Pursuant to Section 542 of the Bankruptcy Code (the "Turnover Motion"). Ex.

14. The Turnover Motion alleged, among other things, that on February 22, 2008, the Trustee had

spoken to counsel for Tiffany who had informed the Trustee that Tiffany had learned, three days

earlier, of two assignments affecting the Hogback Lease – the B-C Assignment, and an assignment

*from B-C* to Barrons Resources LLC, a Vallecito insider. Turnover Motion, ¶¶ 16, 22 (Ex. 14). The

Trustee noted in his Turnover Motion that the assignment from B-C to Barrons Resources LLC was

"concerning," in part because the assignment was executed while the Arcturus Injunction was in place

and "Mr. Briggs [sic] actions on behalf of Vallecito and BC could be construed to be violations of

the Temporary Restraining Order, the Temporary Injunction, and/or violations of relevant statutes."

Turnover Motion, ¶¶ 26, 30.

     The record also discloses that in March of 2008, just *days* after the ORRI Assignment Nos.

11-27 were purchased by the Defendants, the Trustee's counsel sent a letter to an attorney that

stated:

> When we talked you indicated, and subsequently Mr. Briggs also indicated to me, that Briggs-Cockerham LLC was contemplating a possible sale of a portion of its interests in the Hogback Lease to a third party in order to raise the necessary funds to make a settlement payment we have been discussing. . . . We believe that any possible sale or further transfer of any interest of the Hogback Lease must be conducted with the full knowledge of, and complete disclosure to, the Trustee, the Banrkutpcy Court, and all parties in interest in the Vallecito Bankruptcy. Accordingly, on behalf of the Trustee, I want to make it clear that the Trustee does not consent to any such transfer. The Trustee further requests any information regarding a potential transaction, including the parties and the stated consideration and/or purchase price.

Ex. 13.

     Finally, in October, 2008, the Trustee filed a First Amended Disclosure Statement in the

Vallecito bankruptcy case. Ex. 16. The Trustee described Vallecito as of the Petition Date as being

"mired in extensive litigation in multiple courts in various jurisdictions. The Debtor and its principals

were accused of various misdeeds by parties that had entered into transactions with the Debtor and/or its principals involving certain oil and gas projects and/or leases. Ex. 16, p. 8. The Amended Disclosure Statement then listed no fewer than six lawsuits in which some variety of fraud was alleged.

Thus, the Trustee was clearly aware, as of February 2008, that B-C had made at least one assignment of an interest in the Hogback Lease to Barrons Resources, that the Trustee believed was in violation of court orders. Moreover, the Trustee was clearly aware, as early as March of 2008, that B-C was thinking about making further transfers of the Hogback Lease. Finally, the Trustee knew that Vallecito, B-C and its principals stood accused in multiple fora of fraud. Still, the Trustee did not search the San Juan County records at any time prior to confirmation of the Plan (March 17, 2009) to see if any such transfers had been effected. If he had, he would have seen ORRI Assignment Nos. 11-27, recorded only days after the Trustee sent the March, 2008 letter.

The Court notes that normally it is the buyer (here, Vision) in a real estate transaction who is most concerned with doing a title search not the seller (here, the Trustee). On the facts of this case, however, the Trustee should have been equally concerned. The Trustee is a fiduciary to Vallecito's creditors, with a duty to maximize the return to the Vallecito estate. An express condition of the sale to Vision, and to the effectiveness of the Plan proposed by the Trustee, is that the Trustee convey to Vision "one hundred percent (100%) of the working interest and net revenue interest in the Hogback Lease, subject only to the royalty interest held by the Navajo Nation pursuant to the terms of the Hogback Lease." Ex. 17, pp. 14, 15, 17. Despite that contractual obligation, incurred in furtherance of the Trustee's duty to creditors, the Trustee did not search the real property records in San Juan County to determine whether he had such title to transfer to Vision under the Plan.

In short, on these facts, it is difficult to conclude that the Trustee has satisfied his burden to show diligence sufficient to invoke the doctrine of equitable tolling. The Court acknowledges that this lawsuit is essentially between two innocent factions – the Trustee, who inherited the case and its facts from Vallecito, and the Defendants, who purchased ORRIs sold to them by B-C without any knowledge of Vallecito's bankruptcy case or Briggs's disclaimer of B-C's interest in the Hogback Lease. The doctrine of equitable tolling is tempting here, where the Trustee is using the Bankruptcy Code's avoidance powers to recover the Hogback Lease so that it may be sold for the benefit of Vallecito's creditors. But, it must be remembered that the Defendants are equally innocent and appear to have been defrauded by their grantor, B-C.

The Court's research has revealed few cases where the doctrine of equitable tolling has been raised in circumstances such as these – where there has not been some conduct on the part of the defendants that warranted its application, but rather wrongful conduct of an intervening third party. The closest is *Wiscovitch-Rentas v. Almonte*, No. 08-1740(GAG), 2009 WL 349360 (D.P.R. Feb. 11, 2009). In that case, a chapter 11 debtor disclosed on its schedules that it had made payments to creditors within ninety days of the bankruptcy filing. The case was converted to chapter 7 more than two years later, and the chapter 7 trustee thereafter filed adversary proceedings against preference recipients. The defendants moved to dismiss, claiming that the complaints were time-barred. The trustee opposed the motions, invoking the doctrine of equitable tolling, on the ground that the debtor had intentionally prolonged the chapter 11 case until the limitations period expired, in order to prevent the trustee from asserting avoidance claims against insiders. The bankruptcy court granted the motions, and the trustee appealed. The district court affirmed and adopted the reasoning of the bankruptcy judge that "it would be inequitable to allow the trustee to use the doctrine of equitable

tolling to bring these actions against general trade creditors for prepetition preferences, since these defendants played no role in the alleged wrongful conduct perpetrated by the debtor's representative post-petition." *Wiscovitch-Rentas*, 2009 WL 349360 at *2. Similarly, in *In re U.S. Investors Co. of America*, 5 Fed. Appx. 779 (9th Cir. 2001) (unpublished disposition), the Ninth Circuit held that a lack of diligence by a prior chapter 7 trustee prevented the successor trustee from invoking the doctrine of equitable tolling. In both of these cases, therefore, the intervening conduct of a third party was insufficient to invoke the doctrine of equitable tolling.

For all of these reasons, the Court concludes that the Trustee's second cause of action, against the March 20 Claimants, is time-barred to the extent it seeks to avoid, pursuant to § 549, the ORRI Assignments identified on Exhibit A to the Joint Pretrial Order as ORRI Assignment Nos. 11-27.

### ii. The "Good Faith Purchaser" Defense of § 549(c)

As noted above, the elements of the Trustee's § 549 claim are not in real dispute. Rather, the remaining dispute centers on the application of the § 549(c) defense to the ORRI Assignments identified on Ex. A to the Joint Pretrial Order as ORRI Assignment Nos. 28-66.

Section 549(c) provides:

> The trustee may not avoid under subsection (a) of this section a transfer of an interest in real property to a good faith purchaser without knowledge of the commencement of the case and for present fair equivalent value unless a copy or notice of the petition was filed, where a transfer of an interest in such real property may be recorded to perfect such transfer, before such transfer is so perfected that a bona fide purchaser of such real property, against whom applicable law permits such transfer to be perfected, could not acquire an interest that is superior to such interest of such good faith purchaser. A good faith purchaser without knowledge of the commencement of the case and for less than present fair equivalent value has a lien on the property transferred to the extent of any present value given, unless a copy or notice of the petition was so filed before such transfer was so perfected.

Thus, § 549(c) creates a three-part test: (1) was the transferee a "good faith purchaser without

knowledge of the commencement of the case;" (2) did the transferee pay "present fair equivalent value;" and (3) was the transferee's interest perfected before a copy or notice of the bankruptcy petition was recorded, such that a bona fide purchaser under state law could not have acquired a superior interest. *In re Fjeldsted*, 293 B.R. 12 (9th Cir. BAP 2003); *In re Tri-Valley Distributing, Inc.*, no. 01-36562, 2011 WL 2442046 (Bankr. D. Utah June 16, 2011). As noted earlier, the parties have stipulated that a copy or notice of the petition was not filed in the San Juan County records. Joint Pretrial Order, ¶ 40. Therefore, element (3) of the Defendants' § 549(c) defense is undisputed.

As to the second element, *i.e.*, whether the transferees paid "present fair equivalent value" for the transfer, neither side has provided any evidence other than the parties' stipulation that the Defendants paid the amounts set forth on Exhibit A to the Joint Pretrial Order. The record is devoid of *any* evidence of what the transferred interests were worth. In the absence of such evidence, the Court cannot assess at all the equivalence of the value paid, much less determine whether the value paid was presently fair or not. While courts have disagreed about the appropriate benchmark against which the price paid is tested, they are uniform in comparing the price paid against *something*. The Court lacks any evidence of that something here.[41] As the Defendants bore the burden of proof on this issue,[42] the Court concludes that the Defendants are not entitled to the § 549(c) defense for this

---

[41] The Court anticipates that the Defendants will feel blind-sided by the Court's ruling that they have failed to carry their burden of proof as to whether they paid present fair equivalent value for the transfers. In their brief, the Defendants assert that "factual and legal issues as to whether the overriding royalty interest owners are bona fide purchasers for value, including present fair equivalent value, are not being contested and are not disputed. The parties have stipulated as to the dates of assignment, purchase price paid for each assignment and the date of recording of each assignment." *Defendants' Pretrial Br.*, p. 7. Notwithstanding this statement in their brief, the Defendants simply obtained in the Joint Pretrial Order a stipulation as to the amounts they paid; they did not obtain a stipulation that those amounts constituted present fair equivalent value for the transfers. In the absence of such a stipulation, the Court must evaluate the evidence otherwise admitted at trial. Regrettably, there is none to evaluate.

[42] Federal Rule of Bankruptcy Procedure 6001, entitled "Burden of Proof as to Validity of Postpetition Transfer" provides that "any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." *See In re Phinney*, 405 B.R. 170, 176 (E.D. Va. 2009) ("the party seeking protection under § 549(c) bears

reason alone.[43]

However, the Court must also address the first element – *i.e.*, whether the Defendants were

"good faith purchaser[s] without knowledge of the commencement of the case," in order to determine

whether the Defendants are entitled to get a lien for the value they paid under § 549(c). The phrase

"good faith purchaser without knowledge of the commencement of the case" is undefined by the

Bankruptcy Code. The parties here appear to assume that the phrase is defined by reference to state

– here, New Mexico – law. The Trustee argues that

> the ORRI Defendants cannot dispute that they received all of their purported ORRIs subsequent to the recording of a valid notice of lis pendens involving title to the Hogback Lease. Notwithstanding these substantial hurdles, the ORRI Defendants stubbornly assert that they are "bona fide purchasers" under applicable state law. The ORRI Defendants all rely on New Mexico law to support their argument. They do so in the face of the clear and unambiguous effects of a lis pendens under New Mexico law. As described below, the ORRI Defendants [sic] affirmative defense of 'bona fide purchaser' fails and they, as a matter of law, subsequent [sic] purchasers who have no interest whatsoever in the Hogback Lease.

*Trustee's Trial Br.*, pp. 1-2. Conversely, the Defendants argue that

> the Trustee, however, asserts that the Defendants don't qualify for the § 549 defense because, the Trustee contends, the Defendants have constructive notice of issues with respect to title arising out of the Burle Litigation and the Burle Lis Pendens. The Burle Lis Pendens did not put the Defendants on constructive notice of any defect to title and/or to the commencement of the Vallecito bankruptcy proceeding.

---

the burden of establishing the applicability of the exception"); *40235 Washington St. Corp. v. W.C. Lusardi*, 177 F.Supp.2d 1090 (S.D. Cal. 2001), *aff'd on other grounds*, 329 F.3d 1076 (9th Cir. 2003).

[43] The issue of whether the amounts paid by the Defendants constituted present fair equivalent value was *not* listed with specificity in the Joint Pretrial Order as either a contested fact or a contested issue of law for trial. However, in the Joint Pretrial Order, the Trustee asserted the following as a contested issue of law: "Whether each ORRI sold to each ORRI Purchaser is subject to avoidance by the Trustee pursuant to 11 U.S.C. §§ 362, 544, and/or 549." Joint Pretrial Order s. IV, ¶ 49. The Defendants asserted the following as a contested issue of law: "Whether the assignments of the overriding royalty interests are avoidable under Bankruptcy Code Sections 362, 544, or 549." *Id.* at ¶ 55. Therefore, the availability of § 549(a) to the Trustee and the availability of the § 549(c) defenses to the Defendants was squarely raised as a contested issue in the Joint Pretrial Order.

**Memorandum Opinion**                                                                                                    63

*Defs' Trial Br.*, p. 8. The Defendants then argue that they are bona fide purchasers under New Mexico law notwithstanding the Burle Lis Pendens for a variety of reasons, each involving the effect and/or duration of a lis pendens under New Mexico law.

Despite the parties' assumption that the phrase "good faith purchaser without knowledge of the commencement of the case" is defined by reference to state law, the Court notes that not all bankruptcy courts have been as convinced. In fact, the few cases to have addressed this issue have divided. *In re Housey*, 409 B.R. 611, 619 (Bankr. D. Mass. 2009) (the Code does not define the term 'good faith purchaser' and "courts have essentially taken two different approaches in determining its meaning"). The courts in *In re Auxano, Inc.*, 96 B.R. 957 (Bankr. W.D. Mo. 1989), *In re Ellis*, 441 B.R. 656 (Bankr. D. Idaho 2010) and *In re Tri-Valley Distributing, Inc.*, No. 01-36562, 2011 WL 2442046 (Bankr. D. Utah June 16, 2011) forged and applied their own definitions under the Bankruptcy Code itself – *i.e.*, a federal test. The court in *In re D'Alfonso*, 211 B.R. 508 (Bankr. E.D. Pa. 1997) defined the phrase by looking to Pennsylvania law respecting bona fide purchasers.

After carefully considering these cases, the language of the Code and the policy behind § 549(c), the Court concludes that a federal definition should be applied. The Court finds it significant that § 549(c) uses, in the same sentence, two different phrases, both apparently referring to someone who has purchased real property in good faith: the first being a "good faith purchaser without knowledge of the commencement of the case" and the second being a "bona fide purchaser." Had Congress wanted the two terms to carry the same definition, it presumably would have used the same phrase for both. *Russello v. U.S.*, 464 U.S. 16, 23 (1983) ("we refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to

ascribe this difference to a simple mistake in draftsmanship"); *Mississippi Poultry Ass'n v. Madigan*, 992 F.2d 1359, 1363 (5th Cir. 1993), *adhered to on rehr'g,* 31 F.3d 293 (1994) ("the use of different words or terms within a statute indicates that Congress intended to establish a different meaning for those words"). Moreover, when using the phrase "bona fide purchaser" Congress then specifically qualified that phrase with the further phrase "against whom *applicable law permits such transfer to be perfected"* – a clear reference to state law. Congress did not so qualify the phrase "good faith purchaser," thereby suggesting that one does not look to state law to determine whether a transferee is a "good faith purchaser without knowledge of the commencement of the case." In addition, the reference to a "bona fide purchaser" perfecting its interest by recording under state law simply indicates that a court may determine whether the trustee may avoid a transfer to a "good faith purchaser without knowledge of the commencement of the case" by comparing the *timing* of perfection (by a bona fide purchaser recording under state law) against the *timing* of a trustee's filing of a copy of either a copy or notice of the bankruptcy petition in those same state real property records. It does not indicate that the Court must look to state law to determine whether a transferee is a "good faith purchaser without knowledge of the commencement of the case." Finally, § 549 embodies and implements a fundamental bankruptcy policy – that of equality of distribution to creditors – and thus a federal definition of its terms is more appropriate, especially where Congress has not instructed the use of "applicable law" or "applicable non-bankruptcy law," as it has in so many other provisions in the Bankruptcy Code (and, as noted above, in § 549(c) itself in one instance). *See, e.g.,* 11 U.S.C. §§ 108(a), 341(c), 342(b)(2)(B), 363(b)(1)(B)(ii), 505(a)(2)(C), 510(a), 541(c), 543(c)(3), 544(b), 1124(2), 1125(e). Therefore, the Court concludes that the phrase "good faith purchaser without knowledge of the commencement of the case" is properly defined without

reference to the underlying state law involving the "bona fide purchaser" doctrine.

The Court acknowledges that a problem with either a federal law test or a state law test is its proper application. The first question that arises is whether the phrase "good faith purchaser without knowledge of the commencement of the case" constitutes two elements or just one. One could argue, based upon the absence of a comma or the word "and" between the phrase "good faith purchaser" and the phrase "without knowledge of the commencement of the case," that the second phrase is a mere descriptor of the first, such that it simply illustrates a transferee that could not be in good faith. At least one court, however, has specifically noted that "good faith purchaser status is an element apart from the purchaser's knowledge of the commencement of a relevant bankruptcy case." *In re D'Alfonso*, 211 B.R. 508, 515 (Bankr. E.D. Pa. 1997). In practice, however, even while analyzing "good faith" and "knowledge of the commencement of the case" separately, courts frequently collapse the two and end up looking at whether a transferee has sufficient facts to induce a reasonable person to investigate whether the debtor was in bankruptcy as the indicator of good faith. *See, e.g., In re Auxano, Inc.*, 96 B.R. 957, 962 (Bankr. W.D. Mo. 1989) (looking to inquiry notice of the commencement of the case to determine good faith and further noting that "the Court cannot envisage a situation in which a transferee could meet Section 549(c)'s good faith test without also satisfying its knowledge requirement"); *In re Housey*, 409 B.R. 611 (Bankr. D. Mass. 2009) (analyzing the "good faith" prong by looking at whether transferee had inquiry notice of bankruptcy status, and analyzing the "knowledge" component by assessing the transferee's inquiry notice of bankruptcy status); *In re Ellis*, 441 B.R. 656 (Bankr. D. Idaho 2010) (defining "good faith" as a statement of mind consisting of honesty in belief or purpose or absence of intent to defraud and then assessing that state of mind by considering "the extent of a transferee's knowledge" of the

commencement of the case).

The Court is inclined to believe, as a matter of grammar and punctuation, that the phrase "without knowledge of the commencement of the case" is a descriptor of the phrase "good faith," such that if a transferee possesses knowledge of the commencement of the case but accepts a transfer that has not been authorized by the Code or the Court, it does so at its peril as it has not acted in "good faith." For the reasons set forth in detail below, the Court believes that singular standard for good faith is satisfied here, except as noted below with respect to Pugh. But even if the Court analyzes the two phrases as two separate elements, the Court also finds each satisfied here. Turning to "good faith" first, as noted by the court in *In re Auxano*:

> As to what constitutes good faith, this Court has previously opined that its presence turns on 'whether the transaction carries the earmarks of an arms-length bargain' under the circumstances. Alternatively stated, good faith does not exist when a transferee possesses enough facts that would induce a reasonable person to investigate whether the debtor was in bankruptcy or that such occurrence was imminent. In the context of Section 549, such an investigation would reveal to the transferee that the transferred property belonged to the debtor's estate.

*Auxano*, 96 B.R. at 960 (internal citations omitted).

Here, each ORRI Assignment (except with respect to Pugh) carries the earmarks of an arm's length transaction.[44] The Defendants were not insiders of either Vallecito or B-C. They each paid significant consideration for their interest. They got their ORRI Assignments from B-C, not

---

[44] In the related context of sales of property under 11 U.S.C. § 363, the Bankruptcy Code provides that the reversal or modification on appeal of an order authorizing such a sale does not affect the validity of the sale "to an entity that purchased . . . such property in good faith . . ." 11 U.S.C. § 363(m). The language of § 363(m), referring to an entity that "purchased . . . in good faith" is, of course, very similar to the language of § 549(c), which refers to a "good faith purchaser." In the § 363(m) context, the Fifth Circuit has stated that an appropriate characterization of good faith in a sale is a "lack of fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Beach Development LP*, No. 07-21350, 2008 WL 2325647 (5th Cir. June 6, 2008) (quoting *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388, n. 7 (5th Cir. 1981)).

**Memorandum Opinion** 67

Vallecito. Nothing suggests fraud or collusion. Although they knew that Vallecito was B-C's grantor (since they were given a copy of the B-C Assignment prior to their purchases), they had no reason to suspect that Vallecito might still have any interest in the Hogback Lease, since Vallecito had assigned its interest to B-C. And, for the reasons set forth below, none of them (except Pugh) had reason to know that a bankruptcy case had been filed by Vallecito. For all of these reasons, the Court concludes that the Defendants, except for Pugh, acted in "good faith."[45]

The Trustee has stipulated that "[o]ther than Joel Pugh, the ORRI Purchasers did not receive actual notice of the Vallecito Bankruptcy."[46] Joint Pretrial Order, ¶ 34. Thus, the only question is whether constructive knowledge of the commencement of the case will suffice and, if so, whether the Defendants had it.

The phrase "knowledge of the commencement of the case" is not defined by the Bankruptcy Code nor its legislative history. *In re Bean*, 251 B.R. 196 (E.D.N.Y. 2000), *aff'd* 252 F.3d 113 (2nd Cir. 2001). In addition, the decisional authority is "sparse." *Id.* Nevertheless, the courts that have addressed the issue have determined that the term "knowledge" includes both actual knowledge, which the Trustee has stipulated the Defendants lacked, and constructive knowledge. *In re Bean*, 252 F.3d 113 (2nd Cir. 2001); *In re Tri-Valley Distributing, Inc.*, no. 01-36562, 2011 WL 2442046 (Bankr. D. Utah June 16, 2011); *In re Ellis*, 441 B.R. 656 (Bankr. D. Idaho 2010).

---

[45] The Court recognizes that it is the Defendants' evidentiary burden to show "good faith." While the evidence on behalf of the Defendants is hardly overwhelming, the Court concludes that the Defendants have satisfied their burden by a preponderance of the evidence, since there is *no* evidence that they did not act in good faith or that the ORRI Assignments were anything other than arm's-length transactions.

[46] The parties have also stipulated that with respect to the "other than Joel Pugh" language in ¶ 34, such language is not an admission that Joel Pugh received actual notice of the Vallecito bankruptcy case. Rather, the existence of his knowledge was a disputed fact and remained so until he admitted his knowledge on the witness stand. It remains undisputed, however, that none of the other Defendants had knowledge of the Vallecito bankruptcy case until approximately November, 2009, well after all of the ORRI Assignments were recorded.

**Memorandum Opinion**                                                                                                  **68**

To prove that it lacked constructive knowledge of the commencement of the case, a transferee must show "an absence of facts that would cause a reasonable person to investigate whether the transfer would be avoidable," *In re Ellis*, 441 B.R. at 664 (internal citations omitted) or an absence of facts "sufficient to cause a prudent person to inquire whether the seller has filed a bankruptcy case." *In re Housey*, 409 B.R. 611, 623 (Bankr. D. Mass. 2009).

Of course, § 549(c) explicitly provides for one method of constructive notice – *i.e*, the recording of a copy of a bankruptcy petition (or notice of same) in the real property records in the counties in which a debtor owns real property.[47] That was not done here, but the question remains whether § 549(c) provides the *exclusive* method of providing constructive notice and, if not, whether the Defendants had other constructive notice of the commencement of Vallecito's bankruptcy case.

The Court concludes, as a matter of statutory construction, that the filing of a copy or notice of the bankruptcy petition in the county where the debtor's real property is located is not the exclusive method of providing constructive notice of a bankruptcy filing. *See, e.g. In re Bean*, 252 F.3d 113 (2nd Cir. 2001) (real estate purchasers had constructive knowledge of their seller's bankruptcy in a title report). Instead, the Court believes that there may be, in theory, other methods by which transferees receive constructive knowledge of the commencement of a bankruptcy case.

On this point, the Court notes that the Trustee has not specifically argued, in the context of § 549(c), that the Defendants received constructive knowledge of the commencement of Vallecito's bankruptcy case by virtue of the filing of the Burle Lis Pendens. Instead, the Trustee argues that the

---

[47] Since a copy of the petition was not recorded in San Juan County, the Court expresses no view as to whether that recording, which would have provided the Defendants with constructive notice of Vallecito's bankruptcy case, would have been sufficient to strip the Defendants of a § 549(c) defense since their transferor was B-C, not Vallecito.

Defendants are *bound by the Plan* by virtue of the filing of the Burle Lis Pendens - a substantially different context. He makes this argument presumably because he seeks to avoid the ORRI Assignments on the ground that the Defendants' grantor, B-C, had nothing to give to them, because B-C disclaimed its interest in the Hogback Lease in the Plan, and so the Trustee wants to bind the Defendants to the Plan, even though it is undisputed that they were not creditors in the Vallecito bankruptcy case.[48] Joint Pretrial Order, ¶ 38.

The Trustee's argument is as follows: the Trustee first cites the Court to the lis pendens statutes in New Mexico. Those statutes read:

> In all actions in the district courts of this state or in the United States district court for the district of New Mexico affecting the title to real estate in this state, the plaintiff, at the time of filing his petition or complaint, or at any time thereafter before judgment or decree, may record with the county clerk of each county in which the property may be situate a notice of the pendency of the suit containing the names of the parties thereto, the object of the action and the description of the property so affected and concerned, and, if the action is to foreclose a mortgage, the notice shall contain, in addition, the date of the mortgage, the parties thereto and the time and place of recording, and must be recorded five days before judgment, and the pendency of such action shall be only from the time of recording the notice, and shall be constructive notice to a purchaser or encumbrancer of the property concerned; and any person whose conveyance is subsequently recorded shall be considered a subsequent purchaser or encumbrancer and shall be bound by all the proceedings taken after the recording of the notice to the same extent as if he were made a party to the said action.

> The lis pendens notice need not be acknowledged to entitle it to be recorded.

---

[48] The Court notes that the Fifth Circuit, in an unpublished decision, has specifically rejected the notion that the filing of a copy of a debtor's bankruptcy petition and draft plan in the real property records in Oklahoma was sufficient to give constructive notice of the bankruptcy case to existing royalty owners (with royalty interest in a lease located in that same county) such that the royalty owners could be bound to the debtor's plan. *In re Waterford Energy*, 294 Fed. Appx. 900 (5th Cir. 2008). The royalty owners in *Waterford* had not received notice of the bankruptcy filing either by mail or by publication notice under either § 342 of the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure. The Fifth Circuit noted that "notice of a bankruptcy case is governed by federal law, not state law." *Waterford*, 294 Fed. Appx. at 903.

**Memorandum Opinion**                                                                                                    **70**

N.M.Stat. Ann. § 38-1-14 (West 1978). The next section of the statute reads:

> For the purpose of the preceding section, it is considered that an action is pending from the time of filing such notice; provided, that such notice shall be of no value, unless it is followed by the service of such citations or process of citation, or by notice by publication to the defendant, as provided by law, within sixty days after such filing. And the court in which said action was commenced, may in its discretion, at any time after the action shall be settled, discontinue or revoke on application of any person injured, and for good cause shown, and under such notice as may be directed or approved by the court, order the notice authorized by the preceding section to be canceled by the county clerk of any county in whose office the same may have been filed, and such cancellation shall be made by an indorsement to that effect upon the filed notice which shall refer to the order.

N.M. Stat. Ann. § 38-1-15 (West 1978). Accordingly, the Trustee argues that the Burle Lis Pendens that was filed in the real property records in San Juan County prior to any of the ORRI Assignments has the effect making the Defendants "subsequent purchasers" as a matter of law and of binding the Defendants to any and all proceedings taken after the recording of the notice to the same extent as if they were made parties to "said action." The Trustee argues that the Burle Lis Pendens was never released (because Vallecito's purported "Release of Lis Pendens" was legally ineffective) and did not expire, and so therefore the Defendants are bound by the outcome of the Burle Litigation, which, the Trustee argues, was ultimately settled under the Plan – and therefore the Defendants are bound by the Plan.

The Defendants assert various grounds upon which they contend the Burle Lis Pendens lost its vitality. Specifically, they point out that while the Burle Plaintiffs may have originally asserted a claim to title to the Hogback Lease in the Burle Complaint, the Burle Plaintiffs, Briggs and Vallecito entered into the Burle Settlement Agreement in November, 2006, and under the terms Burle Settlement Agreement, the Burle Plaintiffs were no longer able to assert any claim of title to the

Hogback Lease (the Trustee disputes the Burle Plaintiffs' interpretation of the Burle Settlement Agreement). The Defendants further assert that while a dispute erupted under the Burle Settlement Agreement, the judge presiding over the Burle Litigation entered an order on September 28, 2007 finding that the Burle Settlement Agreement was legally valid and should be reduced to judgment, and entered such a judgment that same date. The Defendants then assert that the judgment was not appealed, and the Burle Plaintiffs' later motion for reconsideration was stricken, such that the judgment was final. The Defendants therefore assert that the terms of the Burle Settlement Agreement made clear that the Burle Plaintiffs no longer asserted any claim to *title* to the Hogback Lease, but rather only asserted a claim to *money* under the Burle Settlement Agreement, and thus the Burle Lis Pendens ceased to be effective under New Mexico case law.

The Trustee responds that the Burle Lis Pendens remained valid despite the entry of judgment and the lack of any appeal, because the Burle Plaintiffs filed their Motion for Reconsideration, which tolled the deadline for appeal. The Defendants point out that the Motion for Reconsideration was thereafter "stricken" and therefore it ceased to have, if it ever had, any effect of tolling the appellate deadlines.

The Court need not address the merits of any of these arguments, because the Court concludes that even if the Burle Lis Pendens was, at all material times, valid and effective under New Mexico law, it afforded the Defendants no constructive knowledge *of the commencement of the* [Vallecito bankruptcy] *case* under § 549(c).[49] Section 549's concern with a transferee's level of

---

[49] The Court notes that in the odd factual circumstances present in this adversary proceeding, even if the Defendants had actual or constructive knowledge of the commencement of the Vallecito bankruptcy case, they would not necessarily have notice that they were (1) dealing with a bankruptcy debtor, or (2) dealing with property of the estate since their grantor was B-C, not Vallecito. Although it is true that the Defendants knew, at the time they got their ORRI Assignments, that Vallecito was in the chain of title, there is nothing to suggest that they had notice, at

"knowledge" is, pursuant to the plain and unambiguous language of § 549, directed solely to knowledge "of the commencement of the case."  Section 549(c) is designed to protect good faith purchasers who are unwittingly dealing with a debtor or with property of the estate, so long as they pay present fair equivalent value.  The Court concludes that the Burle Lis Pendens did not, even if effective, provide *any* constructive knowledge to the Defendants that they were dealing with a bankruptcy debtor or with property of a bankruptcy estate.  The Burle Lis Pendens was filed over a year before Vallecito filed its bankruptcy case.  The judgment in the Burle Litigation was also entered nearly a year before the Vallecito bankruptcy filing.  There is nothing in the pleadings in the Burle Litigation that gives any hint of a bankruptcy filing or even that Vallecito was contemplating such a filing.  The only pleading in the Burle Litigation that post-dates Vallecito's bankruptcy filing is the order striking the Burle Plaintiff's Motion for Reconsideration, and it makes no reference to a bankruptcy filing. Ex. 98, 99.

The Trustee argues that nevertheless, the Defendants are bound by the Plan, because the ultimate settlement of the Burle Litigation was approved in the Plan, citing to *Bragg v. Burlington Resources Oil and Gas Co.*, 763 N.W.2d 481 (N.D. 2009).  The Court rejects this argument.  First, it flies in the face of the plain language of the New Mexico lis pendens statute, which provides that once a lis pendens is filed in an action affecting the title to real estate, any person whose conveyance is subsequently recorded shall be bound by all the proceedings to the same extent "as if he were made

---

the time they took their assignments, that Vallecito retained a contingent, reversionary interest in the Hogback Lease. Although they knew that the assignment from Tiffany to Vallecito required BIA approval, and thus could perhaps have assumed that an assignment from Vallecito to B-C would also need such approval, they had no reason to suspect that Vallecito would not assist B-C in seeking that approval.  The B-C Assignment required Vallecito to do so, and the Defendants had notice that Vallecito and B-C were affiliates.  The documents they were provided at the time of their assignments show that the two entities share the same address, and that Briggs signed the documents on behalf of both entities.

**Memorandum Opinion**                                                                                          73

a party to the *said action*." N.M.Stat. Ann. § 38-1-14 (West 1978) (emphasis added).  Clearly, the unambiguous language of the statute only purports to bind subsequent purchasers to proceedings taken in the action in which the lis pendens is filed – not to every other action that may involve claims to the same real property.  Second, the only case cited by the Trustee in support of the novel proposition that a lis pendens binds people to the results of other litigation in which the lis pendens has not been filed is distinguishable.  In *Bragg,* the plaintiffs sued Continental Resources ("Continental") regarding conflicting claims to an oil and gas lease known as the "White Lease" (the "Bragg Litigation").  Continental recorded in November 2000 a lis pendens in the real property records in the county in which the White Lease was situated that referred to the Bragg Litigation.  Meanwhile, as part of a lawsuit between Continental and Burlington Resources Oil and Gas Co. ("Burlington"), Continental assigned to Burlington, in January 2001, several leases including the White Lease.  In 2003, the judge in the Bragg Litigation granted partial summary judgment to the plaintiffs, finding their title to the White Lease to be superior to Continental's title to the White Lease.  The parties to the Bragg Litigation ultimately entered into a settlement agreement, pursuant to which Continental, among other things, executed a quitclaim deed to the White Lease to the plaintiffs of whatever right, title and interest, if any, that Continental then owned.  The plaintiffs recorded that deed in 2004.  The parties to the Bragg Litigation thereafter signed a stipulation of dismissal with prejudice of the Bragg Litigation that stated that all claims had been settled.  In 2004, the judge in the Bragg Litigation considered the stipulation and ordered dismissal of the action, but the parties' settlement agreement was not incorporated into the judgment that dismissed the Bragg Litigation.  Thereafter, the plaintiffs sued Burlington in a quiet title action.  The trial court granted summary judgment to the plaintiffs, holding that the settlement agreement between the plaintiffs and

Continental was a part of "all proceedings" under North Dakota's lis pendens statute (which is substantially similar to New Mexico's statute) even if the settlement agreement had not been incorporated into the judgment. Because the lis pendens against the White Lease had been recorded in the Bragg Litigation before Continental assigned the White Lease to Burlington, Burlington was on notice, prior to its taking an assignment of the White Lease, of the Bragg Litigation and was bound by the settlement agreement between the plaintiffs and Continental. Burlington appealed, arguing that the settlement agreement was not a "proceeding" under the lis pendens statute, because neither the settlement nor the quit claim deed were incorporated into the judgment in the Bragg Litigation. The Supreme Court of North Dakota disagreed, holding that

> the plain and ordinary meaning of 'all proceedings' taken after the filing of a notice of lis pendens includes the courts of procedure or sequence of steps in a legal action and does not preclude settlements . . . Here, although the judgment in the prior action by [the plaintiffs] against Continental dismissed the complaint and counterclaims with prejudice without specifically incorporating the settlement, the plain language of N.D.C.C. § 28-05-07 applies to 'all proceedings' to the same extent as if Burlington was a party to that action and does not require a settlement to be incorporated into the judgment. Moreover, Burlington was placed on notice of all facts apparent on the face of the pleadings in the prior action to the same extent as Continental, and the stipulation for dismissal of that action, which was filed with the judgment, provided notice that the action had been 'fully compromised and settled' . . . We conclude that Burlington is bound by the settlement in the prior action, which is referenced in the stipulation for dismissal of that action, and Burlington took its interest in the White Lease subject to the outcome of that litigation, including the settlement.

*Bragg*, 763 N.W.2d at 486, 488-89.

As should be obvious from the foregoing factual recital, *Bragg* does *not* stand for the proposition that a non-party may be bound to the results of *other* litigation, even if that other litigation is what ultimately settles, for once and for all, disputes in prior litigation in which a lis pendens has been filed. *Bragg* stands for the unremarkable proposition that non-parties may be

bound by the results in litigation in which a lis pendens is filed; even if the ultimate settlement post-dates a partial summary judgment in that same action, it is still a part of "all the proceedings" in the action in which the lis pendens is filed. However, nothing in *Bragg* suggests that the phrase "all the proceedings" of "said action" as used in New Mexico's lis pendens statute includes proceedings in other actions as well.

For these reasons, the Court concludes that the Burle Lis Pendens did not afford the Defendants constructive notice of the commencement of the Vallecito bankruptcy case. Thus, the Defendants have met their burden to show that they are good faith purchasers without knowledge of the commencement of the case pursuant to § 549(c).

However, as previously found, the Defendants who received ORRI Assignment Nos. 28-66 (as so identified on Ex. A to the Joint Pretrial Order) have failed to show that they paid present fair equivalent value for the transfers; thus, the Trustee may avoid their ORRI Assignments. But, because these Defendants, with the exception of Pugh, are "good faith purchasers without knowledge of the commencement of the case, they are entitled to "a lien on the property transferred to the extent of any present value given," since a copy or notice of the petition was not filed before the Defendants recorded their interests. 11 U.S.C. § 549(c). With respect to Pugh, he conceded at trial that he had actual knowledge of the commencement of the Vallecito case in January of 2008, prior to the effective date of his ORRI Assignment (November 2008). Thus, Pugh does not qualify at all for the § 549(c) defense – *i.e.*, he is not a good faith purchasers without knowledge of the commencement of the case and there is no evidence proving that he paid present fair equivalent value for his ORRI.

### D. Section 550 Liability

Section 550 of the Bankruptcy Code provides, in relevant part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from–
>    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>    (2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from--
>    (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
>    (2) any immediate or mediate good faith transferee of such transferee.

The Defendants assert, without citation to a single case, that they are "immediate or mediate transferees of Briggs-Cockerham, the initial transferee of Vallecito. Further, as briefed herein, the Defendants are bona fide purchasers for value without notice and, accordingly, are entitled to the protections of § 550(b). Thus, should the Trustee be successful in avoiding the assignments to the Defendants . . . he may not recover such transfers from Defendants." *Defs. Pretrial Br.*, p. 17. In other words, the Defendants assert that they are subsequent transferees and thus may avail themselves of § 550(b)(1).

An "initial transferee" does not get the benefit of § 550(b)(1). *In re Criswell*, 102 F.3d 1411 (5th Cir. 1997). In determining whether an entity is an initial transferee or a subsequent transferee, the Fifth Circuit has adopted the "dominion and control" test. *In re Goushey*, No. 07-42541, 2011 WL 2470029 (Bankr. E.D. Tex. June 17, 2011) (citing *Security First Nat'l Bank v. Brunson (In re Coutee)*, 984 F.2d 138, 140 (5th Cir. 1993)). The entity must have legal dominion and control, rather than mere possession. *Id*. When an entity acts merely as a conduit and exercises no dominion or control over the property while that property is in its hands, it is not a transferee. *In re The Heritage*

*Organization*, 413 B.R. 438 (Bankr. N.D. Tex. 2009).

Here, the Trustee complains of the ORRI Assignments. Those are the transfers with which the Bankruptcy Code is concerned because they effected a transfer of an interest in the Hogback Lease which remained property of the estate. *Criswell*, 102 F.3d at 1419 ("the only transfer with which the Bankruptcy Code is concerned for purposes of . . . § 550 is the actual transfer that the trustee sought to avoid"). As to the ORRI Assignments, B-C was the Defendants' transferor. B-C clearly exercised dominion and control over the Hogback Lease following the B-C Assignment and made the transfers at issue here. Accordingly, the Defendants are the initial transferees under the ORRI Assignments and may not assert a § 550(b)(1) defense.

The Court notes that the Trustee has consistently characterized his action as one to "quiet title," and he has not expressly sought recovery of the avoided transfers under § 550. Rather, the Trustee has sought an order (1) declaring that each of the Defendants' "purported interest in the Hogback Lease is void and/or voidable," (2) declaring that each Defendant "has no right, title or interest in the Hogback Lease," (3) directing each Defendant to execute any documents necessary to remove their purported interest in the Hogback Lease, and (4) enjoining the Defendants from asserting any right, title or interest in the Hogback Lease. And, while the Trustee has *not* specifically pled a right to recovery under § 550, that is the only remedy available to the Trustee under the Bankruptcy Code if a transfer is avoided under § 549 and such relief is implicit in the relief actually sought by the Trustee. Obviously, the Defendants understood this – that is why they asserted their § 550 defense, which the Court has rejected.

Thus, the Trustee may recover the Defendants' interests in the Hogback Lease from the Defendants holding the ORRIs identified in the Joint Pretrial Order as ORRI Assignment Nos. 28-66

subject to the Defendants' lien rights under § 549(c), except with respect to Pugh. The Trustee may recover Pugh's interest in the Hogback Lease in its entirety and Pugh is not entitled to a lien for the value he paid pursuant to § 549(c) because he is not a "good faith purchaser without knowledge of the commencement of the case" under that section.

## III. CONCLUSION

With respect to the issues of whether the Hogback Lease is property of the estate and whether the ORRI Assignments are void for lack of Navajo Nation consent, the Court's conclusion may be summarized as follows: (1) the Court adheres to its earlier ruling that despite the validity of the B-C Assignment as between Vallecito and B-C, Vallecito retained a sufficient interest in the Hogback Lease such that the Hogback Lease was property of Vallecito's bankruptcy estate on the Petition Date; (2) the Court adheres to its earlier ruling that the Trustee cannot raise the lack of Navajo Nation/BIA approval as a basis to invalidate the B-C Assignment; and (3) the Court further concludes that its prior ruling is equally applicable to the Trustee's attempt to invalidate the ORRI Assignments for lack of Navajo Nation consent. These rulings dispose of the Trustee's fourth cause of action against Kievit in its entirety, and portions of the Trustee's first, second and third causes of action against the remaining Defendants. Kievit is entitled to the entry of a judgment that the Trustee take nothing on his claims.

Alternatively, the Court concludes that if the Court has erred and the Trustee is able to invoke a lack of Navajo Nation consent to the ORRI Assignments as a basis to void those assignments, (1) at the present time, the interests purportedly conveyed by the ORRI Assignments were not created; (2) B-C is precluded from seeking Navajo Nation consent to the ORRI Assignments by confirmation of the Plan; (3) any obligation the Trustee had as successor to Vallecito to seek approval of the B-C

Assignment has been released under the confirmed Plan; (4) B-C's interest in the Hogback Lease is not a "lien" or "encumbrance" such that paragraph 17 of the Confirmation Order excuses the need for a re-conveyance of the Hogback Lease back to the Vallecito estate; and (5) even if the Confirmation Order constituted a re-conveyance of the Hogback Lease back to the Vallecito estate from B-C, the estate received the Hogback Lease subject to B-C's agreement to deliver to the Defendants such additional documents as may be required to obtain Navajo Nation consent to the ORRI Assignments; so, while B-C cannot seek Navajo Nation approval of the ORRI Assignments, the Trustee took the Hogback Lease subject to the ORRI Assignments and the obligations created under the ORRI Assignments. These conclusions dispose of the Trustee's first, second and third causes of action to the extent that the Trustee seeks to invalidate the ORRI Assignments for lack of Navajo Nation consent. In sum, the Trustee is not entitled to a declaration that the ORRI Assignments are void or voidable for lack of Navajo Nation consent.

ORRI Assignment Nos. 2-10 were transferred pre-petition.[50] Therefore, 11 U.S.C. § 362 does not apply to those transfers. Moreover, the Trustee may not rely upon 11 U.S.C. § 362 to avoid ORRI Assignment Nos. 11-66 because it is not an avoidance provision of the Bankruptcy Code. These conclusions dispose of the Trustee's first, second, and third causes of action to the extent that the Trustee seeks to invalidate the ORRI Assignments on the ground that they violated the automatic stay. Therefore, the Trustee is not entitled to a declaration that those ORRI Assignments are avoidable on this ground.

With respect to the Trustee's claims under 11 U.S.C. § 549, that section does not apply to

---

[50] ORRI Assignment No. 1 was to Kievit; the Trustee did not assert claims under §§ 362 and 549 against Kievit, because that ORRI Assignment was both granted and recorded pre-petition.

ORRI Assignment Nos. 1-10, which all occurred pre-petition. However, the Trustee has established

a prima facie case for avoidance as to the ORRI Assignments identified in the Joint Pretrial Order as

ORRI Assignment Nos. 11-66, in that each transfer was a transfer of property of the estate that was

not authorized by the Bankruptcy Code or by the Court. With respect to the Defendants' defenses,

the Court concludes that the Trustee is not entitled to a declaration that the ORRI Assignments that

are identified on Ex. A to the Joint Pretrial Order as ORRI Assignment Nos. 11-27 are avoidable

under § 549 because the statute of limitations of § 549(d) had expired prior to the filing of this

adversary proceeding. Although the doctrine of equitable tolling may apply to a cause of action under

§ 549, its application is not warranted here. Therefore, the Trustee's second cause of action against

the March 20 Claimants is time-barred to the extent the Trustee seeks a declaration that ORRI

Assignment Nos. 11-27 are avoidable under § 549.

As to ORRI Assignment Nos. 28-66, none of these Defendants have established that they paid

present fair equivalent value for the transfers. These Defendants (other than Pugh) have, however,

established that they are "good faith purchasers without knowledge of the commencement of the

case" under § 549(c). Pugh has not established that he is a "good faith purchaser without knowledge

of the commencement of the case." Accordingly, the Trustee is entitled to a declaration that the

ORRI Assignments identified in the Joint Pretrial Order as ORRI Assignment Nos. 28-66 are

avoidable, but each of the holders of those assignments, except for Pugh, is entitled to a lien to the

extent of the value they gave to B-C, which value has been stipulated to in the Joint Pretrial Order.

*See* Joint Pretrial Order, Ex. A. Therefore, the Trustee is not entitled to a declaration that these

Defendants have no right, title or interest in the Hogback Lease, except as to Pugh. However, the

Trustee is entitled to recover, pursuant to § 550, these Defendants' interests in the Hogback Lease,

subject to their lien rights described above.  The Trustee may recover Pugh's entire interest because he is not a good faith purchaser without knowledge of the commencement of the case and he did not prove that he gave present fair equivalent value for the transfer.

A judgment consistent with this Memorandum Opinion will be entered separately.

### End of Memorandum Opinion ###